UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff/Petitioner,*<br><br>v.<br><br>DANIEL J. MACKLE, SR. and SILVER EDGE FINANCIAL, LLC,<br><br>*Defendants/Respondents* | Docket No.: 7:24-mc-489 (PMH)<br><br>Affidavit of Daniel J. Mackle In Opposition to Application of Securities and Exchange Commission |

I, Daniel J. Mackle, being duly sworn deposes and says:

1. I am one of the respondents in this proceeding brought by an Application of the Securities and Exchange Commission ("SEC") for an Order of this Court pursuant to Section 21(e) of the Securities Exchange Act of 1934 and Section 209(d) of the Investment Advisers Act of 1940, enforcing compliance with an order of the SEC, dated March 3, 2023 (the "SEC's Application").

2. The SEC Order Instituting Administrative and Cease-and-Desist Proceedings, pursuant to Sections 15(b) and 21C of the Exchange Act of 1934 and Section 203(f) of the Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order (the "Administrative Order") is attached to the SEC's Application. The Administrative Order was entered by the SEC on consent, without admitting or denying the allegations by the SEC, based on an Offer of Settlement submitted by me and Silver Edge Financial, LLC ("Silver Edge"), of which I am the sole manager. A copy of the Offer of Settlement is annexed hereto as Ex. 1.

3. The essential allegations set forth in the Administrative Order are as follows:

> This proceeding arises out of Respondent's sale of membership interests in two pooled investment vehicles – the Silver Edge Pre-IPO Fund LLC and the Silver Edge Venture Fund LLC (the "Silver Edge Funds") – that were formed to invest

> in pre-IPO securities. Since January 2019, Silver Edge and its CEO, Daniel Mackle, procured interests in the Silver Edge Funds. Silver Edge is the Manager of the Silver Edge Funds and Mackle was the sole member of Silver Edge.

4. The SEC concluded that, as a result of this activity, Silver Edge and I were deemed to be acting as unregistered brokers. Therefore the SEC concluded that Silver Edge and I violated Section 15(a) of the Exchange Act. Significantly, there was no allegation or finding of fraud on the part of myself or Silver Edge.

5. As is common in SEC enforcement matters, Silver Edge and I consented to the Administrative Order concurrently with initiation of the administrative proceeding, following a long investigation conducted by the SEC that had exhausted my funds, eliminating the resources available to me to continue to defend against the SEC's administrative proceeding and keep Silver Edge in business.

6. The Administrative Order subjected me and Silver Edge to certain financial penalties. First, both Silver Edge and I, jointly and severally, were directed to disgorge $2,251,131.92, plus prejudgment interest of $268,928.33, to the SEC for transfer to the general fund of the United States Treasury. Thus, neither Silver Edge nor I were directed to disgorge any monies to any investors in the Silver Edge Funds managed by Silver Edge. Rather, all disgorgement payments were to be designated for remittance to the U.S. Treasury.

7. In addition, the amount of disgorgement demanded by the SEC from me was based upon the amount of "management fees" that Silver Edge received from investors. However, such amount was significantly greater than the "net profits" of Silver Edge. The SEC's determination of the disgorgement amount failed to take into account any offset, credit or reduction for expenses incurred by Silver Edge, including rent, salaries and similar operating expenses, and legal and professional fees.

8. The Administrative Order states: "Mackle took a 4% management fee as his compensation for managing Silver Edge." I did not contest that allegation in the Administrative Order because my consent was made without admitting or denying the SEC's allegations. However, the management fees received by Silve Edge was not paid to me directly. Any management fees were used along with administrative and other fees to pay Silver Edge's expenses. While I did receive profits from Silver Edge, the amount I received was substantially less than the approximately $2.25 million in disgorgement the SEC seeks from me based on the management fees received by Silver Edge.

9. In addition, the Administrative Order required me and Silver Edge to pay to the SEC civil penalties of $975,000.

10. I acknowledge that I have not paid the SEC the disgorgement of $2,251,131.92 plus prejudgment interest of $268,928.33 and civil penalties of $975,000. The reason is that I have no money with which any such payments could be made. All of my assets were invested in Silver Edge and tied up in its activities and operations. Silver Edge is now out of business and I no longer have any access to any of its funds or assets, nor do I have access to any sources of financing.

11. I understand that the SEC has a standard form of detailed affidavit which the Commission requests from any person who may be unable to pay disgorgement, interest and/or penalties. Indeed, after receiving the SEC's Application, I understand that my counsel asked the SEC for such form of affidavit so that I could furnish details of my personal finances to the SEC. However, I also understand that the SEC declined to provide me with the affidavit until after this Court rules on its Application. When given the opportunity to complete the SEC's detailed affidavit, I will do so and sign it under oath.

12. As I will detail in the SEC's affidavit, I have no significant assets which can be used to pay the disgorgement, interest or civil penalties sought by the SEC. The house that I have lived in with my wife for approximately 27 years was purchased long before Silver Edge ever existed, and is owned by my wife. Our household possessions consist primarily of basic furniture and personal items of little monetary value. The vehicle I drive, a 2019 Ram 1500, also is owned by my wife. In the aftermath of Silver Edge's demise, I rely on my wife, who has her own independent income, to pay our living expenses.

13. I do not maintain any bank accounts, nor do I own any brokerage or other securities accounts, or other investments that can be liquidated, except for a self-directed IRA that has a current value of approximately $50,000.

14. I currently have no independent source of income. In addition, I am subject to prior tax obligations in the amount of approximately $665,997.

15. As a result of my lack of assets and outstanding tax liabilities, I have been rendered financially insolvent and in poor financial circumstances.

16. As to Silver Edge, the SEC Order required Respondents to retain the services of an Independent Distribution Consultant ("IDC"). Respondents did so in a timely fashion. As required by the SEC, the IDC is working to develop a written plan for distribution to investors in the two Silver Edge Funds ("Distribution Plan").

17. The Distribution Plan is required to provide for the ultimate liquidation of the Silver Edge Fund investors' interests in the underlying Pre-IPO Shares, whether through IPOs, other liquidity events or sales of such Pre-IPO Shares. The resulting proceeds will be distributed to the investors in accordance with a methodology acceptable to the staff of the SEC. Specifically, Paragraphs 14(c)(i) and (ii) of the Administrative Order state, in relevant part, that:

> i. The Distribution Plan shall provide for the transfer of all assets of the Silver Edge Funds to the IDC or its designee within six months of

> Respondents' engagement of the IDC, including without limitation the transfer of all membership interests, including those held by the Silver Edge Funds' investors, rights to underlying Pre-IPO Shares, and general assets of the Silver Edge Funds to the possession, custody or control of the IDC for distribution…
>
> ii. The Distribution Plan shall provide for investors to receive, from the monies and assets available for distribution, their proportionate share of any gains and losses, as well as the investors' interests in the portfolio of Pre-IPO Shares, whether through distributions after liquidity events or sales of the Pre-IPO Shares and distributions to investors, in accordance with the methodology set forth in the Funds' respective Private Placement Memoranda and Operating Agreement.

18. The only asset with any potential value that Silver Edge may have is a right to receive a "carried interest", or a proportionate amount of certain residual proceeds upon a sale or other liquidity event with respect to the Pre-IPO Shares. I do not currently know whether Silver Edge's contractual entitlement to carried interest will yield any moneys if a monetization event(s) regarding the Pre-IPO Shares were to be achieved in the future, or the amount thereof. However, the Administrative Order requires Silver Edge to turn over to the IDC any carried interest or other assets it would otherwise receive. Administrative Order at ⁋ 16(b). Thus, Silver Edge has no other assets from which to pay disgorgement, interest and/or a civil penalty, and it has not done so.

19. Notwithstanding the fact that Silver Edge is out of business and pursuant to the express provisions of the Administrative Order, is required to distribute all proceeds resulting from its assets to the IDC, the SEC still insists that this Court enter an Order requiring Silver Edge to disgorge $2,251,131.92, plus prejudgment interest and civil penalties of $975,000.

20. As the manager of Silver Edge, I have consented to the Court entering a Final Judgment against Silver Edge as a result of the SEC's Application, on the condition that any judgment is not joint and several and does not affect my rights to object to the SEC's Application

against me. I understand that the SEC has submitted, or will soon submit, an executed Consent and a Proposed Final Judgment against Silver Edge only.

21. Aside from disgorgement, interest and penalties, the Administrative Order also contains certain non-monetary relief against me that the Commission now seeks to convert to a Court Order. The Administrative Order barred me from any association with a broker or dealer or other securities entities, although I may reapply after five years, and also barred me from participating in any penny stock offering. In addition, as noted above, I was required to undertake the appointment of the IDC, which I have done. I do not object to a Court Order granting the relief described in this paragraph only.

22. However, the Administrative Order also requires me to "cease and desist from committing or causing any violations and any future violations of Section 15(a) of the Exchange Act", *i.e.,* the requirement to register as a broker or dealer (the "Cease and Desist Restriction").

23. I object to this Court issuing an injunction based on the Cease and Desist Restriction. There is no allegation in the SEC's Application that, since the entry of the Administrative Order, I have violated the Cease and Desist Restriction, or engaged, or am about to engage, in any acts, practices or conduct that would require me to register with the SEC under Section 15(a) of the Exchange Act. In fact, the SEC could not so allege because I have not violated the Cease and Desist Restriction, or engaged in any such acts, practices or conduct, nor do I intend to do so. I am no longer in the securities business, and cannot reapply to be in the securities business for at least five (5) years, at which time I will be almost 60 years old. It is highly unlikely that I would so reapply or that the SEC would grant any such application if I were to reapply. Thus, I do not believe that there is a basis for this Court to issue an injunction to prohibit me from violating Section 15(a) of the Exchange Act in the future.

24. Nevertheless, if the Court were to grant the SEC an injunction based on the conduct alleged in the Administrative Order, such Order should not be in the form requested by the SEC. The Cease and Desist Restriction does not specify what conduct would constitute a violation of Section 15(a) of the Exchange Act, and what conduct would not. Any injunction against me, it were to be embodied in an Order of the Court, should specify what I can and cannot do, and not leave me to speculate, at the risk of being in contempt of a Court Order.

25. For the foregoing reasons and as elaborated on in the accompanying Objection, I request that the SEC's Application be denied as to me with respect to the requested injunction, and the disgorgement and civil penalty.

26. I affirm this 13th day of January 2025, under the penalties of perjury under the laws of the United States and the State of New York, which may include a fine or imprisonment, that the factual statements in this Affidavit are true and correct to the best of my knowledge and understanding. I understand that this document may be filed in an action or proceeding in a court of law.

**DANIEL J. MACKLE**

# EXHIBIT 1

# Offer of Settlement

**UNITED STATES OF AMERICA**
**before the**
**SECURITIES AND EXCHANGE COMMISSION**

**ADMINISTRATIVE PROCEEDING**
**File No. ______**

| | |
|---|---|
| **In the Matter of**<br><br>**Daniel J. Mackle, Sr. and,**<br>**Silver Edge Financial, LLC**<br><br>**Respondent.** | **OFFER OF SETTLEMENT**<br>**OF DANIEL J. MACKLE, SR. AND**<br>**SILVER EDGE FINANCIAL, LLC** |

**I.**

Daniel J. Mackle, Sr. ("Mackle") and Silver Edge Financial, LLC ("Silver Edge") (collectively, "Respondents"), pursuant to Rule 240(a) of the Rules of Practice of the Securities and Exchange Commission ("Commission") [17 C.F.R. § 201.240(a)] submit this Offer of Settlement ("Offer") in anticipation of public administrative and cease-and-desist proceedings to be instituted against them by the Commission, pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 ("Exchange Act") and Section 203(f) of the Investment Advisers Act of 1940 (the "Advisers Act").

**II.**

This Offer is submitted solely for the purpose of settling these proceedings, with the express understanding that it will not be used in any way in these or any other proceedings, unless the Offer is accepted by the Commission. If the Offer is not accepted by the Commission, the Offer is withdrawn without prejudice to Respondent and shall not become a part of the record in these or any other proceedings, except that rejection of the Offer does not affect the continued validity of the waivers pursuant to Rule 240(c)(5) of the Commission's Rules of Practice [17 C.F.R. § 201.240(c)(5)] with respect to any discussions concerning the rejection of the Offer.

**III.**

Consistent with the provisions of 17 C.F.R. § 202.5(f), Respondents waive any claim of Double Jeopardy based upon the settlement of this proceeding, including the imposition of any remedy or civil penalty herein.

**IV.**

Respondents hereby waive any rights under the Equal Access to Justice Act, the Small Business Regulatory Enforcement Fairness Act of 1996, or any other provision of law to seek from the United States, or any agency, or any official of the United States acting in his or her official capacity, directly or indirectly, reimbursement of attorney's fees or other fees, expenses, or costs expended by Respondents to defend against this action. For these purposes, Respondents agree that Respondents are not the prevailing parties in this action since the parties have reached a good faith settlement.

**V.**

By submitting this Offer, Respondents hereby waive, subject to the acceptance of the Offer, the rights specified in Rule 240(c)(4) [17 C.F.R. §201.240(c)(4)] of the Commission's Rules of Practice. Specifically, Respondents waive:

(1) All hearings pursuant to the statutory provisions under which the proceeding is to be or has been instituted;
(2) The filing of proposed findings of fact and conclusions of law;
(3) Proceedings before, and an initial decision by, a hearing officer;
(4) All post-hearing procedures; and
(5) Judicial Review by any court.

In addition, by submitting this Offer, Respondents waive the rights specified in Rule 240(c)(5) [17 C.F.R. § 201.240(c)(5)] of the Commission's Rules of Practice. Specifically, Respondents waive:

(1) Any and all provisions of the Commission's Rules of Practice or other requirements of law that may be construed to prevent or disqualify any member of the Commission's staff from participating in the preparation of, or advising the Commission as to, any order, opinion, finding of fact, or conclusion of law that may be entered pursuant to this Offer; and

(2) Any right to claim bias or prejudgment by the Commission based on the consideration of or discussions concerning settlement of all or any part of this proceeding.

Respondents also hereby waive service of the Order.

**VI.**

Respondents undertake to:

A. *Independent Distribution Consultant Requirement*. Respondents shall retain, within 60 days of the date of entry of the Order, the services of an Independent Distribution Consultant ("IDC") not unacceptable to the staff of the Commission.

1. Respondents shall compensate the IDC, and persons engaged to assist the IDC, for services rendered pursuant to the Order at their reasonable and customary rates. The IDC's compensation and expenses shall be wholly borne by Respondents or from carried interest in connection with a liquidity event, as per paragraph C.2., below. Respondents shall establish an escrow account at a U.S. bank, or pay into a U.S. attorney trust account agreed to by the Commission, $25,000 to be held as a retainer for the IDC, which shall be used to pay any outstanding invoices of the IDC. Respondents remain responsible for all remaining compensation and expenses of the IDC following exhaustion of the $25,000 retainer.

2. Respondents shall cooperate fully with the IDC and shall provide the IDC with access to their files, books, records, and personnel as reasonably requested for the review. In the event of Respondents' material noncompliance with the IDC, the IDC shall provide written notification to the staff of the Commission within 15 days of such noncompliance.

3. Respondents shall require that the IDC develop a written plan for the distribution of the members' interests in the Silver Edge Funds (the "Distribution Plan"), including the ultimate liquidation of members' interests in the underlying Pre-IPO Shares, whether through distributions after liquidity events or sales of the Pre-IPO Shares and cash distributions to investors, in accordance with a methodology not unacceptable to the staff of the Commission.

a. The Distribution Plan shall provide for the transfer of all assets of the Silver Edge Funds to the IDC or its designee within six months of Respondents' engagement of the IDC, including without limitation the transfer of all membership interests, including those held by the Silver Edge Funds' investors, rights to underlying Pre-IPO Shares, and general assets of the Silver Edge Funds to the possession, custody or control of the IDC for distribution, provided however that no pre-existing liabilities incurred by Silver Edge, Mackle, or the Silver Edge Funds shall be transferred to the IDC, and Mackle and Silver Edge shall remain responsible for all pre-existing liabilities of the Silver Edge Funds.

b. The Distribution Plan shall provide for investors to receive, from the monies and assets available for distribution, their proportionate share of any gains and losses, as well as the investors' interests in the portfolio of Pre-IPO Shares, whether through distributions after liquidity events or sales of the Pre-IPO

Shares and distributions to investors, in accordance with the methodology set forth in the Funds' respective Private Placement Memoranda and Operating Agreement.

c. The Distribution Plan shall provide for completion of the distribution of all assets and conclusion of the Distribution Plan within ten years of approval of the Distribution Plan by the Commission staff. The Distribution Plan shall provide for the orderly sale and distribution of any remaining interest in Pre-IPO Shares if the Funds' interests in those shares have not experienced a liquidity event at the end of ten years from the staff's approval of the Distribution Plan.

d. Respondents shall require that the IDC, for the period of the engagement and for a period of two years from completion of the engagement, shall not enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of its present or former affiliates, directors, officers, employees, or agents acting in their capacity as such. Respondents shall require that any firm with which the IDC is affiliated in performance of his or her duties under the Order shall not, without prior written consent of the staff of the Commission, enter into any employment, consultant, attorney-client, auditing or other professional relationship with Respondents, or any of their present or former affiliates, directors, officers, employees, or agents acting in their capacity as such for the period of the engagement and for a period of two years after the engagement.

e. Respondents shall not, for the period of engagement and for a period of two years from completion of the engagement, (i) retain the IDC for any other professional services outside of the services described in this Order; (ii) enter into any other professional relationship with the IDC, including any employment, consultant, attorney-client, auditing or other professional relationship; or (iii) enter, without prior written consent of the Commission staff, into any such professional relationship with any of the IDC's present or former affiliates, employers, directors, officers, employees, or agents acting in their capacity as such.

f. Respondents (i) shall not have the authority to terminate the IDC, without the prior written approval of the staff of the Commission; and (ii) shall not be in and shall not have an attorney-client relationship with the IDC and shall not seek to invoke the attorney-client or any other doctrine or privilege to prevent the IDC from transmitting any information, reports, or documents to the Commission.

B. *Proof of IDC Engagement*. Respondents shall provide to the Commission staff, prior to the retention of the IDC, two proposed candidates to serve as IDC and a draft of an engagement letter detailing the IDC's responsibilities, which shall include the responsibilities

and tasks set forth herein. Once the Commission staff has identified one or more candidates not unacceptable to the Staff, Silver Edge shall retain one of the IDCs and, within 15 days of retaining the IDC, provide to the Commission staff an executed copy of the engagement letter demonstrating the IDC's engagement by Silver Edge. Once appointed, the IDC shall establish a trust and/or escrow arrangement not unacceptable to the Commission staff in which to hold the assets of the Silver Edge Funds, including the members' interests in the portfolio of Pre-IPO Shares.

C. *Distribution Plan*. Respondents shall require that the IDC submit a proposed Distribution Plan to Respondents and the staff of the Commission no more than 90 days after the date of entry of the Order. The Distribution Plan may be in any form not unacceptable to the IDC and Commission staff, including a Delaware Statutory Trust Agreement to the extent practicable.

1. The proposed Distribution Plan will include provisions for the ultimate liquidation of the portfolio of pre-IPO shares, whether through distributions after liquidity events or sales of the pre-IPO shares and distributions of the proceeds to investors.

2. The Distribution Plan shall provide that in no event will any portion of the funds or assets revert to or otherwise be distributed to or for the benefit of any Respondent, including any carried interest earned in connection with any liquidity event. In the event that carried interest is earned in connection with any liquidity event, such carried interest shall be distributed to the IDC and may be used to pay any outstanding amounts due and owed to the IDC at the time such carried interest is distributed, or coming due after the time when such carried interest is distributed. To the extent such carried interest is used to pay the IDC for amounts due or owed, it shall serve to offset any amounts owed by the Respondents for the IDC's services. In the event there are additional amounts of carried interest in excess of the reasonable fees or expenses due and owed to the IDC in connection with its services, such amounts shall be distributed to the United States Treasury as additional disgorgement at the conclusion of the IDC services.

D. *Approval of Plan.* The Distribution Plan developed by the IDC shall be binding unless, within 90 days after receipt of the proposed Distribution Plan, the staff of the Commission advises the IDC, in writing, of any determination or calculation from the Distribution Plan that it considers to be inappropriate and states in writing the reasons for considering such determination or calculation inappropriate.

E. *Objection Procedure.* With respect to any determination or calculation with which the staff of the Commission does not agree, the staff will work in good faith with the IDC to reach an agreement within 60 days of the date of the written objection. In the event that the staff of the Commission and the IDC are unable to agree on an alternative determination or calculation, the determinations and calculations of the Commission staff shall be binding.

F. *Execution of Plan*. Respondents shall require that the IDC take all necessary and appropriate steps to administer the final Distribution Plan for distribution of the portfolio of pre-IPO shares, whether through distributions after liquidity events or sales of the pre-IPO shares and distributions to investors, in accordance with the final Distribution Plan. To the extent required by the Distribution Plan, Respondents shall cooperate with the IDC by, among other things, transferring, executing and entering into any agreements transferring membership interests or rights in the underlying pre-IPO shares, as well as any other steps reasonably required by the IDC for fulfillment of the Distribution Plan.

G. *Final Accounting.* Within 150 days after the IDC completes the distribution of amounts payable to the affected investors under the Distribution Plan, the IDC shall return all undisbursed funds to the Commission pursuant to the instructions set forth in this Subsection VI. The IDC shall then submit to the Commission staff a final accounting and certification of the disposition of the Funds' assets, including membership interests and rights to the underlying rights to pre-IPO shares. The final accounting shall be in a format to be provided by the Commission staff. The final accounting and certification shall include: (1) the number and value of any shares distributed following any liquidity events; (2) the amount paid to each affected investor, with reasonable interest and post-order interest if applicable; (3) the date of each distribution of shares of payment; (4) the check number or other identifier of money transferred to each affected investor; (5) the amount of any returned payment and the date received; (6) a description of any effort to locate an affected investor whose payment was returned or to whom payment was not made for any reason; (7) the total amount, if any, to be forwarded to the Commission for transfer to the United States Treasury; and (8) an affirmation that the IDC has made all distributions and payments to affected investors in accordance with the Distribution Plan approved by the Commission staff. The IDC shall submit the final accounting and certification, together with proof and supporting documentation of such payment in a form acceptable to Commission staff, under a cover letter that identifies Silver Edge Financial, LLC as the Respondent in these proceedings and the file number of these proceedings to Assistant Director David Becker, 100 F Street NE, Washington, DC 20549, or such other address as the Commission staff may provide. The IDC shall provide any and all supporting documentation for the accounting and certification to the Commission staff upon request, and the IDC shall cooperate with any additional requests by the Commission staff in connection with the accounting and certification.

H. *Procedural Deadlines.* The Commission staff may extend any of the procedural dates set forth in Paragraphs A through I of this Subsection VI for good cause shown and solely at the discretion of the Commission staff. Deadlines for all dates shall be counted in calendar days, except if the last day falls on a weekend or federal holiday, the next business day shall be considered the last day.

I. *Certification*. No later than twenty-four months after the date of entry of the Order, each Respondent shall make an interim certification to the Commission in writing that the Respondents have fully adopted and complied in all material respects with the undertakings set forth in this section that were required by that time period and with the recommendations of the

IDC or, in the event of material non-adoption or non-compliance, shall describe such material non-adoption and non-compliance. At the completion of the IDC's services, each Respondent shall make a final certification to the Commission in writing that Respondents have fully adopted and complied with the undertakings set forth in this section and with the recommendations of the IDC or, in the event of material non-compliance, shall describe such non-compliance to the Commission in writing.

J. *Recordkeeping*. Respondents shall preserve for a period not less than six years from the end of the fiscal year last used, the first two years in an easily accessible place, any record of Respondents' compliance with the undertakings set forth in this Subsection VI.

**VII.**

The disgorgement and prejudgment interest referenced in paragraph VIII.B.5. is consistent with equitable principles, does not exceed Respondents' net profits from their violations, and returning the money to Respondents would be inconsistent with equitable principles. Therefore, in these circumstances, distributing disgorged funds to the U.S. Treasury is the most equitable alternative. The disgorgement and prejudgment interest referenced in paragraph VIII.B.5. shall be transferred to the general fund of the U.S. Treasury, subject to Section 21F(g)(3) of the Exchange Act.

**VIII.**

Respondents hereby:

A. Admit the jurisdiction of the Commission over them and over the matters set forth in the Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to Sections 15(b) and 21C of the Securities Exchange Act of 1934 and Section 203(f) of the Investment Advisers Act of 1940, Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order ("Order"), which is attached;

B. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission or in which the Commission is a party, and without admitting or denying the findings contained in the Order, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section XII, consent to the entry of the Order, in which the Commission:

1. finds that Respondents willfully[1] violated Section 15(a) of the Exchange Act;

---

[1] "Willfully," for purposes of imposing relief under Section 15(b) of the Exchange Act, "'means no more than that the person charged with the duty knows what he is doing.'" *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000) (quoting *Hughes v. SEC*, 174 F.2d 969, 977 (D.C. Cir. 1949)). There is no requirement that the actor "also be

2. orders that Respondents cease and desist from committing or causing any violations and any future violations of Section 15(a) of the Exchange Act;

3. orders that Respondents be, and hereby are:

barred from association with any broker, dealer, investment adviser, municipal securities dealer, municipal advisor, transfer agent, or nationally recognized statistical rating organization with the right to apply for reentry after five (5) years to the appropriate self-regulatory organization, or if there is none, to the Commission; and

barred from participating in any offering of a penny stock, including: acting as a promoter, finder, consultant, agent or other person who engages in activities with a broker, dealer or issuer for purposes of the issuance or trading in any penny stock, or inducing or attempting to induce the purchase or sale of any penny stock with the right to apply for reentry after five (5) years to the appropriate self-regulatory organization, or if there is none, to the Commission.

4. Any reapplication for association by the Respondents will be subject to the applicable laws and regulations governing the reentry process, and reentry may be conditioned upon a number of factors, including, but not limited to, compliance with the Commission's order and payment of any or all of the following: (a) any disgorgement or civil penalties ordered by a Court against the Respondents in any action brought by the Commission; (b) any disgorgement amounts ordered against the Respondents for which the Commission waived payment; (c) any arbitration award related to the conduct that served as the basis for the Commission order; (d) any self-regulatory organization arbitration award to a customer, whether or not related to the conduct that served as the basis for the Commission order; and (e) any restitution order by a self-regulatory organization, whether or not related to the conduct that served as the basis for the Commission order.

---

aware that he is violating one of the Rules or Acts." *Tager v. SEC*, 344 F.2d 5, 8 (2d Cir. 1965). The decision in *The Robare Group, Ltd. v. SEC*, which construed the term "willfully" for purposes of a differently structured statutory provision, does not alter that standard. 922 F.3d 468, 478-79 (D.C. Cir. 2019) (setting forth the showing required to establish that a person has "willfully omit[ted]" material information from a required disclosure in violation of Section 207 of the Advisers Act).

5. orders that Respondents shall pay disgorgement of $2,251,140, prejudgment interest of $268,928.33 and civil penalties of $975,000, jointly and severally, to the Securities and Exchange Commission for transfer to the general fund of the United States Treasury, subject to Exchange Act Section 21F(g)(3). If timely payment is not made, additional interest shall accrue pursuant to SEC Rule of Practice 600. If timely payment of a civil money penalty is not made, additional interest shall accrue pursuant to 31 U.S.C. § 3717.

Payment must be made in one of the following ways:

(1) Respondents may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondents may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondents may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341
6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Mackle as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to David Becker, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-0213.

6. Amounts ordered to be paid as civil money penalties pursuant to the Order shall be treated as penalties paid to the government for all purposes, including all tax purposes. To preserve the deterrent effect of the civil penalty, Respondents agree that in any Related Investor Action, they shall not argue that they are entitled to, nor shall they benefit by, offset or reduction of any award of compensatory damages by the amount of any

part of Respondents' payment of a civil penalty in this action ("Penalty Offset"). If the court in any Related Investor Action grants such a Penalty Offset, Respondents agree that they shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission. Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding. For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondents by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

7. orders that Respondents shall comply with the undertakings enumerated in Section VI, above.

**IX**.

Respondents understand and agree to comply with the terms of 17 C.F.R § 202.5(e), which provides in part that it is the Commission's policy "not to permit a defendant or respondent to consent to a judgment or order that imposes a sanction while denying the allegations in the complaint or order for proceedings," and "a refusal to admit the allegations is equivalent to a denial, unless the defendant or respondent states that he neither admits nor denies the allegations." As part of Respondents' agreement to comply with the terms of Section 202.5(e), Respondents: (i) will not take any action or make or permit to be made any public statement denying, directly or indirectly, any finding in the Order or creating the impression that the Order is without factual basis; (ii) will not make or permit to be made any public statement to the effect that Respondents do not admit the findings of the Order, or that the Offer contains no admission of the findings, without also stating that the Respondents do not deny the findings; and (iii) upon the filing of this Offer of Settlement, Respondents hereby withdraw any papers previously filed in this proceeding to the extent that they deny, directly or indirectly, any finding in the Order. If Respondents breach this agreement, the Division of Enforcement may petition the Commission to vacate the Order and restore this proceeding to its active docket. Nothing in this provision affects Respondents': (i) testimonial obligations; or (ii) right to take legal or factual positions in litigation or other legal proceedings in which the Commission is not a party.

**X.**

Respondents understand that by settling to a bar with the right to reapply as specified in the Commission's Order, Respondents will be able to make an application to reapply after the specified time period. This application, however, does not guarantee reentry. Rather, Respondents' application will be subject to the applicable laws and regulations governing the reentry process and Respondents' reentry will be subject to the discretion of the Commission. An application made to a self-regulatory organization will be reviewed by the self-regulatory

organization and the Commission pursuant to Rule 19h-1 [17 C.F.R. 240.19h.1] and applicable rules of the self-regulatory organization. An application made directly to the Commission will be reviewed under the processes specified in Rule 193 of the Commission's Rules of Practice [17 C.F.R. 201.193] or other applicable provisions. To the extent a state licensing authority may require reapplication for a state license, state law may apply.

**XI.**

Respondents agree that they shall not seek or accept, directly or indirectly, reimbursement or indemnification from any source including, but not limited to, payment made pursuant to any insurance policy, with regard to any penalty amounts that Respondents shall pay pursuant to the Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors. Respondents further agree that they shall not claim, assert, or apply for a tax deduction or tax credit with regard to any federal, state or local tax for any penalty amounts that Respondents shall pay pursuant to the Order, regardless of whether such penalty amounts or any part thereof are added to a distribution fund or otherwise used for the benefit of investors.

**XII.**

Mackle stipulates solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S. C. §523, that the findings in the Order are true and admitted by Mackle, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Mackle under the Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation by Mackle of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

**XIII.**

Respondents state that they have read and understand the foregoing Offer, that this Offer is made voluntarily, and that no promises, offers, threats, or inducements of any kind or nature whatsoever have been made by the Commission or any member, officer, employee, agent, or representative of the Commission in consideration of this Offer or otherwise to induce them to submit to this Offer.

____ Day of ______ ________________________________________

Daniel J. Mackle, Sr.

____ Day of ______ ________________________________________

Daniel J. Mackle, Sr., on behalf of
Silver Edge Financial, LLC

**STATE OF NEW JERSEY** }
} **SS:**
**COUNTY OF BERGEN** }

The foregoing instrument was acknowledged before me this __day of ____________, 20__, by DANIEL J. MACKLE, who ___is personally known to me or ___who has produced a New Jersey driver's license as identification and who did take an oath.

___________________________________
Notary Public
State of New Jersey
Commission Number :
Commission Expiration :