UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>*Plaintiff/Petitioner,*<br><br>v.<br><br>DANIEL J. MACKLE, SR. and SILVER EDGE FINANCIAL, LLC,<br><br>*Defendants/Respondents* | Docket No.: 7:24-mc-489 (PMH) |

COMPENDIUM OF UNREPORTED CASES AND AUTHORITIES

CITED IN THE OPPOSTION OF DANIEL J. MACKLE, SR.

WARSHAW BURSTEIN, LLP
575 Lexington Avenue
New York, New York 10022
(212) 984-7741
msiegel@wbny.com

**COMPENDIUM OF UNREPORTED CASES AND AUTHORITIES**
**CITED IN THE OPPOSITION OF DANIEL J. MACKLE, SR.**

**USDC SDNY CASE NO. 7:24-mc-489**

**INDEX**


| TAB | CASE |
|---|---|
| 1 | *DeHuff v. Digital Ally, Inc.*,<br>No. 3:08 CV 327 TSL-JCS, 2009 WL 4908581 (S.D.Miss.2009) |
| 2 | *In NML Capital Ltd v. Republic of Argentina*,<br>No. 15-cv-2369 (TPG), 2016 WL 715732 (S.D.N.Y. Feb. 19, 2016) |
| 3 | *Nexstar Media, Inc. Grp. v. NLRB*,<br>No. 4:12-cv-01415, 2024 WL 4127090 (N.D. Ohio 2024) |
| 4 | *S.E.C. v. Hohol*,<br>No. 14-C-41, 2014 WL 461217 (E.D. Wis. Feb. 5, 2014) |
| 5 | *SEC v. Carebourn Capital, L.P.*,<br>*21-cv-2114 (KMM/JFD)*, 2024 WL 4249546 (D.Minn. Sept. 20, 2024) |
| 6 | *SEC v. Coronati*,<br>16-cv-2022(ARR), 2016 WL 6462240 (E.D.N.Y. Oct. 14, 2016) |
| 7 | *SEC v. Craig Scott Capital LLC*<br>*No. 16-cv-4757 (SJF)(AYS)*, 2020 WL 435034 (E.D.N.Y. Jan. 28, 2020) |
| 8 | *SEC v. Hansen*,<br>*83 civ. 3692*,1983 WL 2413 (S.D.N.Y. Apr. 6, 1984) |
| 9 | *SEC v. Herman's World of Sports, Inc.*,<br>*No. 05-cv-00438 (KAM)(RLM)*, 2024 WL 4904506 |
| 10 | *SEC v. Laura*,<br>No. 18-cv-5075 (NGG) (VMS), 2020 WL 8772252 (E.D.N.Y. Dec. 30, 2020) |
| 11 | *SEC v. M&A West, Inc.*,<br>*No. C-01-3376 VRW*, 2005 WL 1514101 (N.D. Cal. 2005) |
| 12 | *SEC v. Ripple Labs, Inc.*,<br>No. 20 CIV. 10832 (AT), 2024 WL 3730403 (S.D.N.Y. Aug. 7, 2024) |
| 13 | *SEC v. Taber*,<br>No. 13 Misc 282( KBF ), 2013 WL 6334375 (S.D.N.Y., Dec. 4, 2013) |
| | **OTHER** |
| 14 | Cornerstone Research, *SEC Enforcement Activity: Public Companies and Subsidiaries, Fiscal Year 2024 Update*, https://www.cornerstone.com/wp-content/uploads/2024/11/SEC-Enforcement-Public-Companies-Subsidiaries-FY2024.pdf |
| 15 | Dave Michaels, *SEC Writes off $10 Billion in Fines It Can't Collect*, WSJ, Dec. 31, 2024, https://www.wsj.com/finance/regulation/sec-fines-penalties-collection-write-off-071cb768?msockid=237a161264366adc1851037e65c66ba2 |

# TAB 1

KeyCite Yellow Flag - Negative Treatment
Distinguished by Legacy Resources, Inc. v. Liberty Pioneer Energy Source, Inc., Utah, December 20, 2013

2009 WL 4908581
United States District Court,
S.D. Mississippi,
Jackson Division.

Thomas H. DEHUFF, Plaintiff
v.
DIGITAL ALLY, INC. and Charles A. Ross, Defendants.

Civil Action No. 3:08CV327TSL–JCS.
|
Dec. 11, 2009.

West KeySummary

1 **Securities Regulation** Conduct of Broker-Dealers

Genuine issue of material fact as to whether a consultant for a corporation functioned as a broker for the corporation under federal securities laws precluded summary judgment in favor of the corporation. The corporation argued that the consultant functioned as a broker for the corporation because he was engaged for the specific purpose of finding investors for the corporation, and that toward that end he identified and contacted potential investors and introduced those investors to the corporation's Chief Executive Officer (CEO). The corporation further argued that the consultant attended meetings in which shares of the corporation's stock were promoted and marketed by the CEO, and that he suggested to potential investors that the corporation's stock was "something they should look at." The consultant argued that he was merely a finder for the corporation and not a broker, insofar as his role was limited to finding prospects and introducing them to the CEO, who marketed the stock and negotiated the transactions. Securities Exchange Act of 1934, § 3(a)(4)(A), 15 U.S.C.A. § 78c(a)(4)(A).

**Attorneys and Law Firms**

E. Barry Bridgforth, Ronald H. Pierce, Henry, Barbour, Decell & Bridgforth, PLLC, Yazoo City, MS, for Plaintiff.

Charles F. Barbour, Bennett, Lotterhos, Sulser & Wilson, Jackson, MS, Alan Jeffrey Misler, James F.B. Daniels, McDowell, Rice, Smith & Buchanan, Kansas City, MO, for Defendant.

*MEMORANDUM OPINION AND ORDER*

TOM S. LEE, District Judge.

***1** This cause is before the court on the motion of defendant Digital Ally, Inc. for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. Plaintiff Thomas H. DeHuff has responded to the motion and the court, having considered the memoranda of authorities, together with attachments, submitted by the parties, concludes that the motion should be denied.

Plaintiff Thomas DeHuff brought this action against Digital Ally (Digital) and its president and chief executive officer Andy Ross for breach of contract. In his complaint, DeHuff alleges that, prior to April 1, 2005, Digital, through Ross, engaged him as a consultant to assist in locating investors for Digital and agreed to pay him a ten percent commission on all monies raised by DeHuff. [1] According to DeHuff, as of April 1, 2005, Digital was in breach of its agreement to pay his ten percent commission, and on April 8, 2005, he and Andy Ross, on behalf of Digital, entered into a settlement agreement, under the terms of which he agreed to forego his claims against Digital and Ross in exchange for their agreement to issue him 150,000 shares of Digital stock. Plaintiff alleges that defendants breached that agreement, which prompted him to file the present action.

Previously in this cause, defendants moved for summary judgment on a number of bases, including that plaintiff's claims, which are in effect for the recovery of compensation for his service to Digital, are barred by the one-year statute of limitations applicable to actions on unwritten contracts of employment, as set forth in Mississippi Code Annotated § 15–1–29; alternatively, that plaintiff's claims are barred since defendants' alleged breaches of contracts on which the settlement was grounded, i.e., the claims that plaintiff

allegedly agreed to settle, are time-barred by the applicable limitations period, Miss.Code Ann. § 15–1–49; that the statute of frauds precludes enforcement of the alleged settlement agreement since it was to be performed over a period of three years, *see*Miss.Code Ann. § 15–3–1(e) (writing evidence agreement required for "upon any agreement which is not to be performed within the space of fifteen months from the making thereof ..."); and that there was no meeting of the minds sufficient to form a contract. By memorandum opinion and order dated March 12, 2009, this court denied defendants' first motion for summary judgment, finding there were genuine issues of material fact regarding the nature of plaintiff's relationship with Digital, and in particular, as to whether he was an employee or independent contractor, and also regarding whether there was a meeting of the minds to support the alleged agreement. The court further concluded that enforcement of the alleged agreement is not barred by the statute of frauds, as the agreement could have been performed within fifteen months.

Defendants have now moved for summary judgment on the basis that the alleged agreement which DeHuff seeks to enforce is void under section 29(b) of the Securities Exchange Act, 15 U.S.C. 78cc(b), since its performance involved a violation of federal securities laws. [2] For the reasons that follow, the court concludes that defendants' motion should be denied.

***2** In support of their motion, defendants argue that, in his dealings with potential investors on behalf of Digital, DeHuff acted as a broker, yet he was not registered as a broker with the Securities and Exchange Commission (SEC). Defendants thus maintain that DeHuff violated Section 15(a)(1) of the Securities Exchange Act, 15 U.S.C. § 78***o***(a)(1), which makes it unlawful for a "broker" to make use of any means of interstate commerce "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security" without registering as a broker with the SEC. 15 U.S.C. § 78***o***(a)(1). [3] Defendants contend, therefore, that the putative agreement by which Digital agreed to compensate plaintiff for his efforts on behalf of Digital in "effecting" securities transactions is void by virtue of Section 29(b) of the Securities Exchange Act. [4] That statute provides, in pertinent part, that

> [e]very contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract ... the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract....
>
> 15 U.S.C.A. § 78cc. In order to avoid a contract under section 29(b), a party must show that "(1) the contract involved a 'prohibited transaction,' (2) he is in contractual privity with the defendant, and (3) he is 'in the class of persons the Act was designed to protect.' " *Regional Properties, Inc. v. Financial and Real Estate Consulting Co.,* 678 F.2d 552, 559 (5th Cir.1982) (citations omitted).

DeHuff does not take issue with defendants' ability to establish the second or third requirements. The requirement of privity is satisfied, as plaintiff and defendants were the only parties to the subject agreement. In addition, Digital, as issuer of the stock, is in the class of persons the statute was designed to protect. *See id.* at 558 (issuer obviously in class of persons the Act was designed to protect) (citing *Eastside Church of Christ v. National Plan, Inc.,* 391 F.2d 357 (5th Cir.), *cert. denied,*393 U.S. 913, 89 S.Ct. 234, 240, 21 L.Ed.2d 198 (1968)). DeHuff takes the position, though, that Section 29(a) cannot be used to void the April 8, 2005 settlement agreement because the agreement does not involve a "prohibited transaction." Clearly, an agreement to compensate an unregistered broker for effecting securities transactions would involve a prohibited transaction. *See, e.g., Salamon v. Teleplus Enters., Inc.,* Civ. No. 05–2058, 2008 WL 2277094 (D.N.J. June 2, 2008) (consulting agreement by which issuer hired alleged "broker" to raise funds for payment of ten percent finder's fee involved a prohibited transaction where broker was not registered). Thus, DeHuff presumably would agree that if he were seeking herein to recover for Digital's alleged breach of the original agreement to pay him a ten percent commission for all investment funds which he generated, then that agreement would have been voidable under Section 29(b) if he had indeed been a broker. However, DeHuff argues that in order for Section 29(b) to apply, defendants are required to establish "a direct relationship between the violation at issue and the performance of the contract, i.e., the violation must be 'inseparable from the performance of the contract' rather than 'collateral or tangential to the contract,' " *id.* (citing *Berckeley Inv. Group, Ltd. v. Colkitt,* 455 F.3d 195, 205 (3d Cir.2006)), which he submits is not the case since the "settlement agreement" does not involve the "sale" of "securities" to third parties but rather is a tangential agreement that can be performed without violation of securities laws. The court rejects DeHuff's

position on this point. The alleged settlement agreement between the parties, no less than the original agreement between them, was intended to compensate DeHuff, an alleged unregistered "broker," for his alleged illegal services, and as such, the agreement falls into the category of contracts involving "prohibited transactions," if, in fact, DeHuff was a "broker."

***3** DeHuff next argues, alternatively, that summary judgment must be denied because there exist genuine issues of material fact as to whether he was acting as a "broker," as alleged by defendants, and thus required to register with the SEC, or whether he was instead acting merely as a "finder," who was not required to register. The Securities Exchange Act defines "broker" as one who "engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A). While the statute does not elaborate on what it means to "effect transactions" or to be "engaged in the business," courts have identified a number of factors for determining whether a person qualifies as a broker for purposes of Section 15(a)(1), "including ' "regular participation in securities transactions, employment with the issuer of the securities, payment by commission as opposed to salary, history of selling the securities of other issuers, involvement in advice to investors and active recruitment of investors." ' " *U.S. S.E.C. v. Bravata,* No. 09–12950, 2009 WL 2245649, 2–3 (E.D.Mich. July 27, 2009) (quoting *S.E.C. v. George,* 426 F.3d 786, 797 (6th Cir.2005)). *See also S.E.C. v. Martino,* 255 F.Supp.2d 268, 283 (S.D.N.Y.2003) (listing as the relevant factors (1) whether an employee is the issuer; (2) whether he is reimbursed on a commission-basis rather than a salary; (3) whether he is selling or previously has sold the securities of other issuers; (4) whether he is involved in the negotiations between the issuer and the investor; (5) whether he opines on the merits of the investment or gives advice; and (6) whether he is an active finder of investors); *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures,* No. 8:04CV586, 2006 WL 2620985, 6 (D.Neb. Sept.12, 2006) (observing that "(t)ransaction-based compensation, or commissions are one of the hallmarks of being a broker-dealer.").

These courts recognize that the term "effecting securities" is interpreted broadly, so that a person effects transactions in securities if he or she participates in such transactions "at key points in the chain of distribution". *Cornhusker,* 2006 WL 2620985, at 6 (citing *Massachusetts Fin. Servs. Inc., v. Securities Investor Prot. Corp.,* 411 F.Supp. 411, 415 (D.Mass.), *aff'd,*545 F.2d 754 (1st Cir.1976)). Regarding the meaning of "engaged in the business," "[c]ases and SEC No–Action letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being 'engaged in the business.' " *S.E.C. v. Kenton Capital, Ltd.,* 69 F.Supp.2d 1, 12–13 (D.D.C.1998) (citations omitted). *See also Salamon,* 2008 WL 2277094, at 8 ("In determining whether a particular individual or entity falls within this definition, courts consider whether the individual may be characterized by a certain regularity of participation in securities transactions at key points in the chain of distribution.") (internal quotations omitted). "Regularity of participation has been demonstrated by such factors as the dollar amount of securities sold ... and the extent to which advertisement and investor solicitation were used." *Id.*

***4** There are, however, "certain limited circumstances [in which] a person or entity"—a "finder"—may perform a narrow scope of activities without triggering broker/dealer registration requirements." *Cornhusker,* 2006 WL 2620985, at 6 (citing Mike Bantuveris, 1975 SEC No-act. LEXIS 2158 (Oct. 23, 1975) (referring to "merely act[ing] as a finder in bringing together the parties to transactions involving the purchase and sale of securities")). "A finder, however, will be performing the functions of a broker-dealer, triggering registration requirements, if activities include: analyzing the financial needs of an issuer, recommending or designing financing methods, involvement in negotiations, discussion of details of securities transactions, making investment recommendations, and prior involvement in the sale of securities." *Id.* (citations omitted). "The distinction drawn between the broker and the finder or middleman is that the latter 'bring[s] the parties together with no involvement on [his] part in negotiating the price or any of the other terms of the transaction.' " *Salamon,* 2008 WL 2277094, at 13 (citing *M. Dean Kaufman, Inc. v. Am. Machine & Foundry Co.,* 102 N.J.Super. 1, 10, 245 A.2d 202, 206 (App.Div.1968)).

In the case at bar, defendants argue that the undisputed facts of record establish beyond reasonable challenge that DeHuff functioned as a broker. They note that DeHuff was engaged for the specific purpose of finding investors for Digital and that toward that end, he identified and contacted potential investors and introduced these investors to Andy Ross. In addition, he attended meetings in which shares of Digital stock were promoted and marketed by Andy Ross; and, he suggested to potential investors that Digital stock was "something they should look at." By DeHuff's account, for his efforts, he was able to generate around $1 million in investments for Digital, for which he was to be paid

on a commission basis. And, defendants note, DeHuff had previously been engaged in a similar capacity to promote the sale of securities for another company started by Andy Ross, ICOP Digital. Defendants maintain that these facts establish beyond any meaningful dispute that DeHuff fits squarely within the definition of a person engaged in the business of effecting the sale of securities. DeHuff, on the other hand, submits that there are genuine issues of material fact on the issue of whether his primary role was that of a finder rather than a broker.

DeHuff does not dispute any of the specific facts cited by defendants in support of their motion, but he insists that the record evidence, viewed objectively, tends to show that his role was limited to finding prospects and introducing them to Andy Ross, who marketed the stock and negotiated the transactions. Having considered the record evidence and the parties' arguments, the court tends to agree with DeHuff that his level of participation is properly an issue for trial. It follows, therefore, that defendants' motion for summary judgment will be denied.[5]

***5** Accordingly, it is ordered that defendants' motion for summary judgment is denied.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4908581, Fed. Sec. L. Rep. P 95,549

## Footnotes

1 Digital, which was founded by defendant Ross, is in the business of developing, manufacturing and selling digital recording devices and related equipment, primarily for law enforcement agencies, the military and private security organizations.

2 In its opinion denying defendants' first summary judgment motion, the court noted that defendants had asserted in their rebuttal an argument that they had not previously advanced as a basis for summary judgment, namely, that since Dehuff is not and was never a licensed "broker" or "broker dealer," he could not have lawfully participated in the sale of Digital Ally's unregistered securities other than as an "associated person" of Dehuff, and that in order to be an "associated person," Dehuff must have been a "partner, officer, director or employee" of Digital Ally, which DeHuff maintained he was not. The court declined to consider this argument, as it was raised for the first time in defendants' rebuttal. Defendants have now asserted this and related arguments in support of their present summary judgment motion.

3 Section 15(a)(1) provides, in pertinent part,

> No broker or dealer (other than one whose business is exclusively intrastate) shall make use of the mails or of any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security ... otherwise than on a national securities exchange, unless such broker or dealer is registered in accordance with subsection (b) of this section.

Defendants note that even if he was not registered as a broker, plaintiff's activities as a "broker" would have been lawful if he was an "associated person" or "agent" of a registered broker within the meaning of § 15 of the Securities Exchange Act, 15 U.S.C. § 78***o***(1)(1), or pursuant to SEC Rule 3a4–1, 17 C.F.R. § 240.3a4–1 if he was an "associated person" of Digital, the issuer of the shares. Defendants argue that neither of those exceptions to the registration requirement apply here, and in response, plaintiff does not contend otherwise.

4 Defendants' answer recites as follows:

Any and all claims plaintiff may have are barred by applicable federal and state securities laws and public policy.

Plaintiff is not licensed as a broker/dealer under applicable state or federal securities laws and cannot lawfully receive compensation for the sale of securities.

5 DeHuff has contended that even if he were found to be a broker, the doctrines of *in pari delicto* and/or equitable estoppel should apply to foreclose defendants' avoiding the parties' alleged settlement agreement since defendants knew that DeHuff was not a registered broker and wrongfully led him to believe that his participation in the subject transactions did not require that he be registered as a broker. For their part, defendants have argued in response that *in pari delicto* and equitable estoppel are equitable *defenses* only, which have no applicability where, as here, defendants have raised Section 29(b) solely as an affirmative defense and not as a basis for a claim for rescission and restitution. Because the court concludes there is a genuine issue of material fact on the question whether DeHuff functioned as a broker, the court need not consider or determine whether the equitable doctrines invoked by DeHuff in response to defendants' assertion of their Section 29(b) "affirmative defense," are available in the context presented, which is an issue vigorously contested by the parties.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 2

2016 WL 715732
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

NML CAPITAL, LTD., Plaintiff,
v.
The REPUBLIC OF ARGENTINA, Defendant.
NML Capital, Ltd., Plaintiff,
v.
The Republic of Argentina, Defendant.
FFI Fund, Ltd. and FYI Ltd., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Perez, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Aurelius Capital Partners, LP, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Blue Angel Capital I LLC, Plaintiff,
v.
The Republic of Argentina, Defendant.
EM Ltd., Plaintiff,
v.
The Republic of Argentina, Defendant.
Lightwater Corp. Ltd., Plaintiff,
v.
The Republic of Argentina, Defendant.
Old Castle Holdings, Ltd., Plaintiff,
v.
The Republic of Argentina, Defendant.
Settin, Plaintiff,
v.
The Republic of Argentina, Defendant.
Capital Ventures International, Plaintiff,
v.
THE REPUBLIC OF ARGENTINA, Defendant.
ADAMI, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Capital Markets Financial Services Inc., et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Foglia, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Pons, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Guibelalde, et al., Plaintiffs,
v.
The Republic of Argentina, Defendant.
Dorra, et al., Plaintiffs,

cv-8947 (TPG), 14-cv-8303 (TPG), 14-cv-4092 (TPG), 14-cv-4091 (TPG), 14-cv-8739 (TPG), 14-cv-7258 (TPG), 14-cv-7739 (TPG), 15-cv-0710 (TPG), 14-cv-8243 (TPG), 13-cv-8887 (TPG), 11-cv-4908 (TPG), 14-cv-10141 (TPG), 14-cv-5963 (TPG), 14-cv-1109 (TPG), 14-cv-3127 (TPG), 14-cv-10016 (TPG), 14-cv-7171 (TPG), 14-cv-7169 (TPG), 14-cv-7164 (TPG), 14-cv-7166 (TPG), 14-cv-7637 (TPG), 14-cv-10064 (TPG), 14-cv-9093 (TPG), 14-cv-10201 (TPG), 14-cv-9855 (TPG), 14-cv-5849 (TPG), 15-cv-1470 (TPG), 15-cv-1471 (TPG), 15-cv-1553 (TPG), 15-cv-1588 (TPG), 15-cv-1508 (TPG), 15-cv-2611 (TPG), 15-cv-5886 (TPG), 15-cv-2577 (TPG), 15-cv-5190 (TPG), 15-cv-4654 (TPG), 15-cv-3523 (TPG), 15-cv-4284 (TPG), 15-cv-4767 (TPG), 11-cv-8817 (TPG), 15-cv-6702 (TPG), 15-cv-3932 (TPG), 15-cv-7367 (TPG), 15-cv-2369 (TPG)

|

Signed 02/19/2016

**Attorneys and Law Firms**

Gary Steven Snitow, Snitow, Kanfer & Holtzer, Michael Champlin Spencer, Milberg LLP (NYC), New York, NY, for Plaintiffs.

Carmine D. Boccuzzi, Jr., Cleary Gottlieb Steen & Hamilton, LLP (NYC), New York, NY, for Defendant.

**RULE 62.1 INDICATIVE RULING**

Thomas P. Griesa, United States District Judge

***1** Plaintiffs in these forty-nine actions hold bonds issued by defendant, the Republic of Argentina. In October 2015, the court issued injunctions in these actions. Due to a pending appeal, the court does not presently have jurisdiction over the injunctions.

The Republic now moves for a Rule 62.1 Indicative Ruling that this court would vacate the injunctions if the Court of Appeals were to remand for that purpose. The motion under Rule 62.1 allows the court to state that it would grant a motion to vacate if it had the power to do so. Some plaintiffs support the Republic's motion to vacate; others do not. The court must therefore decide whether it would vacate the injunctions on remand.

Background

The court has often recounted the history of this prolonged litigation. A brief summary will suffice.

**1. The Default**

In 1994, the Republic began issuing bonds pursuant to a Fiscal Agency Agreement ("FAA"), which contains the famed *pari passu* clause:

> The Securities will constitute ... direct, unconditional, unsecured and unsubordinated obligations of the Republic and shall at all times rank *pari passu* and without any preference among themselves. The payment obligations of the Republic under the Securities shall at all times rank at least equally with all its other present and future unsecured and unsubordinated External Indebtedness ....

After the Republic suffered an economic crisis in 2001, it defaulted on its debts, including the FAA bonds. In an attempt to cure this default, the Republic twice invited bondholders to exchange their FAA bonds for new bonds worth only 25–29% of the FAA bonds' value. In all, roughly 93% of the Republic's creditors ultimately accepted these exchange offers, and the Republic began making payments to the "exchange bondholders."

To buttress the first exchange offer, the Republic enacted Law 26,017—the "Lock Law"—which prohibited "any type of in-court, out-of-court or private settlement" with FAA bondholders who could have participated in the exchange offer but chose not to. Then, in 2009, the Republic enacted Law 26,547, which barred the Republic from giving FAA bondholders who had filed lawsuits "more favorable treatment than what [was] offered to those who have not done so." Finally, in 2013, the Republic passed Law 26,886, which again forbade bondholders who had filed lawsuits from getting any settlement worth more than the prior exchange offers.

For many years, the Republic never paid anything on the FAA bonds. Plaintiffs who held beneficial interests in those bonds began filing actions against the Republic in this court. Many obtained money judgments for the outstanding principal and interest. The Republic refused to pay, and the plaintiffs tried—usually in vain—to attach Argentine assets to satisfy their money judgments. *See, e.g.*, *EM Ltd. v. Republic of Argentina*, 865 F. Supp. 2d 415, 417 (S.D.N.Y. 2012) (observing that the Republic has "usually prevail[ed] in defeating the plaintiffs' attempts to recover" through attachment).

**2. The Original Injunctions**

***2** In 2010, a group of plaintiffs in thirteen actions began seeking a different kind of relief.[1] They first filed motions for partial summary judgment, asking the court to declare that the Republic had violated the *pari passu* clause by paying the exchange bondholders while refusing to pay the plaintiffs. The court granted the motions. *See* Order, *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Dec. 7, 2011).

The plaintiffs then moved for specific performance, seeking a remedy for the Republic's violation of the *pari passu* clause. Although the *pari passu* clause does not itself require a particular remedy, the court exercised its inherent equitable discretion under Rule 65(d) to craft appropriate relief. It fashioned injunctions to address the Republic's steadfast refusal to pay plaintiffs anything. The result was that whenever the Republic paid on the exchange bonds, it needed to make a "ratable payment" to plaintiffs. *See* Order § 2(a), *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Feb. 23, 2012).

In issuing the injunctions, the court made findings that, at that time, supported such equitable relief. For example, the court explained that plaintiffs had no adequate remedy at law due to the Republic's passage of Law 26,017 (which prohibited settlement with plaintiffs who declined the exchange offers) and Law 26,547 (which prevented plaintiffs from receiving settlements more favorable than the exchange offers). *Id.* § 1(b). Moreover, the court found that both the equities and the public interest supported the injunctions because of the Republic's "repeated failures" to pay plaintiffs and its "unprecedented, systematic scheme" to pay other debts without paying plaintiffs. *Id.* § 1(c) & (d); *see also* Am. & Suppl. Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Oct. 3, 2014) (holding the Republic in contempt after it attempted to evade the injunctions by passing Law 26,984—the "Sovereign Payment Law").

The Court of Appeals affirmed the injunctions, but remanded for clarification as to how the injunctions would operate. *NML Capital, Ltd. v. Republic of Argentina*, 699 F.3d 246, 255 (2d Cir. 2012). On remand, the court explained the injunctions' payment formula and the effects the injunctions would have on third parties. Order, *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Nov. 21, 2012). The Republic again appealed, and the Second Circuit again affirmed the injunctions in their entirety. *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 248 (2d Cir. 2013). After the Supreme Court denied *certiorari* in June 2014, *Republic of Argentina v. NML Capital, Ltd.*, 134 S. Ct. 2819 (2014), the injunctions went into effect.

In an attempt to encourage settlement, the court appointed a Special Master, Daniel A. Pollack, Esq., on June 23, 2014. The Special Master's mandate was "to conduct and preside over settlement negotiations." Order Appointment Special Master, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. June 23, 2014). Despite his untiring efforts to bring about a settlement, the Republic chose to default on the exchange bonds rather than pay anything to plaintiffs.

**3. The "Me Too" Injunctions**

***3** In early 2015, "me too" plaintiffs in thirty-six actions filed motions for partial summary judgment. As their name suggests, these plaintiffs sought the same *pari passu* ruling that the other plaintiffs had obtained in the original thirteen actions. On June 5, 2015, the court granted the motions because of the Republic's "entire and continuing course of conduct" in refusing to pay plaintiffs anything at all. Op. & Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. June 5, 2015). "Me too" plaintiffs in fifteen other actions then filed similar motions for partial summary judgment, which the court granted on October 22, 2015. Op. & Order, *Trinity Invest. Ltd. v. Republic of Argentina*, No. 15-cv-2611 (S.D.N.Y. Oct. 22, 2015).

The result was that "me too" plaintiffs in fifty-one actions obtained judgments that the Republic violated the *pari passu* clause. Plaintiffs in forty-nine of those actions then filed motions for specific performance, seeking equitable relief akin to the injunctions obtained in the original thirteen actions.[2] The court granted those motions on October 30,

2015. This meant that plaintiffs in a total of sixty-two actions had obtained injunctions against the Republic.

When the court granted the "me too" injunctions, it again discussed the equities. The court highlighted "[t]he Republic's reluctance to entertain meaningful settlement discussions before the Special Master." Op. & Order 10, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Oct. 30, 2015). The court also explained that "[t]he Republic has done nothing in recent years to alleviate the court's concerns" and that, if anything, it had "escalated its scheme" of attempting to pay the exchange bondholders without paying plaintiffs. *Id.* at 8. An appeal followed, which is currently pending before the Second Circuit. Notice Civil Appeal, *NML Capital, Ltd. v. Republic of Argentina*, No. 15-3675 (2d Cir. Nov. 10, 2015).

**4. The 2016 Settlement Negotiations**

In November 2015, the Republic's voters elected Mauricio Macri as their president, ending the twelve-year reign of the previous ruling party led by former President Cristina Kirchner. President Macri's election marked a turning point in the Republic's attitude and actions. Since the election, President Macri's government has consistently declared its desire to resolve the disputes and reopen the country to foreign investors. *See* Stephen Adler & Sujata Rao, *Argentina's Macri Hopes for Creditor Deal Early in 2016*, Reuters (Jan. 23, 2016), *available at* http://www.reuters.com/article/us-argentina-president-idUSKCN0V00UP ("I want to be clear: We want to reach a settlement. We want to find a fair agreement.").

In January 2016, the Argentine government reopened negotiations with the FAA bondholders through the Special Master. President Macri dispatched a delegation of senior government officials to hold talks with lead plaintiffs in New York. On January 13 and during the first week of February, discussions began under the aegis of the Special Master. The Republic presented an informal settlement offer, first to the Special Master, then to those plaintiffs. During the week of discussions before the Special Master, the Republic reached Agreements in Principle with five of those plaintiffs worth over $1.1 billion.[3] Other plaintiffs refused to settle, and the Republic then published its Proposal formally to them and to the world on February 5, 2016. *See* Propuesta, 5 de Febrero de 2016 (Paskin Decl. Ex. J, Dkt. 58, No. 14-cv-8988).

***4** The Republic's Proposal contemplates two settlement categories. The first, known as the "Standard Offer," is open to *all* FAA bondholders, and provides for a cash payment equal to the original principal of the bond plus 50% of that principal, classified as interest. The second, known as the "*Pari Passu* Offer," extends only to FAA bondholders who have injunctions. Those bondholders with injunctions who have money judgments may receive a cash payment equal to the full amount of that judgment, less a 30% discount. Those without money judgments may receive a cash payment equal to the current accrued value of the claims, less a 30% discount. The Proposal also offers an "early-bird" incentive: for bondholders who reach agreements with the Republic by February 19, 2016, the 30% discount drops to 27.5%. Both the Proposal and the existing Agreements in Principle that the Republic has entered into contain two conditions precedent: (1) the approval of the Argentine Congress; and (2) the vacating of this court's injunctions. The Republic estimates that the settlement payments for the bondholders with injunctions, if made, would total approximately $6.5 billion in cash. It has not estimated the additional figure that might be involved in the Standard Offer. Some litigants may qualify under both categories and will have the option to select the category that best suits them.

In his statement issued February 5, 2016, the Special Master called the Republic's Proposal a "historic breakthrough." He noted that settlement would allow the Republic to return to the global financial markets to raise much-needed capital. Finally, he praised the Republic's leaders for their "courage and flexibility in stepping up to and dealing with this long-festering problem which was not of their making."

The U.S. government has also signaled its support. Treasury Secretary Jacob Lew commended the Republic's good-faith efforts to resolve the disputes and expressed his "strong hope" that all bondholders would accept settlements soon. Readout from a Treasury Spokesperson of Lew's Call with Argentine Finance Minister Alfonso Prat-Gay (Feb. 7, 2016), *available at* https://www.treasury.gov/press-center/press-releases/Pages/jl0339.aspx.

Meanwhile, the Republic intensified its efforts to settle with as many bondholders as possible. Not only did government officials continue to negotiate with those plaintiffs who initially declined the Proposal, but they also reached out to plaintiffs who did not have injunctions in their actions. To date, the Republic has successfully executed additional Agreements in Principle with a number of institutional

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

plaintiffs, a group of class-action plaintiffs, and 50,000 Italian bondholders.[4]

To continue the process of effectuating all these settlements, the Republic now moves to vacate the injunctions in all forty-nine of the "me too" actions. Because the Republic appealed the issuance of the injunctions through its prior counsel, the court cannot presently grant the Republic's motion to vacate. Accordingly, the Republic has brought a motion for a Rule 62.1 Indicative Ruling. Rule 62.1 "authorizes a district court whose jurisdiction has been divested by an appeal to 'state either that it would grant the motion if the court of appeals remands for that purpose or that the motion raises a substantial issue.' " *Ret. Bd. of the Policemen's Annuity & Ben. Fund of the City of Chi. v. Bank of N.Y. Mellon*, 775 F.3d 154, 159 n.4 (2d Cir. 2014) (quoting Fed. R. Civ. P. 62.1(a)(3)). The court must therefore consider the merits of the Republic's motion to vacate in order to decide if it would grant the motion on remand.

## Discussion

Courts have the inherent power to vacate their injunctions. *United States v. LoRusso*, 695 F.2d 45, 53 (2d. Cir. 1982); 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2961 (3d ed.) ("Wright & Miller"); *see also* Fed. R. Civ. P. 54(b) (giving courts the power to revise interlocutory orders). Courts may also rely on Federal Rule of Civil Procedure 60(b), which provides that:

> ***5** On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons: ... (5) ... applying it prospectively is no longer equitable; or (6) any other reason that justifies relief.

Courts have "wide discretion" to vacate injunctions. *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 648 (1961); *see also Brown v. Plata*, 131 S. Ct. 1910, 1946 (2011) ("The power of a court of equity to modify a decree of injunctive relief is long-established, broad, and flexible." (quoting *N.Y. State Ass'n of Retarded Children, Inc. v. Carey*, 706 F.2d 956, 967 (2d Cir. 1983))); *Milk Wagon Drivers Union v. Meadowmoor Dairies*, 312 U.S. 287, 298 (1941) ("Familiar equity procedure assures opportunity for modifying or vacating an injunction when its continuance is no longer warranted."); *United States v. Swift & Co.*, 286 U.S. 106, 114 (1932) ("We are not doubtful of the power of a court of equity to modify an injunction in adaptation to changed conditions."); *Matarese v. Lefevre*, 801 F.2d 98, 106 (2d Cir. 1986) ("[Rule 60(b)(6)] confers broad discretion on the trial court to grant relief when appropriate to accomplish justice." (citations omitted)). Accordingly, the standard of review on appeal is whether a court abused of discretion; that is, whether a court's decision to vacate (1) "rests on an error of law or a clearly erroneous factual finding," or (2) "cannot be found within the range of permissible decisions." *In re Terrorist Attacks on Sept. 11, 2001*, 741 F.3d 353, 357 (2d Cir. 2013) (citation omitted).

This considerable discretion does have some limits. Generally, a court may vacate only when "there has been such a change in the circumstances as to make modification of the decree equitable." *Sierra Club v. U.S. Army Corps of Eng'rs*, 732 F.2d 253, 257 (2d Cir. 1984); *see also Davis v. N.Y.C. Hous. Auth.*, 278 F.3d 64, 88 (2d Cir. 2002) (allowing modification "to accommodate changed circumstances" (citing Fed. R. Civ. P. 60(b)(5))). The ultimate question, then, is "whether an ongoing exercise of the court's equitable authority is supported by the prior showing of illegality, judged against the claim that changed circumstances have rendered prospective relief inappropriate." *Salazar v. Buono*, 559 U.S. 700, 718 (2010) (plurality opinion).

A court should also consider "whether the requested modification effectuates or thwarts the purpose behind the injunction." *Sierra Club*, 732 F.2d at 256 (citing *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942)). Put differently, a court usually should not vacate an injunction "in the interest of the defendants if the purposes of the litigation as incorporated in the decree have not been fully achieved." *Id.* at 256 (citing *United States v. United Shoe Mach. Corp.*, 391 U.S. 244, 248 (1968)). Nonetheless, "total compliance" with an injunction "is not an absolute precondition of any modification," *Badgley v. Santacroce*, 853 F.2d 50, 54 (2d Cir. 1988) (citation omitted), and, where equitable, a court may vacate an injunction "even though the purpose of the decree has not been achieved," *United States v. Eastman Kodak Co.*, 63 F.3d 95, 102 (2d Cir. 1995).

Finally, courts may recognize special circumstances that justify a more nuanced approach to the inherent power to vacate injunctions. For example, although changes in fact or law often "afford the clearest bases for altering an injunction," a court's equitable power "extend[s] also to cases where a better appreciation of the facts in light of experience indicates that the decree is not properly adapted to accomplishing its purposes." *King-Seeley Thermos Co. v. Aladdin Indus., Inc.*, 418 F.2d 31, 35 (2d Cir. 1969) (citations omitted). Moreover, a court may vacate "when a decree proves to be unworkable because of unforeseen obstacles; or when enforcement of the decree without modification would be detrimental to the public interest." *Rufo v. Inmates of Suffolk Cty. Jail*, 502 U.S. 367, 383 (1992) (citations omitted); *see also Salazar*, 559 U.S. at 714 ("[A] court should be particularly cautious when contemplating relief that implicates public interests."); Wright & Miller § 2942 ("[B]ecause of its discretionary character, an injunction ... may be modified if circumstances change after it is issued or in the event that it fails to achieve its objectives."); Timothy Stoltzfus Jost, *From* Swift *to* Stotts *and Beyond: Modification of Injunctions in the Federal Courts*, 64 Tex. L. Rev. 1101, 1138 (1986) (arguing that, if an injunction becomes "a tool of oppression" or "obviously inefficient," "the court ultimately has the power to, and should, modify a decree that imposes a burden disproportionate to the benefit it assures").

***6** Here, the Republic and a number of plaintiffs ask the court to exercise its discretion to vacate the injunctions. They argue that the injunctions' continued effect is no longer equitable. The court agrees. The injunctions, once appropriate to address the Republic's recalcitrance, can no longer be justified. Significantly changed circumstances have rendered the injunctions inequitable and detrimental to the public interest.

**1. Changed Circumstances Render the Injunctions Inequitable.**

The original injunctive order explicitly gave this court the power to "modify and amend it as justice requires to achieve its equitable purposes and to account for changing circumstances." Order § 5, *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Feb. 23, 2012). Put simply, President Macri's election changed everything.

Most importantly, the Republic has shown a good-faith willingness to negotiate with the holdouts. Under prior Argentine administrations, plaintiffs had to accept severe haircuts on the value of their bonds, or else engage in a usually fruitless effort to attach property to satisfy their judgments. The Republic never seriously pursued negotiations toward settlement. Instead, the Republic's leadership engaged in rhetoric, calling plaintiffs "vultures" or "financial terrorists," while showing open contempt for this court's rulings. *See* Robin Wigglesworth & Benedict Mander, *Argentina on the Cusp of Peace with Creditors*, Fin. Times (Feb. 16, 2016), *available at* http://on.ft.com/20B7FBk; *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 247 (2d Cir. 2013) (describing the Republic as "a uniquely recalcitrant debtor"). Despite the best efforts of the Special Master, he could not coax the Republic to negotiate with plaintiffs in good faith in 2014 and 2015.

All that has changed. President Macri pledged during his campaign that he would seek to resolve these long-running lawsuits—and he has honored that promise. Not long after President Macri's December 2015 inauguration, the Secretary of Finance approached the Special Master to begin negotiations in earnest. The Republic's high-level officials met with the Special Master and a group of plaintiffs in January 2016 to establish a framework for substantive talks. And, through the first week of February, the Special Master convened a series of meetings in New York. As the Special Master continually informed the court, he communicated intensively with the Republic's officials and the plaintiffs' lead principals on virtually a daily basis. The Republic's senior officials met with a substantial number of plaintiffs as a group, and also spoke separately with a number of those plaintiffs who sought private dialogue with the Republic. By the end of the first week of negotiations, the Republic had reached Agreements in Principle with plaintiffs in five actions, involving payments exceeding $1 billion. At the end of the week, the Republic also issued its public Proposal to settle with all FAA bondholders.

Before the court actually vacates the injunctions, another circumstance must change. As part of the settlement agreements, the Republic must repeal legislative obstacles enacted by prior administrations. Gone will be the Lock Law—the legislation that led the court to fashion these injunctions in the first place—as well as other antagonistic legislation, such as the Sovereign Payment Law. *See generally* Order § 1(b) & (c), *NML Capital Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Feb. 23, 2012); *NML Capital, Ltd. v. Republic of Argentina*, 727 F.3d 230, 241 (2d Cir. 2013). Not only do the very terms of the Republic's Proposal contemplate repeal, but—in the Republic's own words—the lifting of the injunctions would require it. *See* Def.'s Mem. L. Supp.

Mot. Vacate 3, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Feb. 11, 2016). These are truly "exceptional circumstances." *See Motorola Credit Corp. v. Uzan*, 561 F.3d 123, 126 (2d Cir. 2009) (citation omitted).

***7** The Republic's decisions in 2005 to outlaw "any type of in-court, out-of-court or private settlement" (Law 26,017), and in 2009 to pay plaintiffs no more than 29% of the original bonds' value (Law 26,547), are sharply inconsistent with the decisions taken by President Macri's administration. *Compare* Hr'g Tr. 29, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Sept. 28, 2011) (conceding that, in 2011, the Republic would offer plaintiffs no more than it offered the exchange bondholders), *with* Propuesta, 5 de Febrero de 2016 (offering all plaintiffs cash payments equal to the original principal amount of the bond plus 50% of that principal). The Republic's self-imposed conditions—repealing legislative obstacles and paying settlements in full—represent a "dramatic shift in ... policy" that justifies vacating the injunctions. *See Horne v. Flores*, 557 U.S. 433, 461 (2009).

Although the court takes no position on the reasonableness of the Republic's Proposal, the court does recognize the Republic's earnest efforts to negotiate and its striking change in attitude toward settlement since President Macri assumed office. Just as the Republic's conduct in 2012 and 2015 influenced the court's decision to issue the original and "me too" injunctions, so too must the court consider the Republic's present behavior. The balance of equities has shifted, for no longer is the Republic exhibiting "reluctance to entertain meaningful settlement discussions before the Special Master." Op. & Order 10, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Oct. 30, 2015).

Even the objecting plaintiffs have recognized that the Republic's willingness to negotiate a settlement impacts the balance of equities. In arguing that the equities weigh in their favor, those plaintiffs previously invoked the Republic's "refus[al] to negotiate a settlement" and claimed that "[t]he biggest obstacle to settlement is Argentina itself." Pls.' Reply Mem. L. Supp. Mot. Specific Performance 6, 11, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Oct. 9, 2015). And those plaintiffs have acknowledged, from the beginning to the end, that the injunctions would promote settlement and that plaintiffs would support that kind of resolution. [5]

Yet another changed circumstance significantly alters the equities: a number of plaintiffs have now agreed in principle to settle. If the court refused to vacate the injunctions, it would unfairly deny those plaintiffs the opportunity to resolve their disputes amicably with the Republic. It might also create an incentive for the remaining holdout plaintiffs to shun settlement, knowing that they derive leverage from the ability to prevent the Republic and the other plaintiffs from consummating agreements. The injunctions must not be "turned through changing circumstances into an instrument of wrong." *See Swift*, 286 U.S. at 115.

It is also significant that the Republic has not requested the immediate and unconditional lifting of the injunctions. Rather, at the Republic's own urging, the injunctions would remain in effect until it actually makes full payment on all agreements in principle entered into by February 29, 2016, the day before the Argentine Congress reconvenes on March 1. *Cf. Badgley*, 853 F.2d at 51–52 (permitting modification of an equitable order upon fulfillment of certain conditions). The Republic's willingness to impose this condition on itself is compelling evidence of its sincerity and good faith, and stands in stark contrast to the contumacious policies of prior administrations. And the court's retention of jurisdiction should allay any concern that the Republic will return to its old ways.

***8** In sum, circumstances have changed dramatically since the court first issued the injunctions in February 2012. The court finds and holds that maintaining the injunctions would now be inequitable.

**2. Vacating the Injunctions Serves the Public Interest.**

Vacating the injunctions would serve the public interest by ceasing the collateral effects they have on third parties. It would also promote amicable resolution of protracted legal disputes—both generally and in this particular litigation.

The most notable third parties affected by the injunctions are the exchange bondholders. But there are others, too: the financial intermediaries that the Republic engages to help it pay the exchange bondholders; the FAA bondholders who favor settlement but who are not parties to every single case; and the Argentine people generally. Each of these groups will benefit if the court vacates the injunctions.

The court has repeatedly voiced its concern about the exchange bondholders' plight. Hr'g Tr. 11, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

21, 2014) (bemoaning the injunctions' collateral damage to "very innocent third parties"); Hr'g Tr. 15, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug. 8, 2014) ("[S]ettling this case ... will assist real human beings."). When some plaintiffs first sought injunctive relief, they reassured the court that there was "no evidence" that the injunctions would "stop or interfere or impair in any way those exchange offers." Hr'g Tr. 35, 4–5, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Sept. 28, 2011). Yet that is precisely what has happened. Of course, the Republic's decision to default on the exchange bonds was its own, and plaintiffs bear no blame for seeking these injunctions four years ago. But the court may still *now* recognize that it is in the public interest for the Republic to resume paying its restructured debt. If the court vacates the injunctions, the Republic may once again pay the exchange bondholders—something that has not happened for nearly two years.

Vacating the injunctions in all cases further benefits third parties by allowing any FAA bondholder to resolve claims against the Republic. For example, plaintiff EM Limited agreed to settle with the Republic for nearly $1 billion after signing a simple, one-page, handwritten Agreement in Principle. [6] If another plaintiff, armed with an injunction in a different action, could scupper that deal, EM—as a third party to that action—would suffer. The court never intended this result. *See* Hr'g Tr. 39, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Sept. 28, 2011) ("I have felt that the Republic of Argentina had a right to make an exchange offer, and that any bondholders who wished to take that exchange offer had a right to take it. And if they felt that it was beneficial to them, why, that was up to them to make that decision."). Accordingly, if the court lifts the injunctions, it will do so in all cases.

***9** The Court of Appeals has also recognized this court's discretion to consider "the health of the nation" when considering appropriate remedies. *EM Ltd. v. Republic of Argentina*, 131 F. App'x 745, 747 (2d Cir. 2005) ("Exercising discretion with respect to pre– and post-judgment remedies, the District Court acted well within its authority to vacate the remedies in order to avoid a substantial risk to the successful conclusion of the debt restructuring. That restructuring is obviously of critical importance to the economic health of a nation."). Allowing the Republic to reenter the capital markets will undoubtedly help stimulate its economy and thus benefit its people. It might even encourage other indebted nations to choose compromise over intransigence.

Finally, vacating the injunctions serves the public interest by encouraging settlement to resolve disputes generally—particularly such protracted ones—as well as the concern for finality in this particular litigation. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116 (2d Cir. 2005) (recognizing the "strong judicial policy in favor of settlements"). Although such aspirations are broad, the court is mindful that the two interests plaintiffs invoked to support the original injunctions were "enforcing agreements and upholding the rule of law." Pls.' Mem. L. Supp. Renewed Mot. Specific Enforcement 14, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Jan. 6, 2012). The public has a compelling interest in encouraging amicable resolution of longstanding legal battles and ending this massive litigation that dates back nearly fourteen years. *See* Compl., *Applestein v. Argentina Republic*, No. 02-cv-1773 (S.D.N.Y. Mar. 6, 2002). Allowing settlement will further these goals.

**3. The Court May Exercise its Discretion to Vacate the Injunctions.**

Some plaintiffs argue that the court does not have the power to vacate the injunctions. They claim that the court must protect the injunctions' purpose of enforcing the *pari passu* clause. Essentially, these plaintiffs believe the court cannot alter the injunctions if doing so would mean the Republic could pay the exchange bondholders without (1) ratably paying plaintiffs or (2) settling with plaintiffs for the full amount of their claims.

It is important to recall that the plaintiffs had no absolute legal right to the injunctions. An injunction is an extraordinary measure that is not normally available for breach of contract. The *pari passu* clause never *required* the equitable relief that the plaintiffs requested and the court granted. Rather, the court exercised its inherent equitable power to fashion a remedy for the Republic's breach of the plaintiffs' contractual rights. *See* Op., *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6979 (S.D.N.Y. Nov. 21, 2012) (explaining that the injunctions do "not literally to carry out the *pari passu* clause"). In short, the injunctions were a discretionary remedy, not a legal entitlement.

When the court was considering how to craft this equitable remedy, it stressed that the injunctions should not prevent bondholders from settling their claims with the Republic. *See* Hr'g Tr. 40, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Sept. 28, 2011) (expressing the court's desire to find a remedy that would provide "leverage" without

"do[ing] something that would prejudice the rights and opportunities of the people who want to make exchanges"). For years, the court has repeatedly recognized that the only viable way to end this litigation is through settlement—surely for less than the full claim, as the notion of "settlement" implies.[7] To that end, the court appointed a Special Master, who has worked tirelessly and, now, effectively to encourage compromise.

***10** Of course, the court does not have the power to force plaintiffs to accept a settlement. The court notes, however, that the Republic and the Special Master worked diligently to give plaintiffs the opportunity to negotiate and settle their claims. And that process may still continue. Until February 29, 2016, *all* FAA bondholders have the right to accept the terms of the Republic's Proposal, and they are certainly free to make counteroffers. If they reach agreements by that date, they will receive the protections incorporated by this ruling—namely, the Republic must pay their settlements in full before the injunctions are lifted.

Some plaintiffs may choose to reject the Republic's Proposal. That is their right. But that does not diminish the court's discretion to vacate injunctions that would prevent resolution of a meaningful portion of this litigation. The court cannot countenance an equitable remedy that would allow some plaintiffs to hold other plaintiffs hostage. If that were truly the injunctions' effect, it would surely constitute a form of "unforeseen obstacle[ ]" the court had not previously contemplated. *See Rufo*, 502 U.S. at 383.

Lastly, the court wishes to note that the Special Master, Daniel Pollack, has devoted himself to a remarkable degree to carrying out his duties, and he has done so with great skill. His efforts will undoubtedly be of great value in the ultimate resolution of this litigation. He has the thanks of the court.

## Conclusion

For these reasons, the court now indicates that it would vacate the injunctions upon the occurrence of two conditions precedent:

(1) The Republic repeals all legislative obstacles to settlement with the FAA bondholders, including the Lock Law and the Sovereign Payment Law;

(2) For all plaintiffs that enter into agreements in principle with the Republic on or before February 29, 2016, the Republic must make full payment in accordance with the specific terms of each such agreement. The Republic must also notify the court once those plaintiffs have all received full payment.

If the Court of Appeals remands to allow this court to grant the Republic's motion to vacate, the injunctions will be lifted automatically upon fulfillment of these two conditions.

SO ORDERED

**All Citations**

Not Reported in Fed. Supp., 2016 WL 715732

## Footnotes

1 The index numbers of those thirteen actions are 08-cv-6978; 09-cv-1707; 09-cv-1708; 09-cv-8757; 09-cv-10620; 10-cv-1602; 10-cv-3507; 10-cv-3970; 10-cv-8339; 10-cv-4101; 10-cv-4782; 10-cv-9587; 10-cv-5338.

2 The index numbers of those forty-nine actions are 14-cv-8988; 14-cv-8601; 14-cv-8630; 14-cv-8303; 14-cv-8946; 14-cv-8947; 14-cv-7739; 11-cv-4908; 13-cv-8887; 14-cv-1109; 14-cv-3127; 14-cv-5963; 14-cv-7169; 14-cv-7171; 14-cv-7164; 14-cv-7166; 14-cv-7258; 14-cv-8242; 14-cv-8243; 14-cv-10141; 15-cv-0710; 15-cv-1470; 15-cv-1471; 14-cv-10016; 14-cv-10064; 14-cv-10201; 14-cv-7637; 15-cv-1588; 15-cv-2577; 15-cv-2611; 15-cv-5190; 15-cv-5886; 14-cv-9093; 14-cv-5849; 14-cv-4092; 14-cv-4091; 14-

cv-8739; 15-cv-1508; 15-cv-3523; 15-cv-4654; 11-cv-8817; 14-cv-9855; 15-cv-3932; 15-cv-4284; 15-cv-4767; 15-cv-6702; 15-cv-1553; 15-cv-2369; 15-cv-7367.

3 Those plaintiffs are EM Ltd. (No. 14-cv-8303); Montreux Partners, L.P. (No. 14-cv-7171); Los Angeles Capital (No. 14-cv-7169); Cordoba Capital (No. 14-cv-7164); and Wilton Capital, Ltd. (No. 14-cv-7166).

4 Paskin Decl. Ex. E, Dkt. 68, No. 14-cv-8988 (discussing Capital Markets Financial Services settlement); Nate Raymond, *Argentina Reaches Settlement in U.S. Debt Class Action: Mediator*, Reuters (Feb. 16, 2016), *available at* http://www.reuters.com/article/us-argentina-debt-idUSKCN0VP2QE (discussing class-action settlements); Bausili Decl. ¶ 5, Dkt. 59, No. 14-cv-8988 (discussing Italian settlements).

5 *See* Pls.' Mem. L. Supp. Renewed Mot. Specific Enforcement 18, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Jan. 6, 2012) (arguing that the injunctions “could pave the way to a global resolution of this protracted dispute,” while noting that a similar injunction in another case prompted the sovereign “to settle with the plaintiff”); Pls.' Reply Mem. L. Supp. Mot. Specific Performance 12, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Oct. 9, 2015) (“NML would most welcome meaningful settlement discussions with Argentina before the Special Master.”).

6 Where there is good will toward each other, the parties have had no difficulty reaching agreements in principle that are uncomplicated and effective. The court commends the Special Master for helping those parties understand that complexity is not a requisite when agreeing to a monetary settlement of a judgment.

7 *See* Order, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug. 4, 2014) (“It is most important to stay at the settlement table so that the issues in the case can be resolved.”); Hr'g Tr. 29, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. Oct. 28, 2015) (“I have to assume that on this late date in this very lengthy litigation ... that the interested parties, all of them, will participate in settlement negotiations.”); Hr'g Tr. 23–24, *NML Capital, Ltd. v. Republic of Argentina*, No. 14-cv-8601 (S.D.N.Y. May 29, 2015) (“[T]he way to ultimately resolve this litigation must come through settlement.”); Hr'g Tr. 16, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Apr. 22, 2015) (“I hope the Republic at long last will be willing to negotiate.”); Hr'g Tr. 10–11, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug. 21, 2014) (“[T]he thing that is of paramount necessity is to have a settlement.”); Hr'g Tr. 8–9, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug. 8, 2014) (“[T]he really truly important thing is to recognize that this matter will not be resolved without a successful settlement.”). Indeed, even those plaintiffs who now oppose the motion to vacate have previously declared that resolution of these actions would come through settlement. *See* Hr'g Tr. 7, *NML Capital, Ltd. v. Republic of Argentina*, No. 08-cv-6978 (S.D.N.Y. Aug. 21, 2014) (“[W]e, too, believe that a settlement is the way that this matter will ultimately be resolved.”).

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 3

KeyCite Yellow Flag - Negative Treatment
Distinguished by Vanderbilt University v. National Labor Relations Board, M.D.Tenn., December 12, 2024

2024 WL 4127090
Only the Westlaw citation is currently available.
United States District Court, N.D. Ohio, Eastern Division.

NEXSTAR MEDIA, INC. GROUP,
d/b/a WKBN-TV, Plaintiff,
v.
NATIONAL LABOR RELATIONS BOARD, et al., Defendants.

CASE NO. 4:24-cv-01415
|
Signed August 26, 2024

**Synopsis**
**Background:** Employer filed suit against National Labor Relations Board (NLRB), claiming that NLRB unconstitutionally sought legal remedies for unfair labor practices by employer without jury trial in violation of Seventh Amendment, that NLRB members and ALJs were unconstitutionally insulated from removal, and that NLRB's wielding of executive, legislative, and judicial authority and powers violated constitution. Employer moved for temporary restraining order and preliminary injunction to prevent NLRB from proceeding with unfair labor practices administrative action against employer.

**[Holding:]** The District Court, Benita Y. Pearson, J., held that NLRA barred exercise of jurisdiction over claims.

Dismissed.

**Procedural Posture(s):** Motion to Dismiss for Lack of Subject Matter Jurisdiction.

West Headnotes (14)

[1] **Administrative Law and Procedure** Exclusive or original jurisdiction
**Labor and Employment** Unfair labor practice claims in general

In some circumstances, a special statutory review scheme may preclude district courts from exercising jurisdiction over challenges to federal agency action; in such circumstances, the agency fills in for the district court, with the court of appeals providing judicial review, like the NLRA does for unfair labor practice claims. 28 U.S.C.A. § 1331; National Labor Relations Act § 10, 29 U.S.C.A. §§ 160(e), 160(f).

[2] **Administrative Law and Procedure** Exclusive or original jurisdiction

To determine whether a statute prevents judicial review, district court engages in a two-step process: (1) the court looks at whether a statutory scheme displays a fairly discernible intent to limit jurisdiction, and (2) then the court examines whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure.

[3] **Administrative Law and Procedure** Presumptions and burden of proof

Courts consider three factors to decide when a statutory scheme implicitly strips a district court of jurisdiction over challenges to federal agency action, and when the answer to all three of the following questions is yes, courts presume that Congress does not intend to limit jurisdiction, but the same conclusion might follow if the factors point in different directions: (1) whether precluding district court jurisdiction forecloses all meaningful judicial review of the claim, (2) whether the claim is wholly collateral to the statute's review provisions, and (3) whether the claim is outside of the agency's expertise.

[4] **Administrative Law and Procedure** Exclusive or original jurisdiction

The ultimate question in determining when a statutory scheme implicitly strips a district court of jurisdiction over challenges to federal agency action is how best to understand what Congress has done, by inquiring whether the statutory review scheme, though exclusive where it applies, reaches the claim in question.

[5] **Labor and Employment** Unfair labor practice claims in general

**Labor and Employment** Decisions Reviewable

The NLRA's statutory scheme does not allow for district court review of an unfair labor practice; rather, the proceedings go to the National Labor Relations Board (NLRB), and then the NLRB's final order is appealable to an appropriate circuit court of appeals. National Labor Relations Act § 10, 29 U.S.C.A. §§ 160(e), 160(f).

1 Case that cites this headnote

[6] **Labor and Employment** Practices of Employer

Congress intended that NLRA limited jurisdiction of district courts, thus supporting dismissal for lack of jurisdiction over employer's suit claiming that National Labor Relations Board (NLRB) unconstitutionally sought legal remedies for unfair labor practices by employer without jury trial in violation of Seventh Amendment, that NLRB members and ALJs were unconstitutionally insulated from removal, and that NLRB's wielding of executive, legislative, and judicial authority and powers violated constitution, since NLRA's statutory scheme did not allow for district court review of unfair labor practice, so NLRA's structure demonstrated that it was meant to be, and was, comprehensive statute concerning disposition and review of merits of unfair labor practice charges. U.S. Const. art. 2, 3; U.S. Const. art. 3; U.S. Const. Amend. 7; 28 U.S.C.A. § 1331; National Labor Relations Act § 10, 29 U.S.C.A. §§ 160(e), 160(f).

[7] **Jury** Civil Proceedings Other Than Actions; Special Proceedings

When Congress properly assigns a matter to adjudication in a non-Article III tribunal, the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder. U.S. Const. art. 3; U.S. Const. Amend. 7.

[8] **Jury** Nature of Cause of Action or Issue in General

Congress can create administrative schemes for resolving public rights without a jury, but on the other hand, a party seeking private rights legal remedies will require jury trials, under the Seventh Amendment; the question comes down to whether a matter involves public rights or private rights. U.S. Const. Amend. 7.

[9] **Jury** Application of constitutional provisions in general

In determining whether a suit is legal in nature, as would require a jury trial under the Seventh Amendment, courts must consider the cause of action and the remedy it provides, with the remedy as the more important consideration; a remedy is legal in nature when it is designed to punish or deter the wrongdoer rather than solely to restore the status quo. U.S. Const. Amend. 7.

[10] **Jury** Application of constitutional provisions in general

The key to determining whether a request for monetary relief is equitable, or legal and thus requiring a jury trial under the Seventh Amendment, is the nature of the relief sought. U.S. Const. Amend. 7.

[11] **Labor and Employment** Practices of Employer

National Labor Relations Board (NLRB) requested relief for employer's unfair labor practices, including holiday pay, projected

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

earned wages, insurance reimbursement, interest on claimed backpay, and lost investment earnings, that did not constitute legal remedy requiring jury trial, and thus, dismissal for lack of jurisdiction over employer's suit would not foreclose meaningful review of employer's claim that NLRB unconstitutionally sought legal remedies for unfair labor practices without jury trial in violation of Seventh Amendment, since employer failed to distinguish how NLRB's remedies were designed to punish or deter, rather than to restore status quo, and if employer correctly anticipated that NLRB would exceed its authority, that issue could be raised in Court of Appeals under NLRA. U.S. Const. Amend. 7; 28 U.S.C.A. § 1331; National Labor Relations Act § 10, 29 U.S.C.A. §§ 160(e), 160(f).

1 Case that cites this headnote
More cases on this issue

[12] **Labor and Employment** Practices of Employer

NLRA's statutory review scheme provided relief that employer sought in claiming that National Labor Relations Board (NLRB) unconstitutionally sought legal remedies for unfair labor practices without jury trial in violation of Seventh Amendment, and thus, employer's claim was not wholly collateral to NLRA's review provisions, thereby supporting dismissal of employer's suit for lack of jurisdiction, since employer could challenge NLRB's monetary judgment under NLRA, and Seventh Amendment did not apply because employer raised public right. U.S. Const. Amend. 7; 28 U.S.C.A. § 1331; National Labor Relations Act § 10, 29 U.S.C.A. § 160(f).

2 Cases that cite this headnote
More cases on this issue

[13] **Labor and Employment** Remedies
**Labor and Employment** Remedies

The NLRA charges the National Labor Relations Board (NLRB) with the task of devising remedies to effectuate the policies of the NLRA; the NLRB's power is a broad discretionary one, subject to limited judicial review. National Labor Relations Act § 10, 29 U.S.C.A. § 160(c).

[14] **Labor and Employment** Practices of Employer

Employer's suit claiming that National Labor Relations Board (NLRB) unconstitutionally sought legal remedies for unfair labor practices by employer without jury trial in violation of Seventh Amendment was within NLRB's expertise, thus supporting dismissal of suit for lack of subject matter jurisdiction, since NLRA conferred NLRB with broad remedial powers subject to limited judicial review. U.S. Const. Amend. 7; 28 U.S.C.A. § 1331; National Labor Relations Act § 10, 29 U.S.C.A. § 160(c).

1 Case that cites this headnote
More cases on this issue

**Attorneys and Law Firms**

Dean Kpere-Daibo, Constangy, Brooks, Smith & Prophete, St. Louis, MO, Robert A. McMahon, Eberly McMahon Copetas, Cincinnati, OH, for Plaintiff.

David P. Boehm, Contempt, Compliance & Special Litigation Branch, Washington, DC, for Defendants.

Judiann Chartier, Communication Workers of America, AFL-CIO, Washington, DC, for Amicus AFL-CIO NABET-CWA NABET-CWA, AFL-CIO.

**ORDER**

[Resolving ECF Nos. 5 and 13]

Benita Y. Pearson, United States District Judge

***1** This matter comes before the court on Nexstar Media Group, Inc., d/b/a WKBN-TV's Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 5), which seeks the issuance of a preliminary injunction to prevent the National Labor Relations Board from proceeding with an administrative action the NLRB filed against Plaintiff. The NABET-CWA, AFL-CIO filed a Motion For Leave to

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

File *Amici Curiae* Brief (ECF No. 13). Having reviewed the party's filings and applicable law and heard argument of counsel the Court finds that it lacks jurisdiction.

## I. Background

### A. Administrative Proceedings

According to Plaintiff's motion:

> On or about May 3, 2023, the National Association of Broadcast Employees and Technicians – Communications Workers of America, AFL-CIO ("Union") filed an unfair labor practice charge ("ULP") with Region 8 of the National Labor Relations Board ("NRLB"). Nexstar responded, per the NLRB's request, to the ULP with evidence and legal arguments on January 2, 2024. On February 2 and 24, 2024, after Nexstar refuted the Union's allegations, the NLRB permitted the filing of two amended ULPs.
>
> On May 23, 2024, the NLRB issued an administrative complaint, seeking the following legal remedy: "reimbursement of direct and foreseeable consequential damage ... incurred as a result of Respondent's unlawful conduct." [ECF No. 5-2 at PageID #: 125]. Subsequent to the filing of the administrative complaint, the NLRB served a proposed settlement seeking "compensation for direct or foreseeable pecuniary harm." [ECF No. 5-3 at PageID #: 134]. This document alleged $38,550.36 in monetary harm, including (a) $8,165.24 in interest on wages, expenses, and excess tax liability; (b) $6,000 in spousal opt-out cash benefits; and (c) $6,381.15 in health insurance costs. [ECF No. 5-3 at PageID #: 134].
>
> On July 31, 2024, Nexstar filed a motion for summary judgment, arguing, among other things, that the Board violated the Seventh Amendment by seeking legal remedies without a trial by jury. On August 2, 2024, the Board effectively acknowledged that it violated the Constitution by issuing an amended administrative complaint, withdrawing its claim for consequential damages. [ECF No. 5-4]. Nexstar filed an amended motion for summary judgment on August 12, 2024. A hearing on the administrative complaint is presently scheduled for August 27, 2024. [ECF No. 5-4].

ECF No. 5-1.

### B. District Court Proceedings

On August 20, 2024, Plaintiff Nexstar. filed a Verified Complaint (ECF No. 1) against Defendants NLRB; NLRB Chairpersons Jennifer Abruzzo and Lauren M. McFerran, Board Members Gwynne A. Wilcox, Marvin E. Kaplan, and David M. Prouty, Regional Director for Region 8 of the NLRB Iva Y. Choe, Acting and/or Former Acting Regional Director for Region 8 of the NLRB Nora McGinley, and the Administrative Law Judge ("ALJ") (collectively, "Defendants"). Plaintiff brought the following claims against Defendants: (1) "the NLRB unconstitutionally seeks legal remedies without a jury trial in violation of the Seventh Amendment (ECF No. 1 at PageID #: 11), (2) "board members are unconstitutionally insulated from removal" (ECF No. 1 at PageID #: 16), (3) ALJs are unconstitutionally isolated from removal" (ECF No. 1 at PageID #: 19), and (4) "the board's wielding of executive, legislative, and judicial authority and powers violates Article III, § 1 of the Constitution" (ECF No. 1 at PageID #: 22). Plaintiff requests declaratory relief, including that the Court declare that:

> ***2** the practice and/or policy of the NLRB to seek "consequential damages" as remedies for unfair labor practices in matters proceeding before an Administrative Law Judge violates the Seventh Amendment's guarantee of trial by jury for legal claims; the practice and/or policy outlined in GC 21-06 and GC 24-04 violates the Seventh Amendment on the same grounds; the statutes, regulatory provisions, guidance, and/or policies restricting the removal of NLRB ALJs, including 5 U.S.C. § 7521(a), are unconstitutional; and the statutes, regulatory provisions, guidance, and/or policies restricting the removal of Board Members, including 29 U.S.C. § 153(a), are unconstitutional.

ECF No. 1 at PageID #: 25. Plaintiff also requests that the Court: (1) preliminarily enjoin Defendants from subjecting Plaintiff to administrative proceedings seeking an unconstitutional remedy and unconstitutionally constructed

administrative proceedings pending the final resolution of this action, and (2) permanently enjoin Defendants from implementing or carrying out any policy or practice of seeking legal remedies without a trial by jury and unconstitutional removal-protection provisions of ALJs. ECF No. 1 at PageID #: 25.

On August 21, 2024, Plaintiff filed its motion for a temporary restraining order and preliminary injunction. ECF No. 5. Plaintiff seeks the same remedies as requested in its Verified Complaint, but also seeks to enjoin the administrative hearing scheduled for August 27, 2024. ECF No. 5 at PageID #: 118. Defendants filed a response (ECF No. 11), and on August 23, 2024, the Court held a hearing on the motion for temporary restraining order and preliminary injunction. At the hearing, the Court heard argument on jurisdiction and the factors governing a temporary restraining order. *See* Minutes of proceedings, 08/23/2024.

The Court, prior to the hearing, also directed Plaintiff to file a Notice explaining the Court's jurisdiction. Order [non-document], 08/22/2024. Plaintiff complied (ECF No. 12), and Defendants filed an emergency motion for leave to file a response to the Notice (ECF No. 14). At the hearing, Plaintiff requested time to file a reply, which the Court granted. An *Amici Curiae* Brief (ECF No. 13) was filed by the AFL-CIO and NABET Unions. The Court hereby grants the leave sought.

## II. Jurisdiction

Plaintiff asserts that 28 U.S.C. § 1331 confers the Court jurisdiction because its "Complaint raises claims under the Seventh Amendment of the Constitution, Article II, Sections 2 and 3 of the Constitution, and Article III of the Constitution." ECF No. 12 at PageID #: 193. Additionally, it asserts that § 1331confers jurisdiction because Plaintiff's claims arise pursuant to the National Labor Relations Act 29 U.S.C. § 151, *et seq.* ECF No. 12 at PageID #: 193.

The Defendants contend that Nexstar failed to meet its burden to prove that the Court has jurisdiction. ECF No. 14-1 at PageID #: 222. It asserts that 29 U.S.C. §§ 160(e) and (f) displaces the Court's 28 U.S.C. § 1331 jurisdiction over a facial, pre-enforcement challenge. ECF No. 14-1 at PageID #: 222-24. Additionally, as a matter of first impression, the NLRB asserts that the Norris-LaGuardia Act jurisdictionally bars Plaintiff's request for injunctive relief. ECF No. 14-1 at PageID #: 224.

In reply, Plaintiff asserts that the Court should find jurisdiction over its claims as set forth in *Axon* and *Thunder Basin*, and that the Norris-LaGuardia Act is inapplicable to bar its request for injunctive relief. ECF No. 16 at PageID #: 228-39.

### A. Plaintiff's Reliance on *Axon*

**[1]** District courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331. In some circumstances, however, "[a] special statutory review scheme ... may preclude district courts from exercising jurisdiction over challenges to federal agency action." *Axon Enter., Inc. v. FTC,* 598 U.S. 175, 185, 143 S.Ct. 890, 215 L.Ed.2d 151 (2023). In such circumstances, "[t]he agency fills in for the district court, with the court of appeals providing judicial review[ ]", "like the NLRA does for unfair labor practice claims." *Id.* at 185, 143 S.Ct. 890; *see also* *Burnett Specialists v. Abruzzo,* No. 4:22-CV-00605, 2023 WL 5660138, at *5 (E.D. Tex. Aug. 31, 2023).

***3** Plaintiff relies on *Axon* to assert that the NLRA does not preclude the Court from retaining jurisdiction because it seeks relief for a here-and-now injury. ECF No. 12 at PageID #: 194. It asserts that it will "suffer the harm of being subject to an illegitimate proceeding, led by an illegitimate decision maker on August 27, 2024[ ]", which gives rise to a here-and-now injury. ECF No. 12 at PageID #: 195. Particularly, Plaintiff raises three arguments: (1) that the NLRB lacks the structure or mechanisms to conduct a trial by jury notwithstanding the fact that the NLRB seeks legal remedies[ ]"; (2)"29 U.S.C. § 153(a) violates the structure of Article II ... because it limits the President's power to remove NLRB Board Members[ ]"; and (3) "the limitations on removal for ALJs violates the structure of Article II, Section 2 of the Constitution." ECF No. 12 at PageID #: 195.

**[2]** To determine whether a statute prevents judicial review, the Court engages in a two-step process. *Cochran v. U.S. Sec. & Exch. Comm'n*, 20 F.4th 194, 206 (5th Cir. 2021). First, the Court looks at whether "a statutory scheme displays a fairly discernible intent to limit jurisdiction." *Id.* (citation omitted). Next, the Court examines "whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure." *Id.*

**[3]** **[4]** For the second step under *Cochran*, courts consider the three factors that the Supreme Court first articulated in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207-15, 114 S.Ct. 771, 127 L.Ed.2d 29 (1994) to determine when a statutory scheme implicitly strips a district court of jurisdiction:

> First, could precluding district court jurisdiction "foreclose all meaningful judicial review" of the claim? ... Next, is the claim "wholly collateral" to the statute's review provisions? ... And last, is the claim "outside of the agency's expertise"? When the answer to all three questions is yes, we 'presume that Congress does not intend to limit jurisdiction. But the same conclusion might follow if the factors point in different directions. The ultimate question is how best to understand what Congress has done—whether the statutory review scheme, though exclusive where it applies, reaches the claim in question.

*Axon*, 598 U.S. at 186, 143 S.Ct. 890 (citations omitted).

### B. Whether the NLRA Displays an Intent to Limit Jurisdiction

**[5]** **[6]** With respect to the first step under *Cochran*, the Court concludes that Congress intended that the NRLA limit jurisdiction. The NLRA's statutory scheme does not allow for district court review of an unfair labor practice—the proceedings go to the Board, and then the Board's final order is appealable to an appropriate circuit court of appeals. *Beverly Health & Rehab. Servs., Inc. v. Feinstein,* 103 F.3d 151, 152 (D.C. Cir. 1996). Such structure indicates that Congress intended that the NLRA "is meant to be, and is, a comprehensive statute concerning the disposition and review of the merits of unfair labor practice charges." *N.L.R.B. v. United Food & Com. Workers Union, Loc. 23, AFL-CIO*, 484 U.S. 112, 131, 108 S.Ct. 413, 98 L.Ed.2d 429 (1987).

### C. Whether the claims at issue are of the type Congress intended to be reviewed within the statutory structure

Next, the Court must determine whether the NLRA's scheme covers the precise claims that Plaintiff raises through utilizing the three factors listed in *Axon* and *Thunder Basin*.

#### a. The "Foreclosure of Meaningful Judicial Review" Factor

Plaintiff contends that the Court has jurisdiction over Nexstar's Seventh Amendment right to jury trial claim, because the alternative will foreclose Nexstar from all meaningful judicial review. ECF No. 16 at PageID #: 230. Specifically, it alleges that NLRB "attempt[s] to compel Nexstar to litigate legal damages without the benefit of trial by jury [which] makes their prosecution of the administrative complaint an illegitimate proceeding before an illegitimate decision-maker." ECF No. 16 at PageID #: 232.

***4** In *Axon*, the Supreme Court's explanation with respect to the first *Thunder Basin* factor—whether preclusion of district court jurisdiction "could foreclose all meaningful judicial review"—was the least straightforward in the case before it. 598 U.S. at 190, 143 S.Ct. 890. The harm to the plaintiffs was "being subjected" to "unconstitutional agency authority." *Id.* The Supreme Court found such an unconstitutional exercise of agency authority was "impossible to remedy once the proceeding is over, which is when appellate review kicks in" under the applicable judicial review statutes for actions of the Federal Trade Commission (FTC) and the Securities and Exchange Commission (SEC). *Id.* The Supreme Court concluded that when the plaintiffs' claim was that they were "being subjected to an illegitimate proceeding," a court of appeals could do nothing, because once the proceeding happened, it could not be undone, so that judicial review would come too late to be meaningful. *Id.*

**[7]** The Supreme Court has established that "when Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinders." *Meta Platforms, Inc. v. Fed. Trade Comm'n*, No. CV 23-3562 (RDM), —— F.Supp.3d ——, ——, 2024 WL 1121424, at *19 (D.D.C. Mar. 15, 2024) (quoting *Oil States Energy Servs., LLC v. Greene's Energy Grp.*, LLC, 584 U.S. 325, 345, 138 S.Ct. 1365, 200 L.Ed.2d 671 (2018)); *see also Granfinanciera, S.A. v. Nordberg,* 492 U.S. 33, 53–54, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989); *see also Atlas Roofing Co., Inc. v. Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 450-55, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977) ("[W]hen Congress creates new statutory 'public rights,' it may assign their adjudication to an administrative agency with which a jury trial would be incompatible, without violating the Seventh Amendment .... This is the case even if the Seventh Amendment would have required a jury where the adjudication of those rights is assigned instead to a federal court of law instead of an administrative agency.")

**[8]** The Supreme Court has recognized that in some circumstances, as in *Atlas Roofing*, Congress can create administrative schemes for resolving public rights without a jury. *Occupational Safety & Health Rev. Comm'n*, 430 U.S. 442, 97 S.Ct. 1261, 51 L.Ed.2d 464 (1977). On the other hand, as indicated in *Granfinanciera,* a party seeking private rights legal remedies will require jury trials. 492 U.S. 33, 50, 109 S.Ct. 2782, 106 L.Ed.2d 26 (1989). The question comes down to whether a matter involves public rights or private rights. *Oil States Energy Servs.*, 584 U.S. 325, 334, 138 S.Ct. 1365, 200 L.Ed.2d 671 (2018).

**[9]** Pursuant to *Sec. & Exch. Comm'n v. Jarkesy,* "[t]o determine whether a suit is legal in nature ... courts must consider the cause of action and the remedy it provides." ––– U.S. ––––, 144 S. Ct. 2117, 219 L.Ed.2d 650 (2024). Notably, the Supreme Court finds the remedy to be a " 'more important' consideration". *Id.* A remedy "is legal in nature when it is designed to punish or deter the wrongdoer rather than solely to 'restore the status quo.' " *Id.*

The Supreme Court has determined that unfair labor practices under the NLRA do not invoke the Seventh Amendment, because it is a statutory remedy "unknown to the common law". *N.L.R.B. v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 48, 57 S.Ct. 615, 81 L.Ed. 893 (1937). Furthermore, the *Laughlin* court held that the Seventh Amendment "has no application to cases where recovery of money damages is an incident to equitable relief even though damages might have been recovered in an action at law." *Id.* at 48-49, 57 S.Ct. 615.

**[10]** **[11]** Plaintiff contends that Defendants request for the following monetary relief constitutes a legal remedy, because it "unquestionably is 'designed to punish or deter':

> (a) [h]oliday pay **if** scheduled and worked – 2x hourly wage;"3 (b) "**projected** earned wages;" (c) "$3,000 per year reimbursement if use another employer's insurance" or "$6,000 (spouse's opt-out health insurance case benefit)" (d) a 7% or 8% interest rate on claimed backpay; and (e) "**lost investment earnings**." [Exhibits A and B].

ECF No. 16 at PageID #: 232-34 (internal citations omitted). This argument lacks merit because it is speculative and contrary to a here-and-now injury. Under Sixth Circuit jurisprudence, the key to determining whether a request for monetary relief is equitable or legal is "the nature of the relief sought." *Hildebrand v. Bd. of Trustees of Michigan State Univ.*, 607 F.2d 705, 708 (6th Cir. 1979). *Assuming arguendo* that Plaintiff's argument is not speculative—Plaintiff failed to distinguish how such remedies are designed to punish or deter, rather than to restore the *status quo* as required pursuant to *Jarkesy*. 144 S. Ct. at 2119 (2024).

***5** Furthermore, Plaintiff's contention that its Seventh Amendment rights are violated because "the NLRA merely provides for equitable relief, [and] the Board here has unlawfully expanded its authority by seeking monetary damages against Nexstar for well beyond making the alleged aggrieved party whole through an equitable award[ ]"is not persuasive. ECF No. 5-1 at PageID #: 110. Essentially, Plaintiff raises an argument to the NLRA—not a Seventh Amendment violation. And more to the point, if Nexstar is correct in anticipating that the NLRB will exceed its authority, that issue may be raised in the Court of Appeals which will have authority to modify such a ruling or set it aside, pursuant to 29 U.S.C. § 160 (f). *See e.g., Sysco Grand Rapids, LLC v. Nat'l Lab. Rels. Bd.*, 825 F. App'x 348, 360 (6th Cir. 2020).

This *Thunder Basin* factor weighs against jurisdiction.

### b. The Collateralism Factor

**[12]** Plaintiff contends that the NLRA "statutory review scheme does not provide Nexstar the relief [it] seeks—to protect its right to a jury". ECF No. 16 at PageID #: 236. However, as previously explained, the Seventh Amendment does not apply to this action, because Plaintiff raises a public right.

Nevertheless, the NLRA's statutory review scheme does provide the relief that Plaintiff seeks—Plaintiff can challenge the monetary judgment:

> Any person aggrieved by a final order of the Board granting or denying in whole or in part the relief sought may obtain a review of such order in any United States court of appeals in the circuit wherein the unfair labor practice in question was alleged to have been engaged in or wherein such person resides or transacts business, or in the United States Court of Appeals for the District of Columbia, by filing in such a court a written petition

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

> praying that the order of the Board be modified or set aside.

29 U.S.C. § 160(f). This *Thunder Basin* factor weighs against jurisdiction.

**c. Whether Plaintiff's Seventh Amendment Claim Goes Beyond the NLRB's Expertise**

Plaintiff contends that the Defendant's request for monetary relief goes beyond the NLRB's expertise. ECF No. 16 at PageID #: 237-38.

**[13]** **[14]** The Supreme Court has recognized that 29 U.S.C.§ 160(c) confers the NLRB with broad remedial powers: "[Section 10(c)] 'charges the Board with the task of devising remedies to effectuate the policies of the Act .... The Board's power is a broad discretionary one, subject to limited judicial review' " *Fibreboard Paper Prod. Corp. v. N. L. R. B.,* 379 U.S. 203, 216, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (citation omitted). This third *Thunder Basin* factor weighs against jurisdiction and, as indicated above, can be corrected by an appellate court's ruling.

**D. Application of the Norris-LaGuardia Act**

Defendants argue, in the alternative, that the Norris-LaGuardia Act also precludes the Court's jurisdiction. ECF No. 14-1 at PageID #: 224. Plaintiff asserts that the Norris-LaGuardia Act is inapplicable to the instant case because the instant dispute is "between Nexstar and the N.L.R.B.". ECF No. 16 at PageID #: 240. The Court is unpersuaded. Despite Plaintiff's arguments to the contrary, the case before it is intended to divert the NLRB's ability to administratively resolve the dispute initiated by the National Association of Broadcast Employees and Technicians – Communications Workers of America, AFL-CIO. Nevertheless, the Court need not reach this alternative argument.

Based on the above, the Court finds that the *Cochran* analysis, including the three *Thunder Basin* factors convey that the Court lacks jurisdiction.

**III. Temporary Restraining Order**

Because the Court lacks jurisdiction, it is unable to rule on the motions for injunctive relief. Specifically, the question of jurisdiction and Plaintiff's motion for temporary restraining order overlap significantly. Plaintiff's stated reason for seeking injunctive relief in federal court was to avoid a "here-and-now" irreparable injury. *See* ECF 12 PageID ## 2-3 ("Nexstar alleges precisely the type of 'here-and-now' injuries contemplated by *Axon*"). The Court's finding that no such injury lurks if the NLRB continues to preside would be a formidable barrier to the injunctive relief sought. *See In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985). ("Courts may grant one only if the plaintiffs present 'a clear showing' that they are likely to prevail on the merits, that they face irreparable harm without an injunction, that the balance of equities favors them, and that the public interest supports an injunction."); *L. W. by and through Williams v. Skrmetti,* 83 F.4th 460 (6th Cir. 2023).

**IV. Conclusion**

***6** For the reasons above, the Court lacks jurisdiction and closes the matter.

IT IS SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2024 WL 4127090

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 4

2014 WL 461217
Only the Westlaw citation is currently available.
United States District Court,
E.D. Wisconsin.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
Christoper HOHOL, and Brian Poshak, Defendants.

No. 14–C–41.
|
Feb. 5, 2014.

**Attorneys and Law Firms**

Drew Matthew Dorman, Yuri B. Zelinsky, Kelly Rock, United States Securities And Exchange Commission, Washington, DC, for Plaintiff.

Daniel J. Blinka, Godfrey & Kahn SC, Milwaukee, WI, for Defendant.

Brian Poshak, Green Bay, WI, pro se.

**DECISION AND ORDER**

RUDOLPH T. RANDA, District Judge.

***1** This matter is before the Court on the motion filed by the Plaintiff, Securities and Exchange Commission ("S.E.C."), for entry of proposed "final" Judgments as to the Defendants, Christopher Hohol ("Hohol") and Brian Poshak ("Poshak"). (ECF No. 2.) Poshak appears without counsel. As will be further explained, the Court declines to enter the proposed judgments as presented and will require the S.E.C. to supplement its filings by the stated deadline.

The Complaint, filed contemporaneously with the motion, alleges that during at least the three years from 2008 to 2011, the Defendants, while senior executives at Veolia Environmental Services Special Services ("Special Services"), a United States subsidiary of Veolia Environnement S.A. ("Veolia"), violated Section 13(b)(5) of the Securities Exchange Act of 1934, 15 U.S.C. § 78m(b)(5); and Rule 13b2–1 thereunder, 17 C.F.R. § 240.13b2–1; and aided and abetted Veolia's violations of Section 13(b)(2)(A) of the Exchange Act, 15 U.S.C. § 78m(b)(2)(A), by carrying out an illegal scheme. (ECF No. 1.) Hohol was the most senior executive at Special Services, and Poshak was the comptroller. Both Hohol and Poshak resigned from Veolia in May 2011.

The scheme, directed and primarily carried out by Hohol, involved overstating Special Services' earnings before taxes ("EBT") by falsifying accounting records and circumventing corporate internal controls. Special Services overstated its EBT by about $9 million in 2008, $25 million in 2009, and $30 million in 2010. During the relevant period, Veolia paid bonuses of $136,000 and $28,000 to Hohol and Poshak, respectively, that were substantially based upon the financial performance of Special Services. Therefore the Defendants had a motive for ensuring that Special Services appeared profitable.

Veolia consolidated the false financial information that Special Services provided—as a result of Hohol and Poshak's misconduct—into its publicly disclosed financial statements. As a result, Veolia's financial statements for at least the years 2008 through 2010 overstated its income by the same amounts that Special Services overstated its EBT. Veolia filed those financial statements with the S.E.C. The Complaint seeks a permanent injunction against the Defendants, disgorgement, and civil penalties pursuant to 15 U.S .C. § 78u(d)(3).

The motion for entry of judgment is based on the parties' agreement to settle this action. Each defendant has consented to the entry of judgment against him pursuant to the terms of a consent document, (ECF No. 1–3 (Hohol), ECF No. 1–6 (Poshak)), and has also "agree[d] that the Commission may present the Final Judgment to the Court for signature and entry without further notice" (*Id.,* ¶ 13.)

Hohol has consented to an order requiring that he disgorge $136,000 plus $16,649 in prejudgment interest for a total of $152,649; however, all amounts other than $106,000 are waived based on Hohol's sworn "Statement of Financial Condition" dated September 30, 2013, and other documents submitted to the S.E.C. However, the waiver of $46,649 in disgorgement and prejudgment interest, and the lack of the imposition of a civil penalty, are based on the accuracy and completeness of the information provided by Hohol to the S.E.C. regarding his assets, income, liabilities, and net worth. If at any time after the entry of final judgment the S.E.C. obtains information indicating that those representations were fraudulent, misleading, inaccurate, or incomplete, the S.E.C. may petition the Court, without notice to Hohol, for an order requiring Hohol to pay the unpaid portion of the

disgorgement, pre- and post-judgment interest thereon, and the maximum civil penalty allowed by law.

***2** Poshak is ordered to disgorge $28,000 plus $3,500 in prejudgment interest. A civil penalty is waived based on the sworn representations in Poshak's "Statement of Financial Condition" dated October 21, 2013, and other documents and information submitted to the S.E.C. However, the decision not to impose a civil penalty is based on the accuracy and completeness of the information provided by Poshak to the S.E.C. regarding his assets, income, liabilities, and net worth. If at any time after the entry of final judgment the S.E.C. obtains information indicating that those representations were fraudulent, misleading, inaccurate, or incomplete, the S.E.C. may petition the Court, without notice to Poshak, for an order requiring Poshak to pay the unpaid portion of the disgorgement, pre- and post-judgment interest thereon, and the maximum civil penalty allowed by law.

Despite the deference afforded to the determination of an administrative agency, *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 866, 104 S.Ct. 2778, 81 L.Ed.2d 694, (1984), without additional information about each defendant's financial condition and the potential civil penalties under three-tier penalty structure of 15 U.S.C. § 78u(d)(3) that are being waived, the Court has insufficient information to assess whether, as to each defendant, the proposed judgments are fair, reasonable, adequate, and in the public interest. The Court requests that the S.E.C. provide a written factual predicate for why it believes the Court should find that the proposed final judgments are fair, reasonable, adequate, and in the public interest. *S.E.C. v. Citigroup Global Mkt., Inc.,* 827 F.Supp.2d 328, 330–31 (S.D.N.Y.2011), *stayed pending appeal,* 673 F.3d 158, 169 (2d Cir.2012); *United States v. Wells Fargo Bank, NA,* 891 F.Supp.2d 143, 144–45 (D.D.C.2012).

The Court also calls the parties' attention to paragraph three, lines nine and ten of Hohol's consent to judgment stating that the S .E.C. may petition the Court for payment of "the unpaid portion of the disgorgement, prejudgment and post-judgment interest thereon." It is unclear whether that amount includes the waived portions of the disgorgement. The Court has also considered section IV of the proposed judgment and it does not resolve the question. The issue does not arise with Poshak because he is disgorging *all* his ill-gotten bonuses from Veolia.

Additionally, the proposed judgments provide permanent injunctive relief barring Hohol and Poshak from any future violations of the statutory provisions identified in the Complaint. However, as required by the controlling case law the S.E.C. must revise its proposed Judgment *to include,* rather than incorporate by reference, provisions of Hohol and Poshak's consents to judgment. *See Schmidt v. Lessard,* 414 U.S. 473, 476–77, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974); *International Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n, ODG* 389 U.S. 64, 73–76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967); *Blue Cross & Blue Shield Ass'n v. Am. Express Co.,* 467 F.3d 634, 636–37 (7th Cir.2006); *Marseilles Hydro Power, LLC v. Marseilles Land & Water* Co., 299 F.3d 643, 646 (7th Cir.2002). This requirement is consistent with the Court's directives in *S.E.C. v. Koss Corporation,* Case No. 11–C–991 (E.D.Wis.) (ECF Nos. 7 & 9) and *S .E.C. v. Enea,* Case No. 13–C–1151 (E.D.Wis.) (ECF No. 7).

***3** Furthermore, the revised Judgments should eliminate the following statement: "[t]here being no just reason for delay, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Clerk is ordered to enter this Final Judgment forthwith and without further notice." While such a statement is required when final judgment is entered as to "one or more, but fewer than all, claims or parties," Fed.R.Civ.P. 54(b), the statement is not appropriate or necessary in this instance because in this action judgment is being entered against both Defendants and resolves all the claims against each of them. *See* 10 Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice and* Procedure, § 2656 (1998) (stating the most obvious of the implicit limitations of Rule 54(b) is "when all the claims have been determined as to all the parties.").

Finally, the Court raises the question of whether the proposed Judgments are final judgments because neither expressly states the disposition of the claims against the defendant; e.g., dismissal without prejudice, while including a provision for the retention of jurisdiction over the enforcement of the terms of the settlement agreement. With respect to the retention of the Court's jurisdiction, the SEC's attention is directed to *Shapo v. Engle,* 463 F.3d 641, 642–46 (7th Cir.2006) and Blue Cross & Blue Shield Ass'n, 467i F.3d at 636–39. In that regard, the Court also directs the S.E.C.'s attention to *S.E.C. v. Enea,* No. 13–C–1151, 2013 WL 6223017, at *1 (E.D.Wis. Nov.26, 2013).

**NOW, THEREFORE, BASED ON THE FOREGOING, IT IS HEREBY ORDERED THAT:**

The S.E.C. **MUST RESPOND** to this Decision and Order **by February 28, 2014.**

Subsequent to e-filing, the S.E.C. is asked to send a copy of any proposed judgment in a non-PDF format (Word or Word Perfect) to the Court's proposed order email box: RandaPO@wied.uscourts.gov

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 461217

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 5

KeyCite Blue Flag – Appeal Notification
Appeal Filed by SEC v. Carebourn Capital, LP, et al, 8th Cir., November 8, 2024

2024 WL 4249546
Only the Westlaw citation is currently available.
United States District Court, D. Minnesota.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
CAREBOURN CAPITAL, L.P.; Carebourn Partners, LLC, Relief Defendant; and Chip Alvin Rice; Defendants.

No. 21-cv-2114 (KMM/JFD)
|
Signed September 20, 2024

**Attorneys and Law Firms**

Charles J. Kerstetter, Christopher H. White, Timothy J. Stockwell, United States Securities and Exchange CO, Chicago, IL, Craig R. Baune, United States Attorney's Office, Minneapolis, MN, for Plaintiff.

Cassandra Jacobsen, Cozen O'Connor, Minneapolis, MN, Jason Scott Juran, Lee A. Hutton III, The Hutton Firm, PLLC, Minneapolis, MN, Joseph P. Dever Jr., Pro Hac Vice, New York, NY, for Defendants Carebourn Capital, L.P., Carebourn Partners, LLC, Chip Alvin Rice.

**ORDER**

Katherine Menendez, United States District Judge

***1** The Securities and Exchange Commission brought this action alleging that Defendants Carebourn Capital, L.P. ("Carebourn Capital") and Chip Alvin Rice violated Section 15(a) of the Securities Exchange Act of 1934 by acting as unregistered securities dealers. Between 2017 and 2021, through the use of convertible promissory notes, Carebourn Capital and Mr. Rice bought and sold billions of newly issued shares of microcap securities, also known as penny stocks, resulting in several million dollars in revenue. The SEC also alleged that Carebourn Capital and Rice charged penny stock issuers transactional fees that were paid directly to Relief Defendant Carebourn Partners, LLC ("Carebourn Partners"). On September 27, 2023, the Court denied the Defendants' motion for summary judgment and granted summary judgment in favor of the SEC as to all three Defendants' liability.

This matter is now before the Court on the SEC's Motion for Remedies. ECF 186. The SEC seeks the following remedies against Carebourn Capital and Mr. Rice: (1) permanent injunctions prohibiting them from further violating the federal securities laws as alleged in the SEC's complaint; (2) permanent penny-stock bars; (3) an order requiring them to pay, jointly and severally, disgorgement of net profits of $10,135,738.71, and prejudgment interest of $950,173.40, totaling $11,085,912.11; and (4) a civil penalty of $642,500 against each. Further, the SEC asks the Court to Order Relief Defendant Carebourn Partners to pay disgorgement of $1,109,306.50, and prejudgment interest of $103,924.66, totaling $1,213,231.16. Finally, the SEC seeks an order requiring Defendants to surrender for cancellation shares of stock from, and conversion rights under, convertible notes that issuers sold to them.

Defendants have agreed to surrender their remaining shares of stock and conversion rights. Based on that agreement, the Court will Order that relief below without further discussion. However, Defendants otherwise oppose the relief the SEC seeks. Defendants maintain that: the SEC has failed to make the required showing for entry of a permanent injunction or a penny-stock bar; the SEC has not demonstrated that disgorgement of any profits is appropriate, and even if it were, the amount of disgorgement requested is excessive; the Court should not impose any civil penalty, but even if it does, the amount should be far less than the SEC demands; and the SEC's calculation of prejudgment interest is excessive.

The Court held a hearing on the SEC's motion by videoconference on July 22, 2024. Having considered the entire record and the parties' arguments, the SEC's motion is granted in part and denied in part as explained in this Order.

### I. Post-Hearing Letter Briefing

An "interested party," Darkpulse, Inc. observed the hearing through its counsel. Before the SEC commenced this action, Carebourn Capital sued Darkpulse in Minnesota state court. Eventually, Darkpulse obtained a judgment in its favor in the state court action. Like this Court, the state court found that Carebourn engaged in unregistered dealer activity in violation of the federal securities laws. With permission of the Court, Darkpulse filed a letter concerning the remedies phase of

this litigation. Darkpulse asserts that if the Defendants had registered as dealers, they would not have been able to engage in the lending activity that forms the basis of the SEC's claims in this case. Darkpulse also suggested that Mr. Rice made certain false statements in his declaration. ECF 218. The SEC and Defendants filed responsive letters, and Mr. Rice filed a corrected declaration clarifying an earlier error. ECF 221, 222, 223. The Court has reviewed these submissions and considered them to the extent they contain information the Court considers relevant to the remedies questions before it.

***2** Of note, the Court is not persuaded by Darkpulse's suggestion in its letter that Mr. Rice made an intentionally false statement in his declaration provided in opposition to the motion for remedies when he stated that neither he nor Carebourn Capital had previously been found to have engaged in any violation of the dealer-registration requirement though the state court had previously reached the same conclusion that this Court did in its summary judgment order. This is an unreasonable reading of his declaration because, in a paragraph found later in the declaration, Mr. Rice specifically discusses the judgment the state court entered against Carebourn Capital. ECF 205 ¶ 18. If he had engaged in a misrepresentation with the intent to mislead the Court it would have been a curious way to do so by identifying the very case in which another court had made an adverse finding against him. Beyond that, the Court finds that nothing in the parties' post-hearing letters is outcome determinative, and it would have reached the same conclusions set forth in this Order had they not been submitted.

Only one aspect of the parties' letters requires additional comment—namely, the second letter filed by Defendants. ECF 225. In their second letter, Defendants argue that Darkpulse's submission should be stricken from the record because its counsel violated the Local Rules of the District of Minnesota and engaged in unauthorized practice of law by filing the submission without having been admitted pro hac vice in this litigation. Defendants also asked the Court to issue sanctions against Darkpulse's counsel for requiring Defendants to engage in extra work responding to the letter brief. Next, Defendants argue that the state court's judgment in the Darkpulse litigation is based upon flawed rulings by Hennepin County District Judge Patrick Robben. Finally, Defendants contend that the averments in Darkpulse's letter require the Court to hold an evidentiary hearing concerning remedies and "stay the issue of liability." Defendants' second letter reflects little more than the acrimony between it and Darkpulse and varyingly includes or hints at remarkably unreasonable requests for relief from this Court. In requesting that the Court sanction Darkpulse's counsel, Defendants ignore the fact that the undersigned expressly permitted them to file their letter brief. It would be difficult to imagine a decision more unreasonable than allowing an attorney to take an action in a case and then sanctioning them for doing that very thing. These requests for sanctions are rejected.

The Court also rejects Defendants' suggestion that statements in Darkpulse's letter require an evidentiary hearing and some alteration of the Court's liability ruling. If it doesn't ask for it explicitly, Defendants' request for an evidentiary hearing comes perilously close to arguing an appeal of the state court judgment, which this Court, of course, would not entertain. In any event, nothing in Darkpulse's letter requires the Court to resolve disputed factual issues in this case through an evidentiary hearing. Nor will the Court "stay the issue of liability." The Court has already concluded the SEC is entitled to summary judgment on liability, so there is nothing to stay, and Defendants have neither received permission to file a motion for reconsideration, nor shown that the Court's summary judgment decision ought to be revisited.

## II. Permanent Injunction and Penny Stock Bar

Because the law governing whether the Court should issue a permanent injunction and impose a penny-stock bar involves consideration of very similar, if not identical, factors, the Court discusses these issues together.

### A. Legal Standards for Injunctive Relief and Industry Bar

#### 1. Permanent Injunction

***3** "The SEC is entitled to injunctive relief when it establishes (1) a prima facie case of previous violations of federal securities laws, and (2) a reasonable likelihood that the wrong will be repeated." *SEC v. Keener*, 644 F. Supp. 3d 1290, 1298-99 (S.D. Fla. 2022) (quoting *SEC v. Calvo*, 378 F.3d 1211, 1216 (11th Cir. 2004)). Courts consider several factors when assessing the likelihood the defendant will engage in future wrongdoing:

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

> (1) the egregiousness of the defendant's actions, (2) the isolated or recurrent nature of the infraction, (3) the degree of scienter involved, (4) the sincerity of the defendant's assurances against future violations, (5) the defendant's recognition of the wrongful nature of his conduct, and (6) the likelihood that the defendant's occupation will present opportunities for future violations.

*Id.* at 1299; *SEC v. Shanahan*, No. 07-cv-2879 (JNE/JJG), 2010 WL 173819, at *9 (D. Minn. Jan. 13, 2010) (substantially same); *see also* *SEC v. Cap. Solutions Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 892 (D. Minn. 2014) (considering "(1) the degree of scienter involved; (2) the isolated or repeated nature of the violations; (3) the defendant's recognition of the wrongful nature of her conduct; and (4) whether, because of the defendant's professional occupation, future violations could be anticipated").

**2. Penny Stock Bar**

"Under the Exchange Act, a court may prohibit any person who, at the time of the alleged misconduct, was participating in any offering of penny stock from participating in any future offering of penny stock." *Keener*, 644 F. Supp. 3d at 1302 (quoting *SEC v. Almagarby*, 17-cv-62225, 2021 WL 4461831, at * 4 (S.D. Fla. Aug. 16, 2021)). "Before a court may enter a penny stock bar, the SEC must demonstrate that the stock at issue in the violations under review is, in fact, a penny stock." *Id.* (quoting *SEC v. Huff*, 758 F. Supp. 2d 1288, 1357 (S.D. Fla. 2010)).

In deciding whether to impose a penny stock bar, courts consider: "(1) the egregiousness of the underlying securities law violation; (2) the defendant's repeat offender status; (3) the defendant's role or position when he engaged in the [misconduct]; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *SEC v. Becker*, No. 09 CIV. 5707 (SAS), 2010 WL 2710613, at *1 (S.D.N.Y. July 8, 2010) (internal quotation marks omitted); *see also* *Shanahan*, 2010 WL 173819, at *16 (considering same factors in deciding whether to enter an officer/director bar based on a violation of section 10(b) of the Exchange Act); *SEC v. Universal Exp., Inc.*, 475 F. Supp. 2d 412, 429 (S.D.N.Y. 2007) ("The standard for imposing such a bar essentially mirrors that for imposing an officer-or-director bar.").

**B. Discussion**

Several factors support imposition of both an injunction and a penny-stock bar. First, the Court finds that the recurrent nature of the Defendants' misconduct weighs in favor of the requested injunctive relief and the bar on future penny-stock activity. Although Defendants argue that they engaged in a single violation of the dealer-registration requirement because they only failed to register once, [1] this characterization ignores the reality of their conduct. Each time the Defendants purchased convertible promissory notes, converted them into newly issued shares of stock at steep discounts from market prices, and then promptly sold as many converted shares into the market as they could, they engaged in unregistered-dealer activity. They did this hundreds of times during the relevant period, and it is a mischaracterization for Defendants to suggest that their conduct in this case involved a single violation of the securities laws. *See* *Keener*, 644 F. Supp. 3d at 1299 ("[T]he R&R accurately concludes that Keener's conduct was recurrent because he disregarded the dealer registration requirement during a period of over three years as he acted as an unlicensed dealer.... That conduct was not an isolated incident, but a systemic practice of noncompliance with the Exchange Act.").

***4** Second, Mr. Rice's occupation as a longtime participant in the financial markets presents opportunities for future violations of the registration requirement. Mr. Rice has extensive experience acting as an unregistered dealer, and the Court finds that it is reasonably likely that he will engage in future violations if injunctive relief is not imposed.

Third, there is no question that Mr. Rice and Carebourn Capital have a significant economic stake in the violation of the securities laws at issue in this case. As the Court has already found, their unregistered-dealer activity generated millions of dollars in revenue over several years. And fourth, the Court finds that Mr. Rice was the central decision-maker who had the ultimate responsibility to decide which issuers Carebourn Capital would contract with to purchase convertible promissory notes. These factors provide additional support for imposition of injunctive relief and a penny-stock bar.

Other factors are neutral, weigh against imposition of injunctive relief or a penny-stock bar, or do not plainly point in one direction or the other. For example, the parties agree that Carebourn Capital and Mr. Rice did not act with scienter in violating the Exchange Act's dealer-registration requirement. This is consistent with the position taken by the SEC in summary-judgment briefing, with which the Court agreed, that a failure to register is a strict-liability offense that requires no showing of scienter. Nevertheless, the absence of a showing that Defendants acted with scienter does not necessarily preclude imposition of an injunction or a penny-stock bar. *See**SEC v. Almagarby*, 92 F.4th 1306, 1321 (11th Cir. 2024) (explaining that although "scienter is an important factor in this analysis, it is not a prerequisite to injunctive relief") (quotations omitted); *see also**Keener*, 644 F. Supp. 3d at 1299–30 (imposing permanent injunction against future unregistered-dealer activity despite no showing of scienter). Although it is not dispositive, this factor weighs in favor of the Defendants.

The Court also finds that the SEC has failed to show that Mr. Rice's and Carebourn Capital's actions in failing to register were "egregious." The SEC suggests that the recurrent or "systematic" violation of the registration requirement supports this factor. Pls.' Mem. 7–8. While the Court has found that the recurrent nature of the violation here weighs in favor of injunctive relief and a penny-stock bar, these are listed as separate factors in the case law. Finding a defendant's conduct to be egregious merely because it is recurrent renders one of these factors superfluous. *Almagarby*, 92 F.4th at 1323 (rejecting the district court's acceptance of the SEC's position that defendant's conduct was egregious because it "spanned over three years and thousands of transactions" because that analysis "collapses the egregiousness determination into the recurrence factor"). The SEC has not presented evidence either to suggest that Defendants' violations of the dealer-registration requirement were "blatant" or that they involved fraud or scienter. *Id.* at 1324 (explaining that "several facts indicat[e] egregiousness: (1) 'blatant' securities-law violations, (2) knowingly or recklessly making material misrepresentations or omissions (fraud), and (3) scienter").

The Court also finds that consideration of the Defendants' attitude regarding their conduct does not clearly support a permanent injunction and permanent penny-stock bar. The SEC takes the position that Mr. Rice and Carebourn Capital are recalcitrant and that they continue to insist they did nothing wrong. However, Defendants have had every right to disagree with the SEC's allegations and put up a vigorous defense. Moreover, they still retain their appeal rights. *SEC v. Johnson*, 595 F. Supp. 2d 40, 45 (D.D.C. 2009) ("Needless to say, [defendant] has a right to vigorously contest the SEC's allegations and was not required to 'behave like Uriah Heep in order to avoid an injunction.' ") (citing *SEC v. First City Financial Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989)); *see also**Shanahan*, 2010 WL 173819 at *15 (same). Like the *Keener* court, this Court gives little weight to this factor. *See**Keener*, 644 F. Supp. 3d at 1300.

***5** Next, the Court considers Mr. Rice's assurances against future violations. Mr. Rice offered a declaration, submitted under penalty of perjury, in which he states that he "acknowledge[s] and respect[ ]s the Court's summary judgment ruling in favor of the SEC." Rice Decl. ¶ 3, ECF 205. Further, he conveys his understanding of the Court's decision and declares that he "fully intend[s] to comply with and abide by the Court's ruling in this case." *Id.* And he testifies "I have no intention nor desire to engage in the same investment activities in the future and I certainly have no intention to do so again without registration as a dealer under the federal securities laws. The same is true for Carebourn Capital." *Id.* ¶ 8. Based on these statements, the Defendants contend that Mr. Rice has provided adequate assurances against future violations, and they argue that the SEC's enforcement of the dealer-registration requirement through lawsuits like this one has effectively eliminated any market for Defendants to engage in similar future violations. The SEC argues that the Court should be unmoved by Mr. Rice's declaration. Specifically, the SEC points out that these statements are undermined because (1) Defendants purchased a convertible note and sold penny-stock after the SEC initiated this suit; (2) they were uncooperative in the underlying investigation; and (3) Mr. Rice "repeatedly lied during his deposition." Pls.' Reply 22, ECF 207; Pls.' Mem. 19.

Having considered the parties' competing arguments about the sincerity of Mr. Rice's assurances, the Court finds that this factor does not ultimately tip the balance in any particular direction. The Court is not particularly persuaded by the SEC's reliance on the fact that Defendants purchased a convertible note and sold penny-stock after the SEC initiated this lawsuit. To place significant emphasis on that fact would suggest that merely because they had been sued, Defendants were required to agree with the SEC, or at a minimum, to take the most cautious approach possible. While a more conservative approach may have been the prudent course

of action here, the Court cannot say that this renders Mr. Rice's current assurances insincere. Nor does Defendants' lack of cooperation during the underlying investigation weigh heavily in this analysis, though the Court does note that it is an important consideration when determining whether to impose civil penalties. However, the Court is very troubled by Mr. Rice's deposition testimony in this case and the way in which it flatly contradicted earlier testimony he had given during the SEC's investigation. Summary Judgment Order 17–18, 27–28 (discussing inconsistencies between deposition testimony and prior testimony in effort to create issues of fact for trial). Although the Court does not fully adopt the SEC's characterization that Mr. Rice "repeatedly lied under oath," this does not mean the Court ignores the importance of this issue. Mr. Rice demonstrated a willingness to, at best, significantly shape testimony provided under oath to suit his purposes depending on the stage of the proceedings. As a result, the Court does not have unreserved faith in the sincerity of the assurances he has provided now in his effort avoid the consequences of his unregistered dealer activity.

Ultimately, whether to impose a permanent injunction or even a more limited injunction, and whether to impose a penny-stock bar require a consideration of the totality of the circumstances and the foregoing factors inform whether the SEC has shown a reasonable likelihood that Defendants will engage in future violations absent injunctive relief. Carebourn Capital continues to operate as an investment business, and Mr. Rice, as its controlling officer, has had a lengthy career focused on the financial markets. Such a "firm position in the financial industry," combined with years of noncompliance with the Exchange Act's dealer-registration requirement support a finding that Defendants will engage in future violations if no injunctive relief is imposed. *Keener*, 644 F. Supp. 3d at 1301 (finding that the defendant's "decade-long history of noncompliance and nondisclosure, when combined with his firm position in the financial industry," supported imposition of a permanent injunction). The Court also finds support for this decision in the fact that during the investigation and this litigation, Mr. Rice provided contradictory testimony, which undermines the weight given to his assurances that he will not engage in future unregistered dealer activity.

***6** The SEC asks the Court to enter the following permanent injunction against future violations of the dealer-registration requirement:

> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that Carebourn Capital, L.P. and Chip Rice ("Defendants") are permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78***o***(a)(1)], as a dealer [15 U.S.C. § 78c(a)(5)], by making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security pursuant to 17 C.F.R. § 240.15a-2 or commercial paper, bankers' acceptances, or commercial bills), unless the Defendants are registered with the Commission as a dealer, or associated with a registered dealer, in accordance with Exchange Act Section 15(b).
>
> **IT IS FURTHER ORDERED, ADJUDGED, AND DECREED** that as provided in Federal Rule of Civil Procedure 65(d)(2), the foregoing paragraph also binds the following who receive actual notice of this Final Judgment by personal service or otherwise: (a) Defendants' general partners, limited partners, members, managing members, officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

ECF 192 at 1–2.

Defendants argue that if the Court concludes that injunctive relief is appropriate, it should only "impose time-limited relief instead of life-time injunctive relief." Defs.' Opp'n at 32. However, the cases Defendants cite in support of this request for, at most, time-limited injunctive relief do not persuade the Court that the permanent injunction requested here is inappropriate. Indeed, in two of the cited cases, even though courts limited the duration of the industry bars to a term of years, they imposed permanent injunctions. *SEC v. Findley*, No. 3:20-cv-0397 (SRU), 2024 WL 707264, at *11–12 (D. Conn. Feb. 21, 2024) (providing a time-limited industry bar prohibiting the defendant from serving as an officer or director of a publicly-traded company, but imposing a permanent injunction against future violations of fraud provisions in the Exchange Act and Securities Act); *SEC v. Gallison*, 2023 WL 3004882, at *2–3 (S.D.N.Y. Feb. 4, 2023) (imposing permanent injunction and a time-limited officer-and-director bar). Because the permanent injunction here does not limit future participation in the financial services industry, but only future illegality, this authority is less persuasive.

Defendants do not otherwise argue that the form of the permanent injunction requested by the SEC is improper. Accordingly, the SEC's motion is granted to the extent it seeks

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

a permanent injunction against Defendants prohibiting future violations of the dealer-registration requirement.

The Court will also grant, in part, the SEC's request for imposition of a penny-stock bar, though it will not impose this industry bar permanently on Carebourn Capital and Mr. Rice. There is no dispute that Defendants' conduct in this case involved penny stocks, nor that the Court has the authority to bar Carebourn Capital and Mr. Rice from participating in the offering of any penny stock. *See*15 U.S.C. § 78u(d)(6) ("In any proceeding ... against any person participating in, or, at the time of the alleged misconduct who was participating in, and offering of penny stock, the court may prohibit that person from participating in an offering of penny stock...."). Nevertheless, in determining whether to impose such a prohibition, the Court is mindful that the bar requested by the SEC would "prohibit[ ] unlawful *and* lawful penny-stock transactions," *Almagarby*, 92 F.4th at 1322, for the remainder of Mr. Rice's life and for as long as Carebourn Capital exists. The record in this case does not support a permanent injunction against future lawful penny-stock transactions, though Defendants' conduct does support a more limited penny-stock bar.

***7** Defendants suggest that the Court should follow *Almagarby* and find that this record does not support any industry bar at all. Like *Almagarby*, 92 F.4th at 1323–26, where the Eleventh Circuit reversed the district court's imposition of a penny-stock bar, this case does not involve scienter or egregious conduct, and Defendants should not be punished for defending themselves in this litigation. However, unlike the defendant in *Almagarby*, as explained above, this case does provide "reason to question the sincerity" of Mr. Rice's "assurances against future securities-law violations." *Id.* at 1323. Indeed, the Court has explained above why it is not inclined to unreservedly accept Mr. Rice's assurances. And unlike Mr. Almgarby, Mr. Rice has not moved on to employment in an entirely different field. *Id.* at 1322 (indicating that Almagarby was employed in a home-repair business). In short, this case is different enough from *Almagarby* that the Eleventh Circuit's decision does not persuade the Court that no penny-stock bar would be appropriate here.

The SEC highlights that Mr. Rice engaged in at least one penny-stock transaction after the SEC filed suit, failed to comply with the SEC's administrative subpoenas until the SEC asked a federal court to hold Defendants in contempt, and provided testimony during his deposition in this case that directly conflicted with his prior testimony during the SEC's investigation. According to the SEC, these circumstances more closely align with the situation addressed by *Keener* court than that involved in *Almagarby*, and consequently, the SEC argues that this Court should impose a permanent penny stock bar upon Defendants. Pl.'s Mem. 8; Pl.'s Reply 21–22. However, the *Keener* court did not impose a permanent penny-stock bar; rather, it limited the duration of the bar to a specific term of years. 644 F. Supp. 3d at 1303 (adopting the defendant's "proposal to temporarily limit the penny stock bar to five years"). The Court similarly finds that, in this case, the SEC has failed to show "a reasonable likelihood that [Carebourn Capital and Mr. Rice] cannot *ever* engage in lawful penny stock offerings." *Id.* The Court also notes that while Defendants engaged in unregistered-dealer transactions on a recurrent basis over many years, the conduct at issue in this case did not occur after Defendants had already been found to have violated the dealer-registration rules. *SeeSEC v. Patel*, 61 F.3d 137, 142 (2d Cir. 1995) (indicating that a "before imposing a permanent bar," a court should consider whether there has been a "prior history of unfitness").

Accordingly, the Court will not permanently bar Defendants from engaging in any penny stock offering, trading, etc., as requested by the SEC. However, the Court will limit the scope of the penny-stock bar to a period of three years from the date of this Order.

### III. Disgorgement

The SEC requests an Order requiring Carebourn Capital and Mr. Rice to pay, on a joint-and-several basis, disgorgement of net profits of $10,135,738.71. In addition, the SEC asks the Court to require Relief Defendant Carebourn Partners to pay disgorgement of $1,109,306.50, based on its receipt of ill-gotten gains from the conduct of Carebourn Capital and Rice.

#### A. Legal Standards for Disgorgement

Disgorgement is an equitable remedy that serves the purpose of depriving a wrongdoer of ill-gotten gains. *SEC v. Keener*, No. 20-cv-21254-BLOOM, 2022 WL 17748407, at *7 (S.D. Fla. Aug. 8, 2022), *R&R adopted in part, rejected in* part, 644 F. Supp. 3d 1290 (S.D. Fla. 2022).

There are two potential sources of a court's authority to issue an award of disgorgement under the Exchange Act. First, under 15 U.S.C. § 78u(d)(5), when the SEC brings an action under the securities laws, a court "may grant, any equitable relief that may be appropriate or necessary for the

benefit of investors." Although the statute does not define "equitable relief," in *Liu v. SEC*, 591 U.S. 71 (2020), the Supreme Court held that "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is [permissible] equitable relief...." *Id.* at 74–75. The Supreme Court explained that disgorgement is a traditional equitable remedy focused on depriving wrongdoers of net profits attributable to their wrongdoing. *Id.* at 79–81. Therefore, courts are required to "deduct legitimate expenses before ordering disgorgement under § 78u(d)(5)." *Id.* at 91–92. In addition, the Court interpreted § 78u(d)(5)'s requirement that equitable relief be "appropriate or necessary for the benefit of investors" to mean that a disgorgement remedy "must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id.* at 89.

***8** After *Liu*, courts have generally held that the SEC can satisfy the so-called "victim-benefit requirement" by demonstrating that it plans to distribute disgorged funds to investors if it is able to collect. *Almagarby*, 92 F.4th at 1320 (finding that the SEC adequately satisfied the victim-benefit requirement by explaining "that it planned to distribute awards to counterparties who had purchased shares from Almagarby and were negatively affected by the price impact of his selling activity); *SEC v. Arias*, No. 12-cv-2937 (RPK) (SIL), 2023 WL 1861641, at *4 (E.D.N.Y. Feb. 9, 2023) (finding it sufficient that "the SEC has stated that it will return disgorged funds to investors if it can collect them.... At this stage of the litigation, such a representation is enough."); *SEC v. Penn*, No. 14-CV-581 (VEC), 2021 WL 1226978, at *14 (S.D.N.Y. Mar. 31, 2021) (collecting cases); *SEC v. NIR Grp., LLC*, No. 11-CV-4723 (JMA) (AYS), 2022 WL 900660, at *4 (E.D.N.Y. Mar. 28, 2022). Other courts have required a more substantial showing. *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023) (finding an abuse of discretion where the district court determined that investors were victims without finding that they suffered pecuniary harm); *SEC v. Lemelson*, 596 F. Supp. 3d 227, 238 (D. Mass. 2022) ("[T]he SEC has not provided any evidence that it could identify victims and has left open whether it is feasible to create a Fair Fund.").

The second source is also found in Section 78u, and it is more direct. After the Supreme Court decided *Liu*, Congress amended section 78u. *See* William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388, 4626. The statute now provides that "[i]n any action or proceeding brought by the [SEC] under any provision of the securities laws, the [SEC] may seek, and any Federal court may order, disgorgement."15 U.S.C. § 78u(d)(7). Notably, the 2021 amendment to the statute no longer requires that the equitable remedy of "disgorgement" be "for the benefit of investors." *SeeKeener*, 644 F. Supp. 3d at 1305; *SEC v. O'Brien*, 674 F. Supp. 3d 85, 103 (S.D.N.Y. 2023) ("[A]fter *Liu*, Congress enacted amendments to the relevant portion of the Exchange Act, suggesting that courts have greater discretion to order disgorged funds to be deposited with the Treasury.").

With respect to the amount of any disgorgement remedy, courts have found that the SEC need only provide a "reasonable approximation of the profits causally related to the fraud." *Lemelson*, 596 F. Supp. 3d at 238 (quotation omitted); *see alsoSEC v. Capital Solutions Monthly Income Fund, LP*, 28 F. Supp. 3d 887, 897 (D. Minn. 2014) ("As long as the measure of disgorgement is reasonable, the wrongdoer should bear the risk of any uncertainty."). And the SEC also must show that the profits are "causally connected to the violation" of the securities laws. *SEC v. Drake*, No. 2:20-cv-00405 MCS (PLAx), 2021 WL 12299079, at *2 (C.D. Cal. Oct. 7, 2021).

> The amount of disgorgement need only be a reasonable approximation of profits causally connected to the violation.... The SEC carries the burden of persuasion as to whether the disgorgement figure reasonably approximates the amount of unjust enrichment.... After the SEC meets this burden, a defendant must then demonstrate that the disgorgement figure was not a reasonable approximation.... Additionally, the ill-gotten gains include prejudgment interest to ensure that the wrongdoer does not profit from the illegal activity.

*Id.* (internal citations and quotations omitted).

**B. Discussion**

**1. Reasonable Approximation**

As discussed below, the Court finds that the SEC has met its burden to show that during the relevant period

of January 1, 2017 through September 24, 2021, a reasonable approximation of Carebourn Capital's and Mr. Rice's net profits from their unregistered dealer business is $10,135,738.71. Further, the SEC has shown that during that same period, Relief Defendant Carebourn Partners received $1,109,306.50 in transactional fees charged by Defendants to issuers of the convertible notes as a result of Defendants' unregistered-dealer activity. And Defendants have failed to demonstrate that the SEC's calculation of disgorgement amounts is not a reasonable approximation of net profits.

***9** The SEC establishes a reasonable approximation of Defendants' net profits through the declarations of Craig McShane. First McShane Decl., ECF 129; Second McShane Decl., ECF 190. For the period of January 1, 2017 through September 24, 2021, McShane reviewed general ledgers and "master files" containing securities purchase agreements, conversion notices, convertible notes, and disbursement authorizations, as well as documents from brokers, transfer agents, issuers of notes and stocks, traditional banks, accountants, and other service providers hired by Defendants. First McShane Decl. ¶¶ 3–4. Over that time, Carebourn Capital purchased 93 convertible notes from 27 different issuers, purchased 18 convertible notes from third parties, and converted shares of 37 convertible notes across 23 different issuers. It spent $17,499,051.84 to purchase the notes in the form of cash to issuers, purchases from third parties, and fees paid to service providers such as attorneys and auditors. *Id.* ¶ 15. Over that same time, Carebourn Capital's gross revenue from stock sales across 32 issuers was $26,170,463.29; $4,940,834.83 in repayments of principal on convertible notes from 23 issuers; $527,343.70 from the sale of 12 convertible notes from six issuers to third parties, and $22,500 from fees charged to two issuers. *Id.* ¶¶ 16–17. This resulted in total cash receipts of $31,661,141.82, and subtracting the $17,711,181.85 in expenditures Carebourn Capital laid out to acquire the convertible notes, McShane determined that Carebourn Capital's net income was $13,949,959.97. *Id.* ¶¶ 18–19.

McShane further reviewed financial statements from Carebourn Capital for the years 2017–2021 in an effort to identify additional business expenses to be deducted from Carebourn Capital's net income. Second McShane Decl. ¶ 7. He did not include certain expenses among those deductions, such as $98,501.88 in rent that Carebourn Capital paid to Linrick Industries; $1,820,788.79 in commission payments that Carebourn Capital paid to Linrick; $17,633,098.58 in "bad debt" expenses identified in the financial statements as principal note balances deemed no longer collectible; expenses for advertising ($25,208), travel ($6,806), meals and entertainment ($1,277); and fees ("200,068), office ($12), management ($2,000), and reimbursements ($2,433) for which McShane could not confirm the specific business purpose.[2] *Id.* ¶ 8. Setting aside those expenses, McShane identified $3,814,221.26 in business expenses to be excluded, and he determined that a reasonable approximation of $10,135,738.71. *Id.* ¶¶ 7, 9.[3]

Further, McShane explained that during the review period, documentation showed that Carebourn Partners received $1,109,306.50 in "transactional expense" fees charged to penny stock issuers that entered the convertible note agreements with Carebourn Capital. *Id.* The transactional expense fees were included in the principal amount of the notes that the issuer was required to repay and were paid directly to Carebourn Partners from Carebourn Capital. First McShane Decl. ¶ 20 & Ex. E.

Defendants challenge the sufficiency of the SEC's showing in three ways: (1) the SEC has failed to meet its burden because Mr. McShane's calculations are based on an insufficient review of relevant documents that should have included Defendants' financial statements and tax returns; (2) Mr. McShane's approximation should have written off millions in so-called "bad debt" expenses rather than including them in the Defendants' income; and (3) if the Court grants the SEC's request for disgorgement, Defendants suggest a reasonable approximation of net profits should be no more than $1,176,087. The Court finds these arguments unpersuasive.

First, Defendants argue that it is unclear what documents McShane reviewed and that his calculations are unreliable because he should have based them on Carebourn Capital's financial statements and tax returns. But McShane plainly stated the types of documentation that he relied upon in conducting his assessment of Defendants' net revenue obtained from the relevant transactions, and he used financial statements to identify proper business expenses. First McShane Decl. ¶ 3; Second McShane Decl. ¶¶ 3, 7. Defendants have not persuaded the Court that McShane's calculations fail to provide a reasonable approximation of profits because of any lack of clarity regarding the documents he reviewed.

***10** Second, Defendants' base their own calculations in large part on writing off certain "bad debt" expenses that

the Court finds should not be excluded from a reasonable approximation. Defendants removed the costs of loans that they deemed worthless from Carebourn Capital's balance sheet as a bad debt expense. Third McShane Decl. ¶ 5, ECF 208.[4] Between January 1, 2017 and September 24, 2021, Carebourn Capital's balance sheets reflect $18,211,414.00 in such bad debt expenses. *Id.* ¶ 6. However, in the SEC's assessment, Mr. McShane already accounted for bad debt expenses during the relevant period as "cash to issuers," so these amounts have already been factored into the approximation of net profits. First McShane Decl. ¶ 8(c). In addition, McShane explains that a total of 30 percent of these expenses—totaling $5,508,968.27—were based on convertible notes and other assets purchased by Carebourn Capital prior to January 1, 2017, but written off as expenses in subsequent years. Third McShane Decl. ¶ 7. However, Defendants' own calculations do not include any income generated from the notes purchased prior to the relevant period, whether in the form of principal payments or through stock conversions. Including the losses for these transactions, but not the gains undervalues the profits actually obtained in the relevant period. Further, some of the bad debt expenses reflected in Defendants' calculations include transactional fees that were paid to Carebourn Partners as opposed to any issuers. *See* Third McShane Decl. ¶ 10. The Court finds that deducting such bad debt expenses from the calculation of Defendants' profits would not be appropriate.[5]

### 2. Defendants' Remaining Arguments

The Court also finds unpersuasive Defendants' remaining arguments that the SEC failed to show that disgorgement was for the benefit of investors, that the SEC has proved no causal connection between the statutory violation at issue in this case and any profits Defendants obtained, and that the SEC has not met its burden with regard to Relief Defendant Carebourn Partners.

***For the Benefit of Investors***

First, Defendants contend that under *Liu*, to show that a disgorgement award is for the benefit of investors, the SEC is required to demonstrate specific instances where investors suffered pecuniary harm as a result of Defendants' conversions of the notes and subsequent stock sales. Although this presents an interesting question that the Eighth Circuit has not squarely addressed, the Court does not adopt Defendants' position. The Court agrees with the Eleventh Circuit's analysis in *Almagarby*. 94 F.4th at 1320. As explained in *Almagarby*, the principal holding in *Liu* is that an award of "disgorgement must not exceed a wrongdoer's net profits and must be awarded for victims to be permissible under section 78u(d)(5)." *Id.* (internal quotations omitted). However, the SEC is not required to "link loss amounts to specific instances of investor harm to satisfy the requirements of section 78u(d)(5)." *Id.* (citing *SEC v. GenAudio Inc.*, 32 F.4th 902, 952–53 (10th Cir. 2022)). Instead, the SEC need only "identify investors who have suffered pecuniary harm" to show that a disgorgement award is "for the benefit of investors" under § 78u(d)(5) and demonstrate that it intends to distribute the award to investors. *Id.*; *accord**SEC v. Keener*, 102 F.4th 1328, 1337 (11th Cir. 2024) (following *Almagarby* and finding that *Liu*'s victim-benefit requirement was satisfied where the SEC provided evidence that investors had stock price declines and the agency "promised to distribute the disgorged profits to investor-victims who suffered from [the defendant's] activity"); *but see**SEC v. Govill*, 86 F.4th 89, 105 (2d Cir. 2023) (finding that the district court abused its discretion by awarding disgorgement without showing that particular investors suffered "pecuniary harm").

***11** In addition, the Court notes that the post-*Liu* amendment to the statute, adding § 78u(d)(7), explicitly provides that disgorgement may be awarded, but it does not include the "for the benefits of investors" language found in § 78u(d)(5). Under this provision, the Court has even greater flexibility, and may prevent unjust enrichment by disbursing collected funds that cannot be returned to investors to the Treasury. *Keener*, 644 F. Supp. 3d at 1305; *SEC v. Spartan Secs. Gr., Ltd.*, 620 F. Supp. 3d 1207, 1225 (M.D. Fla. 2022) ("Between the money staying with [the defendant] or a fund at the Treasury, it is more equitable to order disgorgement.").

The SEC has made the required showing here. An SEC financial economist identified the dates of Carebourn Capital's sales of stocks from penny-stock issuers through various broker-dealers. Gullapalli Decl. ¶ 6, ECF 191. He obtained data for the issuers' market prices from a subscription-based database that provides comprehensive financial market data and compared it to the Defendants' trading records to identify the price movement that coincided with Defendants' trades. *Id.* ¶ 7. Based on that comparison, he found that the share prices of issuers whose stock was sold by Carebourn Capital experienced large declines over the trading periods, and 28 out of 29 issuers' share prices dropped during the period in which Defendants made their trades. *Id.* ¶ 8; *id.*, Exs. 1–5. Moreover, the SEC avers that it intends to establish

a fair fund for distribution of disgorged funds to Carebourn Capital's investors and issuers, and "[a]ssuming there are adequate funds to distribute to harmed victims, the SEC will file a proposed distribution plan with the Court. Defendants and Relief Defendant then may raise any objections they have. The SEC will only proceed with the distribution plan once it has this Court's approval." SEC Mem. 14. The SEC further states that any funds it is unable to disburse to harmed investors or issuers can be disbursed to the Treasury to prevent Defendants' unjust enrichment.

***Causation***

Next, Defendants argue that the SEC has failed to show that any of their profits from converting the promissory notes into shares of stock and reselling them to the market are causally linked to their violation of the dealer-registration requirement. They contend that the SEC has failed to demonstrate that, but for their failure to register, they would not have been able to engage in the same transactions and obtained the same revenues.

***12** The Court disagrees with Defendants' framing of causality here. In other cases like this one, other courts have found a causal connection to engaging in unlawful, unregistered dealer activity without requiring a separate showing that, had the Defendants registered, the transaction would not have occurred. The Eleventh Circuit rejected an identical argument to that raised by Defendants in *Almagarby*:

> Finally, Almagarby's profits were causally linked to his failure to register. Section 15(a) prohibits unregistered dealers from using interstate commerce "to effect *any transactions* in ... any security." *Id.*§ 78***o***(a)(1) (emphasis added). Almagarby was altogether prohibited from making transactions as an unregistered dealer, so *any* profits generated from his prohibited transactions were causally linked to his failure to register. *See*[*SEC v. Teo*, 746 F.3d 90, 103 (3d Cir. 2014)](#) (providing that the Commission's civil enforcement actions need not show "proximate causation"); *see also*[*SEC v. Apuzzo*, 689 F.3d 204, 212–13 (2d Cir. 2012)](#).
>
> The district court did not have to speculate about the profits of any lawful transactions that Almagarby *might* have made had he chosen to register as a dealer.... Indeed, had Almagarby registered, he likely would have faced significant restraints on his toxic lending activity. For example, dealers must comply with self-regulatory organizations' rules, and the Commission asserts that Almagarby likely would have been limited by regulations such as the industry prohibition on "unfair or unreasonable" underwriting activity. *See* FINRA Rule 5110(c)(2)(A). So the district court did not abuse its discretion by ordering Almagarby to disgorge the profits causally linked to his failure to register.

92 F.4th at 1320–21. Other courts have rejected Defendants' argument for similar reasons. *See*[*Keener*, 102 F.4th at 1337](#) (same, following *Almagarby*); [*SEC v. Fierro*, No. 20-02104 (GC) (JBD), 2024 WL 2292054, at *6 (D.N.J. May 21, 2024)](#) (same).

The Court agrees with the analysis of the causation issue in these cases and rejects Defendants' argument to the contrary. Moreover, the Court notes that in its post-hearing letter, the SEC explains in detail the type of "oversight, standards, and heightened scrutiny that comes with dealer registration." ECF 221 at 4. These include statutory and regulatory provisions requiring registered dealers to provide regular reports with information about their assets, cash flow, and internal compliance measures. *Id.* at 3 (citing 15 U.S.C. § 78q(e)(1)(A); 17 C.F.R. §§ 240.15c3-1, 240.15c3-3(e), 240.17a-5(a), (d)(1), (2), (3)). And the SEC represents that because of the heightened oversight for penny stock trading, the agency suspended trading for several of the issuers from whom Defendants purchased promissory notes during the four-year period relevant to this case. *Id.* at 3–4. This information supports the SEC's contention that if Carebourn Capital and Mr. Rice had registered, increased oversight would likely have presented obstacles to Defendants' lending and conversion activities.

***Relief Defendant Carebourn Partners***

Defendants argue that the SEC's request for disgorgement of $1,109,306 from Relief Defendant Carebourn Partners should be denied because the "transactional expenses" that this figure represents were not derived from Carebourn Capital's unregistered dealer activity. Rather, Defendants argue, the transactional expense fees were derived from Carebourn Capital's activity of providing cash loans to issuers, and the fees paid to Relief Defendant came out of Carebourn Capital's cash accounts. Accordingly, Defendants contend that there is no causal connection between the expense fees and any unregistered-dealer activity.

The Court rejects Carebourn Partners' efforts to characterize the transactional expense fees that it obtained directly from Carebourn Capital as a result of the convertible

note transactions as unrelated to Defendants' unregistered-dealer activity. Carebourn Capital was prohibited from engaging in these transactions because they did so without registering as a dealer, and the fees that were passed through to Carebourn Partners were the direct result of those transactions. Therefore, the Court finds that the fees paid to Carebourn Partners were causally related to the unregistered dealer activity at issue in this case. Carebourn Partners raises no other argument to suggest that an award of disgorgement as to it would be improper, and the Court concludes that it is not.

### 3. Prejudgment Interest

The SEC also seeks to recover prejudgment interest on the disgorgement sums that the Court ultimately awards. Defendants argue that if the Court decides to award disgorgement, it should exercise its discretion to deny the SEC's claim for prejudgment interest because neither Carebourn Capital nor Mr. Rice has the financial means to pay prejudgment interest on top of a disgorgement award.

***13** "Courts ordering disgorgement may also order prejudgment interest on the disgorged amount." *SEC v. Quan*, No. 11-cv-723 (ADM/JSM), 2014 WL 4670923, at *14 (D. Minn. Sept. 19, 2014), *amended*, No. 11-cv-723 ADM/JSM, 2014 WL 6982914 (D. Minn. Dec. 10, 2014), *aff'd*, 817 F.3d 583 (8th Cir. 2016). The purpose of awarding prejudgment interest is to prevent a defendant from profiting from a violation of the securities laws and depriving "a defendant from obtaining the benefit of an interest-free loan due to his unlawful conduct." *Id.* "The rate of interest commonly used by courts when ordering prejudgment interest in connection with disgorgement is the rate applied by the Internal Revenue Service ("IRS") for the underpayment of federal income tax." *Id.*

District courts have discretion when determining whether to award prejudgment interest. *SEC v. Markusen*, 143 F. Supp. 3d 877, 894 (D. Minn. 2015). In exercising that discretion, courts consider the following criteria:

> (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court. In an enforcement action brought by a regulatory agency, the remedial purpose of the statute takes on special importance.

*Id.* (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1476 (2d Cir. 1996)).

In arguing that the Court should decline to award prejudgment interest, Defendants focus on the fairness and relative equities of such an award by reference to the financial conditions of Mr. Rice and Carebourn Capital to the exclusion of the other relevant factors. Even if Defendants have financial challenges to payment of an award, they ignore the special importance of the remedial purpose of the statutory provisions that allow the SEC to recover disgorgement. Defendants have had the benefit of receiving millions of dollars of profits as a result of their unregistered dealer activity, and disgorging those amounts without a payment of prejudgment interest will allow them to retain the benefit of keeping those revenues for several years without any recognition of the time value of those funds. This would essentially allow Defendants to have obtained the very no-interest loan that an award of prejudgment interest is designed to prevent. Awarding prejudgment interest here in the amounts requested by the SEC will serve the purpose of preventing Defendants from being unjustly enriched as a result of their unregistered-dealer activity and will allow the SEC, through the establishment of a fair fund, to distribute funds to investors and issuers in an amount that provides full compensation for their losses.

Defendants do not contest Mr. McShane's calculation of an appropriate amount of prejudgment interest on the disgorgement amounts the Court has found appropriate above. For Defendants Carebourn Capital and Mr. Rice, McShane calculates those amounts as $950,173.40, and for Relief Defendant Carebourn Partners, he concludes that $103,924.66 is owed. Second McShane Decl. ¶¶ 10, 12.

### 4. Conclusion

In sum, the Court concludes that the SEC has met its burden to provide a reasonable approximation of the Defendants' net profits, and the SEC's calculation of legitimate business expenses is more persuasive than Defendants' alternative

calculations. Accordingly, the Court finds that Defendants Carebourn Capital and Chip Rice are jointly and severally liable for disgorgement in the amount of $10,135,738.71, and prejudgment interest in the amount of $950,173.40. Relief Defendant Carebourn Partners is liable for disgorgement in the amount of $1,109,306.50, and prejudgment interest in the amount of $103,924.66.

### IV. Civil Penalties

***14** The SEC requests civil penalties against Carebourn Capital and Chip Rice in the amount of $642,500 each, which amounts to 12.7 percent of the SEC's proposed disgorgement figure.

#### A. Legal Standards for Civil Penalties

The Exchange Act authorizes courts to impose civil penalties for violations of federal securities laws according to a three-tier system of increasing amounts. 15 U.S.C. § 78u(d)(3)(A)-(B). Only the first-tier penalty is at issue. [6] The Exchange Act sets forth the following regarding the first-tier civil penalty:

> The amount of a civil penalty imposed under subparagraph (A)(i) shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (I) $5,000 for a natural person or $50,000 for any other person, or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.

*Id.* § 78u(d)(3)(B)(i); *see also* *Keener*, 644 F. Supp. 3d at 1308 ("Regardless of the tier, the Court may impose a penalty up to the amount of a defendant's gross pecuniary gain."). The amounts of the first-tier civil penalties, adjusted for inflation, are now $11,524 for a natural person and $115,231 for an entity. *See* U.S. Securities and Exchange Commission, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission (Jan. 15, 2024), https://www.sec.gov/enforce/civil-penalties-inflationadjustments.

Civil penalties serve both a punitive and deterrent purpose. *Keener*, 644 F. Supp. 3d at 1308; *see also* *SEC v. Jarkesy*, 144 S. Ct. 2117, 2130 (2024) ("In sum, the civil penalties in this case are designed to punish and deter, not to compensate."). Courts have discretion to determine "whether to impose a civil penalty and in what amount." *Keener*, 644 F. Supp. 3d at 1308; *Quan*, 2014 WL 4670923, at *16 (D. Minn. Sept. 19, 2014).

Courts consider several factors that are similar to those taken into account when considering whether to impose an injunction or an industry bar. *E.g.*, *SEC v. Spartan Sec. Gr., Ltd.*, 620 F. Supp. 3d 1207, 1229 (M.D. Fla. 2022). Among the relevant factors are: (1) egregiousness; (2) scienter; (3) repeated violations; (4) admissions of wrongdoing; (5) losses resulting from defendant's violations; (6) defendant's cooperation with enforcement authorities; and (7) defendant's financial condition. *Id.*; *see also* *Markusen*, 143 F. Supp. 3d at 894–95 (same).

#### B. Discussion

Although similar factors relevant to imposition of civil penalties lead the Court to impose a permanent injunction and a three-year industry bar, the Court finds that no civil penalty should be imposed under the circumstances of this case for several reasons. First, the SEC made no showing that Defendants acted with scienter and have not demonstrated that their unregistered-dealer activity was particularly egregious. Nor does the record indicate that before the Defendants engaged in their convertible-note business in this case they had previously been found to have violated the dealer-registration requirement or any other regulations.

***15** Also, the Defendants' financial condition weighs against such penalties, particularly in light of the substantial disgorgement order. The parties disagree over the effect Defendants' financial condition should have on the propriety of civil penalties. Defendants argue that they do not have the financial means to pay the civil penalties sought by the SEC. Mr. Rice states that his only income at the moment is a monthly Social Security check and he does not have significant assets that can be liquidated to pay a civil penalty. He explains that his car and home are owned by his wife, that he has modest balances in his checking and savings account that are held jointly with his wife, and that has a half interest in approximately $15,000 of household furniture and goods. Mr. Rice avers that his current net worth is negative $3,309. Rice Decl. ¶¶ 14–15. Further, Mr. Rice indicates that Carebourn Capital does not have the assets to pay a large civil penalty. He states that Carebourn Capital holds $475,095 in assets at

several brokerage firms that are untradeable securities and $3,126,510 in investments in two private companies. Rice Decl. ¶ 17. Finally, Mr. Rice testifies that Carebourn Capital is subject to a nearly $400,000 judgment against it in the Minnesota state court action in favor of Darkpulse. *Id.*

The SEC argues that Defendants have failed to meet their burden to show that they are unable to pay a civil penalty, and even if they are, that alone does not mean that a civil penalty cannot be awarded. The SEC criticizes Mr. Rice's declaration concerning his financial condition as a "self-prepared" and "self-serving," lacking any explanation for how Mr. Rice made his calculations.

Under the circumstances of this case, the Court gives some weight to Defendants' financial condition. If the SEC is correct that Mr. Rice and Carebourn Capital have at least $3 million in assets that could potentially be collected by the agency, that will go toward the disgorgement award of over $10 million, along with prejudgment interest. The Court is mindful that disgorgement and civil penalties serve different purposes, which have led some courts to determine that a civil penalty is warranted even when they order disgorgement of profits. *Sec. & Exch. Comm'n v. Bajic*, No. 20 CIV. 7 (LGS), 2023 WL 6289953, at *5 (S.D.N.Y. Sept. 27, 2023) ("Congress provided for civil penalties because disgorgement merely requires the return of wrongfully obtained profits; it does not result in any actual economic penalty or act as a financial disincentive to engage in securities fraud.") (internal quotations omitted). But the SEC has not demonstrated that a civil penalty is necessary to punish the Defendants for violating the dealer-registration requirement or to deter future violations. Moreover, the SEC has indicated that its plan is to establish a "fair fund" from which to distribute disgorged funds to investors who were harmed by Defendants' unregistered dealer activity. Declining to impose a civil penalty will help ensure that any funds Defendants do have are available for distribution to such investors.

For these reasons, the SEC's request for imposition of civil penalties is denied.

**ORDER**

For the reasons set forth above, **IT IS HEREBY ORDERED THAT**

1. Plaintiff's Motion for Remedies is GRANTED IN PART and DENIED IN PART as set forth herein.

2. The motion is denied to the extent that it seeks civil penalties against Carebourn Capital, L.P. and Chip Rice.

3. Carebourn Capital, L.P. and Chip Rice ("Defendants") are permanently restrained and enjoined from violating, directly or indirectly, Section 15(a)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78*o*(a)(1)], as a dealer [15 U.S.C. § 78c(a)(5)], by making use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security pursuant to 17 C.F.R. § 240.15a-2 or commercial paper, bankers' acceptances, or commercial bills), unless the Defendants are registered with the Commission as a dealer, or associated with a registered dealer, in accordance with Exchange Act Section 15(b);

4. Pursuant to Federal Rule of Civil Procedure 65(d)(2), the permanent injunction set forth in Paragraph 2 of this Order also binds the following who receive actual notice of the Final Judgment by personal service or otherwise: (a) Defendants' general partners, limited partners, members, managing members, officers, agents, servants, employees, and attorneys; and (b) other persons in active concert or participation with Defendants or with anyone described in (a).

***16** 5. Defendants are barred, for a period of three years from the date of this Order, from participating in an offering of penny stock, including engaging in activities with a broker, dealer, or issuer for purposes of issuing, trading, or inducing or attempting to induce the purchase or sale of any penny stock.

6. (a) Defendants are jointly and severally liable for disgorgement of $10,135,738.71, representing net profits gained as a result of the conduct alleged in the Complaint, together with prejudgment interest thereon in the amount of $950,173.40, for a total of $11,085,912.11; and (b) Relief Defendant Carebourn Partners, LLC ("Relief Defendant") is liable for disgorgement of $1,109,306.50, representing the receipt of ill-gotten gains from Defendants' illegal conduct, together with prejudgment interest thereon in the amount of $103,924.66, for a total of $1,213,231.16.

7. Within ten days of entry of Judgment, Defendants must surrender for cancellation their remaining shares of stock of

the issuers listed in Exhibit 1 of the SEC's motion for remedies in this case and surrender their remaining conversion rights under the convertible securities issued by the Issuers. Further, Defendants shall send copies of correspondence evidencing the surrender for cancellation of Defendants' remaining shares of the Issuers and their remaining conversion rights under the convertible securities issued by the Issuers to the SEC addressed to Charles J. Kerstetter, U.S. Securities and Exchange Commission, 175 W. Jackson Blvd., Suite 1400, Chicago, IL 60604.

**Let Judgment be entered accordingly.**

**All Citations**

Slip Copy, 2024 WL 4249546

## Footnotes

1 Defs.' Opp'n 19 ("While it is true that Defendants engaged in many debt conversions and stock sales over the course of several years, at bottom the Defendants committed a one-time violation by failing to register as a securities dealer when they first started the investment activities years ago.").

2 Defendants' own calculations include write-offs for the so-called "bad debt" expenses that the SEC did not deduct. The Court addresses this issue in more detail below. Defendants also take issue, generally, with the methodology the SEC used to reach its approximation of Defendants' profits, and the Court discusses this issue below as well. However, Defendants do not specifically argue that the SEC should have allowed deductions for rent, marketing, advertising, and other categories that Mr. McShane decided not to deduct.

3 The disgorgement amount does not include Defendants' investments in two ventures—Sustainable Metal Solutions and Acres Gaming—that Defendants argue should be excluded from any monetary judgment the Court finds appropriate. Pl.'s Reply 9 n.2; Def.'s Opp'n 25; ECF 205 ¶ 19.

4 This document is captioned as the "Second Declaration of Craig L. McShane in support of SEC's Motion for Remedies." Because the SEC relies on two declarations from McShane that were filed directly in connection with the remedies motion as well as his declaration submitted in support of the SEC's motion for summary judgment, the Court refers to them in as the First, Second, and Third declarations in the order they were filed.

5 The court is also not persuaded that the substantial losses identified in Carebourn Capital's financial statements and tax returns for 2019 and 2020 show that the SEC's reasonable approximation of Defendants' profits is improperly inflated. As the Court previously observed, Mr. Rice testified that Carebourn Capital was consistently profitable and never failed to pay dividends to its investors. Summ. J. Order 29–30, ECF 177. In *Sec. & Exch. Comm'n v. Sripetch*, No. 20-cv-01864-H-BGS, 2024 WL 1546917, at *6 (S.D. Cal. Apr. 8, 2024), the court did not have before it any comparable evidence undermining the persuasiveness of the defendant's tax returns. But here, this Court is not persuaded by Defendants' argument that it should similarly accept their calculations of profits.

6 Courts can order the second and third tiers of civil penalties only where the violation at issue "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 78u(d)(3)(B)(ii)–(iii). The SEC does not argue any of these circumstances are at issue here.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 6

2016 WL 6462240
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

UNITED STATES SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
Anthony CORONATI, Defendant.

16-CV-2022 (ARR)
|
Signed 10/14/2016

**Attorneys and Law Firms**

Andrew M. Calamari, John J. Graubard, Elizabeth Reilly Goody, Lara Shalov Mehraban, U.S. Securities and Exchange Commission, New York, NY, for Plaintiff.

**REPORT AND RECOMMENDATION**

ROANNE L. MANN, UNITED STATES CHIEF MAGISTRATE JUDGE

***1** Plaintiff United States Securities and Exchange Commission ("plaintiff" or the "Commission") moves for the entry of default judgment against defendant Anthony Coronati ("defendant" or "Coronati") and seeks judicial enforcement of a consent order entered by the Commission against defendant on October 17, 2014. On September 7, 2016, the Honorable Allyne R. Ross referred the motion to the undersigned magistrate judge for a Report and Recommendation. See Order Referring Motion, Electronic Case Filing ("ECF") Docket Entry ("DE") #10. For the reasons set forth below, the Court recommends that plaintiff's motion for entry of default judgment be granted, to the extent described below, pursuant to Rule 55(b) of the Federal Rules of Civil Procedure ("FRCP").

**FACTUAL BACKGROUND**

Pursuant to an investigation initiated by the Commission's Division of Enforcement, plaintiff found that from as early as 2009 through 2013, defendant induced investors to pay more than $2 million in several fraudulent securities offerings and misappropriated more than $400,000 of that amount. See Order Instituting Administrative and Cease-and-Desist Proceedings (the "Consent Order") ¶¶ 1, 42, DE #9-3. The anatomy of the fraudulent securities offerings consisted of defendant holding himself out as an investment adviser to a nonexistent hedge fund, known as Corsac Group Limited ("Corsac Fund"), and offering investors units in the Corsac Fund, while touting an upcoming but fictitious "Corsac" initial public offering ("IPO").[1] See id. ¶¶ 2–3, 6, 9, 18–19. Defendant also offered investors membership interests in defendant's other company, Bidtoask, which purported to invest their money in the Facebook IPO and in "promising technology companies that had yet to hold [IPOs]." See id. ¶¶ 3, 7, 24–25.

Defendant's fraudulent conduct, which occurred during the period from 2008 to 2012, consisted of the following:

1. Soliciting [investors] to invest in the fictitious fund known as "Corsac Group Limited," and using the funds for his own purposes, including making Ponzi-type payments to Corsac investors;

2. Soliciting them to invest in Bidtoask LLC, a New Jersey limited liability company Coronati set up, to obtain Facebook shares in its initial public offering, purchasing some Facebook shares, but diverting a portion of the investor funds to his own use; and

3. Soliciting them to invest in Bidtoask to participate in the initial public offerings of two companies, neither of which had plans to go public, and using the funds for his own purposes, including a Caribbean vacation and plastic surgery.

Supplemental Declaration of John J. Graubard (the "Supp. Graubard Decl.") ¶ 7, DE #12; see generally Consent Order.

**PROCEDURAL HISTORY**

On July 9, 2014 and October 4, 2013, respectively, the Commission issued and served defendant with two investigative subpoenas (requesting documents and testimony) that defendant ignored. See id. ¶¶ 42–43. On November 4, 2013, the Commission petitioned the United States District Court for the Southern District of New York to enforce defendant's compliance with the two subpoenas. See id. ¶ 44. Defendant then ignored an order entered by United States District Judge Kimba Wood, of the Southern District of New York, compelling defendant's compliance with both subpoenas. See id. at ¶¶ 45–46. The Commission filed an

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

application in the same court for an order holding defendant in civil contempt, and Judge William H. Pauley III granted the motion on January 17, 2014. See id. ¶¶ 47–48.

***2** Thereafter, on October 17, 2014, having accepted an offer of settlement from Coronati and Bidtoask, the Commission entered a consent order against defendant and his entity. See Consent Order at 2. The Consent Order found that defendant willfully violated various antifraud provisions of the federal securities laws, including Section 17(a) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77q(a); Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b); Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and Sections 206(1), 206(2), and 206(4) of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-6(1), (2), and (4). See Consent Order at 6; Declaration of John J. Graubard in Support of Motion for Judgment on Default (the "Graubard Decl.") ¶ 5, DE #9-2. Among other things, the Consent Order required defendant to pay disgorgement in the amount of $292,646.36, prejudgment interest in the amount of $7,353.64, and a civil penalty of $100,000, for a total of $400,000. See Consent Order at 7. Notwithstanding defendant's payment of the initial installment of $150,000 on October 20, 2014, defendant failed to pay the remaining $250,000 balance within the requisite 364 days. See Supp. Graubard Decl. ¶ 11; id., Ex. 3 at 1, DE #12-1; Graubard Decl. ¶ 6.

The Commission initiated the present action against defendant on April 25, 2016, to enforce the Consent Order. [2] See Graubard Decl. ¶ 4. Although he was properly served on May 2, 2016, defendant failed to interpose an answer or otherwise defend this action. See id. ¶¶ 7–8. On July 14, 2016, the Clerk of the Court noted defendant's default pursuant to Rule 55(a) of the FRCP. See Graubard Decl. ¶ 8.

On September 12, 2016, after Judge Ross referred the Commission's motion for a default judgment to the undersigned magistrate judge, this Court issued an order directing the Commission to file, by September 23, 2016, a memorandum of law in support of its motion and an accounting of how the claimed disgorgement, prejudgment interest, and civil penalties amounts were calculated. See Order (the "9/12/16 Order") at 1–2, DE #11. The Court also ordered defendant to respond to the motion by October 11, 2016. See id. at 2. The Commission filed its supplemental submissions on September 15, 2016, but defendant failed to submit a response to the Commission's motion.

## DISCUSSION

### I. Standard of Review for Motion for Default Judgment

"The determination of whether to grant a motion for default judgment is within the sound discretion of the district court." U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A., 220 F.R.D. 404, 406 (S.D.N.Y. 2004). Under Rule 55(b) of the FRCP, a defendant's failure to file a responsive answer constitutes a default and "entry of default may be made by either the clerk or the judge." Brown v. Gabbidon, No. 06 Civ. 8148(HB), 2007 WL 1423788, at *2 (S.D.N.Y. May 14, 2007). "In considering a motion for default judgment, the court will treat the well-pleaded factual allegations of the complaint as true, and the court will then analyze those facts for their sufficiency to state a claim." See id. (internal quotation marks and citation omitted). However, "[u]nlike allegations pertaining to liability, allegations of damages are not deemed admitted in the context of a default judgment and the damages sought are not automatically awarded." Trs. of Empire State Carpenters Annuity, Apprenticeship, Labor-Mgmt. Cooperation, Pension & Welfare Funds v. Town & Country Wood Flooring LLC, No. 13-CV-0040 (JS)(WDW), 2013 WL 4807110, at *4 (E.D.N.Y. Sept. 9, 2013). The Court must examine whether the movant has provided adequate support for the requested relief. See Finkel v. Omega Commc'n Servs., Inc., 543 F.Supp.2d 156, 160 (E.D.N.Y. 2008) (determining that court must still "conduct an inquiry to ascertain the amount of damages with reasonable certainty" after entry of default (citing Credit Lyonnais Sec., Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir. 1999)). The inquiry can be conducted by an inquest hearing or on papers. See Trs. of Empire State Carpenters, 2013 WL 4807110, at *4. Indeed, the Second Circuit permits the holding of an inquest by affidavit, without an in-person court hearing, "as long as [the Court has] ensured that there was a basis for the damages specified in the default judgment." Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997) (citations omitted).

### II. The Commission's Motion for Default Judgment

***3** The facts of this case and defendant's failure to appear in this action and to respond to the Commission's motion warrant entry of default judgment. Indeed, even if defendant had not defaulted, he would be precluded from challenging the validity of the Consent Order in this enforcement proceeding under the Securities Act and the Exchange Act. See SEC v. Gerasimowicz, 9 F.Supp.3d 378, 381–82 (S.D.N.Y. 2014)

(collecting cases). The only issue remaining is the relief requested by the Commission.

In connection with its demand for monetary relief, the Commission has submitted the Supplemental Declaration of John J. Graubard, Senior Trial Counsel at the Commission, along with relevant exhibits, including accounting spreadsheets prepared by the Commission's Office of Financial Management ("OFM") that calculate the disgorgement amount, prejudgment interest amount, and civil penalty amount owed by defendant. See Supp. Graubard Decl. ¶¶ 1, 11–20 (citing exhibits). For the most part, those documents support the relief sought by the Commission.

**A. Disgorgement and Prejudgment Interest**

The fundamental purpose of disgorgement is to deter violations of the securities law by depriving malefactors of the fruits of their illicit conduct. See SEC v. Fischbach Corp., 133 F.3d 170, 175 (2d Cir. 1997). District courts are accorded broad discretion in calculating disgorgement amounts associated with securities law violations. See SEC v. Contorinis, 743 F.3d 296, 301 (2d Cir. 2014). The only restrictions imposed upon courts in the awarding of disgorgement is that the amount constitute a reasonable approximation of the profits causally related to the illicit activity. See SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1475 (2d Cir. 1996). In that respect, the Commission must show that its proposed disgorgement figure reasonably approximates the amount of unjust enrichment. See SEC v. Razmilovic, 738 F.3d 14, 31 (2d Cir. 2013) (citing SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996)). Once the Commission does so, the burden shifts to the wrongdoer to demonstrate that the disgorgement amount requested is not a reasonable approximation of the unlawfully obtained profits. See id. at 31–32.

In the instant matter, based on the amounts that defendant had converted from investors pursuant to the above-referenced fraudulent securities offerings, and in accordance with defendant's settlement offer during the administrative phase, the Commission determined defendant should pay disgorgement of $292,646.36. See Supp. Graubard Decl. ¶¶ 6–7. As of October 17, 2014, the Commission calculated the prejudgment interest that defendant owed to be $7,353.64, making the total $300,000. See id. The Commission and defendant agreed upon both the disgorgement and prejudgment interest figures in the Consent Order. See id. ¶ 8. These figures were the result of the Commission's comprehensive calculation of the monetary proceeds from defendant's execution of the securities fraud, and constitute a reasonable approximation of the unjust enrichment therefrom. Normally, the burden would shift to defendant to show that the disgorgement amount is unreasonable; however, since the Commission's motion remains unopposed, and defendant agreed to the figures in October 2014, it is unnecessary to engage in burden-shifting.

Defendant complied with that aspect of the Consent Order directing him to pay $150,000 within ten days of the order's entry, having paid that amount on October 20, 2014. See id. ¶ 11. However, defendant failed to pay the remaining $150,000 disgorgement and prejudgment interest balance within the 364 days prescribed in the Consent Order. See Graubard Decl. ¶ 6. Pursuant to Rule 600 of the Commission's Rules of Practice, prejudgment interest for disgorgement penalties "shall be computed at the underpayment rate of interest established under Section 6621(a)(2) of the Internal Revenue Code, 26 U.S.C. [§] 6621(a)(2), and shall be compounded quarterly." 17 C.F.R. § 201.600(b). Between October 17, 2014—the date of the Consent Order's entry—and March 31, 2016, the Section 6621(a)(2) underpayment rate was three percent; from April 1, 2016 to December 31, 2016, the rate is four percent. See U.S. Dep't of Labor, *IRC 6621 Table of Underpayment Rates*, https://www.dol.gov/agencies/ebsa/employers-and-advisers/plan-administration-andcompliance/correction-programs/vfcp/table-of-underpayment-rates (last visited Oct. 12, 2016). Accordingly, the Court recommends that defendant be ordered to pay disgorgement of $150,000, as well as prejudgment interest, compounded quarterly, at an annual rate of three percent for the time period between October 17, 2014 and March 31, 2016, and an annual rate of four percent for the time period between April 1, 2016 and the date of judgment.

**B. Civil Penalty**

***4** The civil penalty provision of Section 21A of the Exchange Act, 15 U.S.C. § 78u-1, "is designed to go beyond disgorgement of illegal profits to add the imposition of a significant fine as a needed deterrent." SEC v. Anticevic, No. 05 CV 6991(KMW), 2009 WL 4250508, at *5 (S.D.N.Y. Nov. 30, 2009) (internal quotation marks and citation omitted). "When determining the amount of the penalty, courts in [the Second] Circuit typically consider (1) the defendant's culpability; (2) the amounts of profit gained; (3) the repetitive nature of the unlawful act; and (4) the deterrent effect of a penalty given the defendant's net worth." Id. (citation omitted).

Here, it is clear that defendant was the sole architect and executor of the securities fraud in which over $400,000 redounded to his direct personal benefit while the remainder of his investors' funds was used to sustain the fraud from 2009 through 2013. See Consent Order ¶ 1. Although the Commission has not submitted any information on defendant's net worth, defendant's $400,000 profit from the fraud renders the Commission's imposition of a $100,000 civil penalty reasonable, particularly in light of the fact that defendant agreed to that penalty. See Supp. Graubard Decl. ¶ 8. Pursuant to 31 U.S.C. § 3717, interest on that civil penalty of $100,000 accrues at an annual rate of one percent. See Supp. Graubard Decl. ¶¶ 17–19 & Ex. 5, DE #12-3. Accordingly, the Court recommends that defendant be ordered to pay a civil penalty of $100,000, plus interest at an annual rate of one percent from October 17, 2014 through the date of judgment.

## CONCLUSION

For the reasons set forth above, the Court respectfully recommends that the Commission's motion for entry of default judgment against defendant pursuant to Rule 55(b) of the FRCP be granted.[3] The Court further recommends that the District Court award the Commission the following sums: (1) disgorgement with prejudgment interest as of October 17, 2014 in the amount of $150,000, plus prejudgment interest, compounded quarterly, at an annual rate of three percent for the time period between October 17, 2014 and March 31, 2016, and at an annual rate of four percent for the time period between April 1, 2016 and the date of judgment; and (2) civil penalties in the amount of $100,000, plus interest at an annual rate of one percent from October 17, 2014 through the date of judgment.

Any objections to the recommendations contained herein must be filed with the Honorable Allyne R. Ross by **October 31, 2016**. Failure to file objections in a timely manner may waive a right to appeal the District Court order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Small v. Sec'y of Health & Human Servs., 982 F.2d 15, 16 (2d Cir. 1989) (*per curiam*).

***5** The Clerk is directed to docket this Report and Recommendation through the Electronic Case Filing System, and to email a copy to defendant and to mail him a copy at the following address:

1294 Rockland Ave., Apt. 2B

Staten Island, NY 10314

**SO ORDERED.**

**Dated: October 14, 2016**.

**All Citations**

Not Reported in Fed. Supp., 2016 WL 6462240

## Footnotes

1 Corsac was the Delaware corporation that defendant formed in July 2009 that purported to serve as the investment adviser to the Corsac Fund. See Consent Order ¶ 8.

2 Bidtoask was not named as a defendant in this action.

3 The Commission initially sought to have the District Court: declare that “amounts ordered to be paid as civil penalties pursuant to this Judgment shall be treated as penalties paid to the government for all purposes, including all tax purposes”; enjoin defendant from advancing certain arguments “in any Related Investor Action”; and retain jurisdiction over the administration of any distribution of the funds collected from defendant. Proposed Judgment on Default (Sept. 6, 2016) at 4, DE #9-1. Noting that these requests were not supported by any legal analysis or authority, this Court directed the Commission to file a supplemental submission addressing these requests (along with the Commission's calculations of amounts due). See 9/12/16 Order at 1 n.1. The Commission's supplemental submissions do not discuss the aforesaid requests; indeed, its most

recent summary of the relief being sought abandons these particular requests. See Memorandum of Law in Support of Motion for Judgment on Default (Sept. 15, 2016) at 9, DE #13.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 7

2020 WL 435034
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
CRAIG SCOTT CAPITAL, LLC, Craig S. Taddonio and Brent M. Porges, Defendants.

16-CV-4757 (SJF)(AYS)
|
Signed 01/28/2020

**Attorneys and Law Firms**

Andrew M. Calamari, John J. Graubard, Judith Ann Weinstock, Sanjay Wadhwa, Securities and Exchange Commission New York Regional Office, New York, NY, for Plaintiff.

**ORDER**

FEUERSTEIN, District Judge:

***1** Pending before the Court is the motion of plaintiff Securities and Exchange Commission ("plaintiff" or the "SEC"), *inter alia*, pursuant to Local Civil Rule 6.3 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, seeking reconsideration of an order entered on April 29, 2019 denying its application to reopen this case as against defendant Craig S. Taddonio ("Taddonio"). For the reasons stated herein, the motion for reconsideration is granted but, upon reconsideration, the Court adheres to its original determination.

I. Background

On August 25, 2016, the SEC commenced this action against, *inter alia*, Taddonio pursuant to Section 21(e)(1) of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78u(e)(1), seeking to enforce Taddonio's compliance with a consent order entered by the SEC on April 12, 2016 (the "Commission Order"), *inter alia*, finding that Taddonio willfully aided and abetted, and caused, the violation by defendant Craig Scott Capital ("CSC") of Section 17(a) of the Exchange Act, 15 U.S.C. § 78q(a), and Rule 17a-4(b)(4) thereunder, 17 C.F.R. § 240.17a-4(b)(4); and requiring Taddonio to pay a civil penalty of twenty-five thousand dollars ($25,000.00) to the SEC for transfer to the general fund of the United States Treasury, "subject to Exchange Act Section 21F(g)(3), 15 U.S.C. § 78u-6(g)(3); on installment of $10,000.00 to be due within 10 days of the entry of the Commission Order and three installments of $5,000.00 each due within 90, 180, and 270 days of the entry of the Commission Order, subject to Exchange Act Section 21F(g)(3), 15 U.S.C. § 78u-6(g)(3), with interest to accrue if timely payment was not made pursuant to 31 U.S.C. § 3717." (Complaint ["Compl."], ¶ 18(f)).

The return of service filed by the SEC on September 8, 2016 indicates that a summons and the complaint were served upon Taddonio on August 30, 2016. When Taddonio failed to serve an answer within twenty-one (21) days after being served with process, *see* Fed. R. Civ. P. 12(a)(1)(A)(i), the SEC moved to enter his default in this action. On October 5, 2016, the Clerk of the Court entered Taddonio's default in this action pursuant to Rule 55(a) of the Federal Rules of Civil Procedure. Thereafter, the SEC moved pursuant to Rule 55(b)(2) of the Federal Rules of Civil Procedure for a default judgment against Taddonio. By electronic order dated October 27, 2016, the initial pretrial conference that was scheduled to be held before the undersigned on January 5, 2017 was converted to a hearing on the SEC's motion for a default judgment and was advanced to December 13, 2016 at 11:15 a.m. Although the SEC was directed to serve a copy of that order upon defendants and file proof of such service with the Court, the SEC did not file proof of service in accordance with that order.

By letter dated November 15, 2016, *inter alia*, the SEC requested an adjournment of the hearing on its motion for a default judgment "without date due to Mr. Taddonio's Chapter 7 bankruptcy filing," and indicated that it would "continue to advise the Court regarding the status of the matter with respect to Defendant Taddonio's bankruptcy and as to when [it] expect[ed] to seek a hearing date for the Motion." (Docket Entry ["DE"] 17). By electronic order dated November 17, 2016, the SEC's motion was granted to the extent that its claims against Taddonio were "severed and administratively closed with leave to reopen on ten (10) days notice *within thirty (30) days from the date the bankruptcy stay [was] lifted*, and the application [was] otherwise denied." [1] (emphasis added).

***2** By letter motion dated March 21, 2019, the SEC, *inter alia*, (i) advised that the Bankruptcy Court granted Taddonio a discharge in his case pursuant to 11 U.S.C. § 727 on July 21, 2017, and issued a final decree and closed the case on November 9, 2017; and (ii) requested leave to reopen the matter as to Taddonio, notwithstanding that "the window of time that the Court granted [it] leave to reopen the matter as to Mr. Taddonio ha[d] passed," *i.e.*, more than thirty (30) days had passed from the date the bankruptcy stay was lifted, because its action was "still timely." (DE 21). Although the SEC apologized for its delay in seeking leave to reopen, it proffered no excuse, much less a reasonable excuse, for its failure to comply with this Court's November 17, 2016 order.[2] By electronic order dated April 29, 2019 (the "April Order"), the SEC's application was denied, *inter alia*, due to "the significant delay caused by [its] failure to prosecute its claims against Taddonio, despite receiving clear notice that it was required to seek leave to reopen within thirty (30) days from the date the bankruptcy stay was lifted."

The SEC now moves pursuant to Local Civil Rule 6.3 for reconsideration of the April Order or, in the alternative, for dismissal of this action "with leave to refile so that [it] may recommence this action as it is still timely under the applicable statute of limitations." (SEC Mem., at 2).

II. Discussion

A. Standard of Review

"Motions for reconsideration may be brought pursuant to Rules 59(e) and 60(b) of the Federal Rules of Civil Procedure and Local Rule 6.3." *U.S. v. Real Prop. & Premises Located at 249-20 Cambria Ave., Little Neck, N.Y. 11362*, 21 F. Supp. 3d 254, 259 (E.D.N.Y. 2014). "A motion for reconsideration is an extraordinary request that is granted only in rare circumstances, such as where the court failed to consider evidence or binding authority." *Van Buskirk v. United Grp. of Cos., Inc.*, 935 F.3d 49, 54 (2d Cir. 2019). "The standard for granting such a motion is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked--matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp. Inc.*, 70 F.3d 255, 257 (2d Cir. 1995); *accord Van Buskirk*, 935 F.3d at 54; *Analytical Surveys, Inc. v. Tonga Partners, L.P.*, 684 F.3d 36, 52 (2d Cir. 2012). In determining a motion for reconsideration, the court should consider: (1) whether there has been "an intervening change of controlling law;" (2) whether there is new evidence presented that was not previously available on the original motion; and (3) whether there is a "need to correct a clear error or prevent manifest injustice." *Kolel Beth Yechiel Mechil of Tartikov, Inc. v. YLL Irrevocable Trust*, 729 F.3d 99, 104 (2d Cir. 2013) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).

Reconsideration "is not a vehicle for relitigating old issues, presenting the case under new theories, securing a rehearing on the merits, or otherwise taking a 'second bite at the apple[.]' " *Analytical Surveys*, 684 F.3d at 52 (quotations, alterations and citation omitted). Generally, reconsideration will not be granted where the moving party: (1) seeks to introduce additional facts not in the record on the original motion, *see Norton v. Town of Brookhaven*, 47 F. Supp. 3d 152, 155 (E.D.N.Y. 2014) ("A party requesting reconsideration is not supposed to treat the court's initial decision as the opening of a dialogue in which that party may then use [reconsideration] to advance new facts and theories in response to the court's rulings" (quotations, brackets and citation omitted)); *Redd v. New York State Div. of Parole*, 923 F. Supp. 2d 393, 396 (E.D.N.Y. 2013) (holding that on a motion for reconsideration, the moving party must "demonstrate that any available factual matters ... were presented to the court on the underlying motion" (quotations and citations omitted)); (2) advances new arguments or issues that could have been raised on the original motion, *Salveson v. JP Morgan Chase & Co.*, 166 F. Supp. 3d 242, 248 (E.D.N.Y. 2016), *aff'd*, 663 F. App'x 71 (2d Cir. Oct. 17, 2016) ("A motion for reconsideration is neither an occasion for repeating old arguments previously rejected nor an opportunity for making new arguments that could have previously been made" (quotations and citation omitted)); *Norton*, 47 F. Supp. 3d at 155 ("[A]rguments raised for the first time on reconsideration are not proper grounds for reconsideration"); *Redd*, 923 F. Supp. 2d at 396 ("A motion for reconsideration is not intended as a vehicle for a party dissatisfied with the Court's ruling to advance new theories that the movant failed to advance in connection with the underlying motion ..." (quotations and citations omitted)); or (3) "seeks solely to relitigate an issue already decided." *Shrader*, 70 F.3d at 257; *see also Analytical Surveys*, 684 F.3d at 52 (holding that reconsideration "is not a vehicle for relitigating old issues ..." (quotations and citation omitted)). It is within the sound discretion of the district court whether or not to grant a motion for reconsideration. *See Belfiore v. Procter & Gamble Co.*, 140 F. Supp. 3d 241, 245 (E.D.N.Y. 2015); *In re Citigroup ERISA Litig.*, 112 F. Supp. 3d 156, 158 (S.D.N.Y. 2015).

***3** Since the SEC contends, *inter alia*, that reconsideration is necessary because "a manifest injustice" will result if Taddonio is "able to avoid the monetary sanction, a penalty, imposed for his violations of the federal securities laws," (SEC Mem. at 1; *see also Id.* at 4), its motion for reconsideration is granted. However, for the reasons set forth below, upon reconsideration, the Court adheres to its original determination.

B. Failure to Prosecute

Despite receiving clear notice that it was required to seek leave to reopen within thirty (30) days from the date the bankruptcy stay was lifted, plaintiff delayed more than fifteen (15) months in seeking to reopen this case to prosecute its claims against Taddonio, which is of sufficient duration to justify denying leave to reopen for failure to prosecute, particularly absent any excuse for the delay. *See, e.g. Gaeta v. Inc. Village of Garden City*, 644 F. App'x 47, 48 (2d Cir. Mar. 23, 2016) (summary order) (concluding that the district court did not abuse its discretion in refusing to grant the plaintiff's motion to reopen because, *inter alia*, his failure to prosecute caused significant delay and it was clear from the magistrate judge's report and recommendation that it was up to the parties to notify the court to request restoring the action); *Zappin v. Doyle*, 756 F. App'x 110, 2019 WL 1210296, at * 2 (2d Cir. Mar. 13, 2019) (summary order) ("Case law ... supports a conclusion that a 49-day delay could be significant and could weigh in favor of dismissal" for failure to prosecute under Rule 41(b) of the Federal Rules of Civil Procedure); *Rubin v. Abbott Labs.*, 319 F.R.D. 118, 120 (S.D.N.Y. 2016) (finding that the plaintiff's "continuous silence" over a period of approximately seventeen (17) months and in the face of "a direct court order to act[,] [spoke] to her lack of interest in pursuing th[e] action.")

Furthermore, prejudice to Taddonio may fairly be presumed from plaintiff's unreasonable delay in seeking to prosecute its claims against him, particularly since the Commission Order was entered almost four (4) years ago and is based upon conduct occurring over a four (4)-year period commencing in January 2012, approximately eight (8) years ago. *See e.g. Gaeta*, 644 F. App'x at 48 (finding that "defendants surely were prejudiced by the extensive delay," where the underlying events occurred approximately twelve (12) years before the plaintiff sought leave to reopen); *Lopez v. Pichardo 2230 Rest. Corp.*, 734 F. App'x 16, 18 (2d Cir. May 16, 2018) (summary order) ("[P]rejudice to Defendants 'resulting from unreasonable delay may be presumed.' " (quoting *Shannon v. Gen. Elec. Co.*, 186 F.3d 186, 195 (2d Cir. 1999))); *Diaz v. Cortes*, No. 12-cv-2904, 2015 WL 542521, at * 2 (S.D.N.Y. Feb. 9, 2015) ("[P]rejudice to Defendant can be fairly presumed where, as here, there is a delay of more than six months and Plaintiff has ignored multiple court orders and deadlines without requesting any extension or offering any cause for the delay.") In addition, in light of plaintiff's apparent disinterest in prosecuting its claims against Taddonio, the need to alleviate calendar congestion outweighs plaintiff's right for a day in Court. *See e.g. Caussade v. United States*, 293 F.R.D. 625, 631 (S.D.N.Y. 2013) (finding that where the plaintiff "made no effort to prosecute th[e] action, it would be unfair to the numerous other litigants who await the attention of th[e] Court to permit her suit to remain on the docket."); *Pratt v. City of New York*, No. 16-cv-8278, 2018 WL 3154613, at * 4 (S.D.N.Y. June 28, 2018), *report and recommendation adopted by* 2018 WL 3435056 (S.D.N.Y. July 17, 2018) ("[C]ourts in this district have held that calendar congestion outweighed plaintiff's opportunity to be heard when the plaintiff has rebuffed opportunities to be heard...." (quotations, alterations and citation omitted)); *Rennie v. City of New York*, No. 95 Civ. 2234, 1996 WL 2002, at * 1 (S.D.N.Y. Jan. 3, 1996) ("[W]here the Court is faced with a plaintiff ... who seems uninterested in pursuing his opportunity for due process, ... justice requires clearing the dormant case from the docket and removing the cloud from defendants.")

***4** In addition, given plaintiff's unexplained failure to comply with this Court's orders, and its apparent lack of interest in prosecuting its claims against Taddonio, there is no reason to believe that any alternative, lesser sanction would be appropriate. *See, e.g. Gaeta*, 644 F. App'x at 48 (finding that the district court did not abuse its discretion in determining "that no sanction other than 'dismissal' would be appropriate because of the 'significant prejudice to the Defendants in permitting a twelve-year old case to proceed.' ") Accordingly, and since the SEC fails to identify any data or law that the Court overlooked in denying its motion to reopen and merely seeks to relitigate an issue already decided, upon reconsideration of the April Order, the Court adheres to its original determination to deny plaintiff's motion to reopen this case to prosecute its claims against Taddonio. Moreover, in light of, *inter alia*, the prejudice to Taddonio caused by the SEC's significant delay in prosecuting its claims against him, plaintiff's request that its claims against Taddonio be dismissed without prejudice, *i.e.*, "with leave to refile so that the Commission may recommence this action" against him, (SEC Mem. at 2), is denied.

III. CONCLUSION

For the reasons set forth herein, the SEC's motion for reconsideration of the April Order pursuant to Local Civil Rule 6.3 is granted but, upon reconsideration, the Court: (i) adheres to its original determination denying the SEC's motion to reopen this case due, *inter alia*, to the significant delay caused by its failure to prosecute its claims against Taddonio despite receiving clear notice that it was required to seek leave to reopen within thirty (30) days from the date the bankruptcy stay was lifted; and (ii) denies so much of the SEC's motion as seeks dismissal of its claims against Taddonio without prejudice and "with leave to refile so that the Commission may recommence this action" against him.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 435034

## Footnotes

1 On December 13, 2016, following a hearing before the undersigned, a default judgment was entered against the other two (2) defendants, CSC and Brent M. Porges.

2 Indeed, in its memorandum of law in support of the motion for reconsideration, the SEC "again apologizes for failing to comply with the Court's deadline to reopen the case as to Taddonio," (Memorandum of Law in Support of the SEC's Motion for Reconsideration ["SEC Mem."], at 1), but still fails to proffer any excuse, much less a reasonable one, for such failure.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 8

KeyCite Yellow Flag - Negative Treatment
Declined to Extend by Leach v. Department of Financial Institutions, Division of Securities, Wis.App., November 27, 2024

1984 WL 2413
United States District Court; S.D. New York.

Securities and Exchange Commission
v.
Howard J. Hansen d/b/a Howard J. Hansen And Associates, et al.

No. 83 Civ. 3692
|
April 6, 1984

**Opinion**

GAGLIARDI, District Judge.

***1** Plaintiff Securities and Exchange Commission (the "SEC") commenced this action against several defendants including Howard J. Hansen, individually ("Hansen"), and d/b/a Howard J. Hansen & Associates ("HJH Associates"), alleging violations of sections 5(a), 5(c) and 17(a) of the Securities Act of 1933, (the "Securities Act"), 15 U.S.C. §§ 77e(a), 77e(c), 77q(a); of sections 10(b) and 15(a)(1) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78*o*(a)(1); and of Rule 10b-5 (1983), 17 C.F.R. § 240.10b-5 (1983), promulgated pursuant thereto.[1] Plaintiff moved for a preliminary injunction. Hansen, proceeding pro se, filed a "petition to dismiss complaint with prejudice," along with what is apparently a counterclaim for forty million dollars. The SEC has moved to dismiss the counterclaim.

On October 3, 1983, a hearing was conducted with respect to the SEC's motion for a preliminary injunction.[2] Subsequent thereto, the SEC requested, with Hansen's consent, that the action on the merits be consolidated pursuant to Rule 65(a)(2), Fed. R. Civ. P., with the hearing of the application for an injunction. The request for consolidation is granted. Accordingly, the court now makes the following findings of fact and conclusions of law pursuant to Rule 52(a), Fed. R. Civ. P.

*Facts*

Howard J. Hansen, age 52, resides in Mexico, New York, and for much of his life has worked as an entrepreneur and advisor to investors. HJH Associates is a business, located in Mexico, New York, which purportedly provides consulting services to independent oil and gas producers. Defendant Vaught Oil Company ("VOC") is an oil and gas exploration company with its headquarters in Ohio and which maintained an office in New York City for the relevant period from June 1979 through November 1981 (the "relevant period"). VOC is a sole proprietorship, owned and operated by Bill D. Vaught.

***2** During the relevant period, fractional undivided interest in oil and gas rights of 26 separate VOC oil wells (the "VOC programs") were offered and sold to the public. Most of those interests were in the form of a $^{1}/_{32}$ interest in a particular well. Hansen was associated with VOC throughout the relevant period, ans during that time promoted and sold to the public interests in all 26 of the VOC programs. Hansen, who received a 15% commission on each interest he sold in any of the programs, earned almost $400,000 in commissions from VOC. Neither during nor since the relevant period has Hansen been registered as a broker with the SEC.

VOC and Bill Vaught made filings with the SEC in connection with the offering and sale of 21 of the VOC programs, in purported compliance with Regulation B, 17 C.F.R. §§ 230.300 to 230.346 ("Regulation B").[3] No filing was made with respect to the other five VOC programs, despite the legend on the Schedule D offering sheet provided to investors which suggested that those documents had been filed with the SEC.[4]

Through the use of offering sheets and other written and oral representations, Hansen offered to the public interests in the VOC programs. Hansen frequently prepared letters on HJH Associates stationery which extolled the virtues of those programs. Hansen placed advertisements in newspapers, sponsored seminars and social events, and used gifts, bumper stickers and other promotional items to induce investors to purchase interests in the VOC programs. Hansen also participated in a financial symposium at the New York City Coliseum called "The Money Show" at which he promoted the VOC programs.

Hansen hired several individuals, inexperienced in both securities and oil and gas development, who offered and sold interests in the VOC programs by mailing out written materials prepared by Hansen. He provided those employees with a prepared script and directed them to telephone prospective investors who had responded to Hansen's newspaper advertisements or other solicitations.

***3** During the relevant period, Samuel L. Deck invested in numbers of the VOC programs and later subdivided his interests by forming a limited partnership. Hansen referred to Deck individuals seeking to purchase less than a full $^{1}/_{32}$ interest in a VOC program and paid Deck commissions of approximately $62,000. Hansen provided Deck with written information to give to prospective investors.

During the relevant period, Hansen orally represented to prospective investors that they would receive large returns on any capital invested in the VOC programs. In one instance, Hansen told an investor that the William & Holmes Limestone lease would yield $1,000 per day in income from oil and natural gas sales. He claimed that VOC's wells produced, on the average, ten to twenty barrels per day, but did not disclose that a significant percentage of this fluid was not oil. Hansen also asserted that the average VOC well would produce oil for fifteen to twenty years, even though during the relevant period, the oldest VOC program well was less than fifteen years old.

Hansen has a number of prior instances of involvement with authorities regulating securities. In 1967, the SEC denied Hansen's company, HJH Hansen & Company, a broker-dealer registration. The denial was based upon findings that Hansen violated sections 5 and 17(a) of the Securities Act, 15 U.S.C. §§ 77e and 77q(a), and sections 10(b) and 15(c)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78*o*(c)(1) and Rules 10b-5 and 15c1-2, 17 C.F.R. §§ 240.10b-5 and 240.15c1-2 thereunder, through a scheme to defraud investors in the sale of Siltronics, Inc. stock. *Atlantic Equities et al.,* Securities Exchange Act Release No. 8118 (July 11, 1967).

In 1970, without admitting or denying the allegations contained in an SEC complaint, Hansen consented to the entry of a final judgment of permanent injunction against further violations of sections 5(a)(1) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a)(1) and 77e(c), as to any security. *SEC v. Suburban Land Investment Company, Inc. and Howard J. Hansen,* Civ. Action No. 481-70-A (E.D. Va. 1970). In 1982, several states prohibited Hansen from transacting business as a broker-dealer without registration and from engaging in the sale of securities not appropriately registered. *Commonwealth of Virginia ex. rel. State Corporation Commission v. Howard J. Hansen, Individually and d/b/a Howard J. Hansen and Associates,* Case No. SEC 810041 (May 14, 1982) (Virginia); *In the Matter of Vaught Oil Company, et al.,* (May 26, 1982) (Maryland); *In the Matter of Howard J. Hansen, et al.,* 82 SEC-80 (January 6, 1982) (Minnesota).

In May 1982, Hansen ended his association with VOC. From that time through September 1982, Hansen acted as a commissioned salesman, promoting and selling interests in Bison, Inc.'s oil and gas programs. In November 1982, Bison, Inc. entered into a consent order with the Securities Deputy of North Carolina pursuant to which it was to cease and desist from the violation of that state's securities laws. Since that time, Hansen has continued to approach former VOC program investors and other individuals to offer his services as a promoter of oil and gas ventures.

*Discussion*

***4** In order to prevail in this action for a permanent injunction pursuant to Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), the SEC must establish that Hansen has violated the federal securities laws and that there is a "realistic likelihood of recurrence" of such violations. *See SEC v. Commonwealth Chemical Securities, Inc.,* 574 F.2d 90, 100 (2d Cir. 1978). The court will first address the question of whether Hansen has violated the federal securities laws.

I. *Violations of the Securities Act and the Exchange Act.*

A. *The Registration Provisions*

Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a) and 77e(c), (the "registration provisions") provide respectively, that "unless a registration statement is in effect" or "has been filed" for a security, it is unlawful to sell or to offer to sell that security through means of communication or transportation in interstate commerce or through the mails. [5] A prima facie showing that the registration provision has been violated requires proof

that no registration statement was in effect as to the securities. Second it must be established that the defendant sold or offered to sell these securities, and finally, the use of interstate

transportation or communication or of the mails in connection with the sale or offer of sale must be proved.

*Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 686 (5th Cir. 1971); *Kistsner v. United States,* 332 F.2d 978 (8th Cir. 1964); *Neuwirth Investment Fund, Ltd. v. Swanton,* 422 F. Supp. 1187, 1193 n.8 (S.D.N.Y. 1975).

The fractional undivided interests in oil rights at issue in the instant case are securities subject to the registration provisions. *See*15 U.S.C. § 77b(1). VOC purported to comply with the registration requirement by qualifying for the Regulation B exemption. *See* note 2 at p. 22. The record establishes that no offering sheet was filed for the following five VOC programs: the Flintkote #4, Robert Williamson #6A, Grey Holmes #2, Shanafelt #1 and Starr #1 (the "five VOC programs"). Those securities therefore did not qualify for the Regulation B exemption and accordingly were sold and offered for sale "without benefit of registration." *SEC v. Southwest Coal, supra,* 624 F.2d at 1315. The record also establishes that Hansen sold or attempted to sell interest in the five VOC programs by use of the mails, the telephone, advertisements in publications distributed nationally and by other intestate means of communication. The SEC thus has established a prima facie case of violation of the registration provisions with regard to the five VOC programs. Nothing in the affidavits or documents submitted by Hansen rebuts any aspect of the SEC's prima facie showing. Accordingly, the court concludes that the SEC has established that Hansen violated the registration provisions with regard to the five VOC programs.

***5** With respect to the twenty-one VOC programs for which Schedule D offering sheets actually were filed (the "twenty-one VOC programs"), the record indicates that Hansen violated other requirements for the Regulation B exemption. Rule 320 of Regulation B, 17 C.F.R. § 230.320, disqualifies from that exemption a security offered for sale by means of estimates of oil or gas recoveries when such estimates have not been included in the offering sheets filed with the SEC. [6] As one investor testified at the hearing, Hansen in his effort to sell interests in the VOC programs made representations as to the number of barrels expected to be produced by a particular well or VOC program. No such estimates were included in the Schedule D filings. [7]

Rule 318 of Regulation B, 17 C.F.R. § 230.318, disqualifies from that exemption any security which is offered for sale by the communication of substantially more information than was provided in the Schedule D offering sheet filed with the SEC. *See Cooperative Oil Investments, Inc.* [1973 Transfer Binder] FED. SEC. L. REP. (CCH) P 79,548, Admin. Proc. File No. 3-4305 (October 18, 1973). [8] The record establishes that Hansen routinely sent to prospective investors materials with far more extensive information regarding oil production than was contained in the Schedule D offering sheets filed for the twenty-one VOC programs. Hansen did so despite Vaught's repeated urging that Hansen "stick to the Schedule D" offering sheets.

***6** Hansen's letters emphasized to prospective investors: "[I]f [VOC program investors] acquire improved leases within a sound budget, it should only be a matter of time before they find themselves ranked among the top producers of crude oil and natural gas in our country." In a letter to a VOC program owner solicited for additional investment, Hansen wrote:

Mr. Vaught feels that he is operating at 25% of capacity and if he ever finds enough people who are ready, willing and able to allow him to drill and complete wells at 100% of capacity, I feel his production results will be dramatic.

After 30 years Vaught has developed an uncanny ability to find and produce oil and gas within cost disciplines he understands and controls.

Hansen sent prospective investors bumper stickers with the legend: "If you don't have an oil well–get one!" and VOC's name, address and telephone numbers. Hansen also promoted sale of interests in the VOC programs by his "oil production seminars," by publication of the following message:

. Learn why sophisticated investors seek out independent producers

. How any investor can obtain the tax benefitst that tax shelter programs sell

. How excess costs and fees can erode your return

. Why drilling in proven fields and regular participation are the best strategies

. Case study of an actual independent producers performance

The court concludes that in connection with his offering of the VOC programs, Hansen has used advertisements and written communications containing information far beyond

that which was included in the Schedule D offering sheets filed with respect to those programs. Accordingly, the Regulation B exemption is inapplicable to those twenty-one VOC programs, and it is undisputed that no other form of SEC registration has been filed with respect thereto. As with the five VOC programs, Hansen offered for sale the twenty-one programs by mail and other means of interstate communication. Hansen therefore has violated the registration provisions with respect to all twenty-six VOC programs.

B. *The Anti-Fraud Provisions*

Section 17(a)(2) of the Securities Act, 15 U.S.C. § 77q(a)(2), prohibits false statements or misleading omissions of material facts in the offer or sale of securities by mail or by interstate means of communication.[9] Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 pursuant thereto, 17 C.F.R. § 240.10b-5, prohibit the same abuses in the sale of securities.[10]

***7** To establish a violation of the anti-fraud provisions, the SEC must prove that Hansen offered to sell or sold securities by means of communications omitting or misstating material facts.

> [F]acts will be regarded as "material" whenever there is a substantial likelihood that disclosure of the omitted fact would have assumed significance in the deliberations of a reasonable investor; or, stated alternatively, a fact is deemed "material" if its disclosure would have been viewed by a reasonable investor as having significantly altered the "total mix" of information made available. *TSC Industries, Inc. v. Northway Inc.,* 426 U.S. 438, 449 (1976). Thus, to establish the materiality of a misstatement or omission, it must be shown that in all probability the omitted or misrepresented facts would, in view of the circumstances, have assumed actual significance in the deliberations of the reasonable shareholder.

*SEC v. Paro,* 468 F. Supp. 635, 646 (N.D.N.Y. 1979).[11] Although the SEC need not prove scienter with respect to the alleged violations of section 17(a)(2) of the Securities Act, *see Aaron v. SEC,* 446 U.S. 680, 697-99 (1980), it must do so with respect to the alleged violations of section 10(b) and Rule 10b-5. *Id.* at 695.

Hansen and his sales staff, at his direction, made innumerable false and misleading statements in offering and selling interests in the VOC programs. Hansen distributed during the relevant period Schedule D offering sheets with respect to the Grey-Holmes #2 VOC program and the Starr #1 program which indicated no pending litigation against those issues. In fact, as Vaught had informed Hansen, the Virginia Corporation Commission on May 15, 1981 had issued a temporary injunction barring Vaught and VOC from selling in Virginia unregistered securities through the efforts of unlicensed salespeople. Plainly, the existence of such state securities law violations is a material fact whose omission may well have misled investors. *See DeMarco v. Security Planning Service, Inc.,* 462 F. Supp. 1066, 1071 (D. Ariz. 1978).

Hansen was aware of the Virginia proceedings and had discussed them with Vaught. Hansen, in failing to disclose those proceedings, therefore acted with scienter, or with "intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 194 n.12 (1976). He thereby violated the anti-fraud provisions.

In a letter dated September 19, 1979, Hansen wrote a prospective investor that VOC "pumpers," employees responsible for inspecting the wells, had purchased interests in the programs on the same basis as was offered to the public. In fact, no VOC employee had invested in the programs. Hansen also emphasized in a number of letters that Vaught's earnings from the VOC programs were limited to a return on his capital outlay on the same terms as the other investors. In fact, the VOC programs compensated Vaught for his services in producing oil and gas.

***8** Hansen similarly misrepresented in other correspondence that VOC was audited by a number of governmental agencies such as the SEC, the New York Attorney General and the Ohio Securities Commission. Hansen's misstatements plainly conveyed to investors a false sense of security regarding the stability of the VOC programs. Given the largely speculative nature of the oil and gas industry, the

court readily concludes that "in all probability [those] . . . misrepresented facts would, in view of the circumstances, have assumed actual significance in the deliberations of the reasonable shareholder." *SEC v. Paro, supra,* 468 F. Supp. at 646. [12]

Hansen told prospective buyers that the VOC interests were offered at a "turn-key" price. He repeatedly explained that under such a pricing arrangement, an investor's costs were limited to the fixed amount of his or her interest. A March 6, 1981 memorandum from Hansen is typical of his oral and written representations on that issue: "Bill Vaught is . . . the Operator of the improved leases. He agrees to provide all leasehold improvements required in order to produce gas and oil at a 'turn-key' price and if he spends money on goods and services that result in no production Mr. Vaught eats those costs." In fact, as Vaught testified, VOC investors routinely were charged

> [c]osts that were incurred during the operation of the well. We charged a fixed fee for pumping the well and overhead and supervision, and then any third party services that might be needed for the wells . . . a spark plug or belts for a gas engine [;] that type of thing.

The possibility of liability for such cost overruns plainly would have been material to prospective investors in the VOC programs.

The SEC thus has established Hansen's false statements concerning the investment of VOC employees, Vaught's remuneration, the audit of VOC by various governmental entities, and the operational charges levied upon VOC investors. The evidence also indicates the high probability that investors relied upon those misstatements. The SEC has not established that Hansen was aware that he was providing false information with regard to those matters. [13]

The SEC correctly argues that liability under section 10(b) may be established by a showing that a defendant who did not intentionally lie nevertheless recklessly misstated or failed to state material facts. *See IIT, An International Investment Trust v. Cornfield,* 619 F.2d 909, 923 (2d Cir. 1980). The SEC, however, has not demonstrated that Hansen was reckless, within the meaning of the securities laws, in misstating the abovementioned facts.

***9** To determine whether the defendants acted recklessly, the Court must inquire "whether the defendants knew the material facts misstated or omitted, or failed or refused, after being put on notice of a possible material failure of disclosure, to apprise themselves of the facts where they could have done so without any extraordinary effort." *Lanza v. Drexel & Co.,* 479 F.2d [1277], 1306 n.98.[(2d Cir. 1973)].

*Eriksson v. Galvin,* 484 F. Supp. 1108, 1126 (S.D.N.Y. 1980). Again, the record is devoid of evidence that Hansen was put on notice of the possible error in his statements concerning the VOC employee investments, Vaught's remuneration, the government audits of VOC, and the additional operations charges incurred by VOC investors. Accordingly, the court concludes that the SEC has not met its burden of establishing scienter with regard to those misstatements and consequently has not established those alleged violations of section 10(b) and Rule 10b-5. As discussed *supra,* at pp. 10-11, the scienter requirement is not applicable to section 17(a)(2) of the Securities Act. Hansen's material misstatements concerning VOC employee investments, the government audits, Vaught's compensation, and the well operation charges therefore violated that provision of the securities laws.

The testimony and affidavits of the VOC investors indicate that they relied most heavily on Hansen's statements regarding the probable rate of return on these investments. Hansen repeatedly told potential investors that they could expect to recover their entire capital outlay within three years; that a $^{1}/_{32}$ interest in eleven of the VOC programs would yield annual returns of $25,000; and that an investment in thirtytwo $^{1}/_{32}$ interests would be recovered within twelve months. The overwhelming majority of the individuals who purchased interests from Hansen received sporadic returns of only a tiny fraction of their investments.

The fact that a security seller's predictions concerning an investment do not materialize will not result in liability under the anti-fraud provisions unless those predictions were not prepared in a reasonable manner or with a firm basis. *See Pittsburgh Coke & Chemical Co. v. Bollo,* 421 F. Supp. 908, (E.D.N.Y. 1976), *aff'd,*560 F.2d 1089 (2d Cir. 1977). Vaught testified that he did not provide Hansen with estimated oil recoveries or investment return for the VOC programs. Vaught spoke "in generalities" to Hansen regarding such matters, but never conveyed either orally or in writing the type

of information Hansen would have needed to estimate in a reasonable manner the VOC investors' likely rate of return.

With regard to the scienter requirement, the court concludes that Hansen provided those estimates and predictions with reckless disregard of their accuracy. *See* discussion, *supra* at p. 13-14. Although VOC investors repeatedly advised Hansen that their returns fell far short of his predictions, Hansen continued to use the same wildly optimistic and unfounded forecasts throughout the relevant period. Accordingly, the court concludes that Hansen's predictions about the returns on the VOC programs violated both section 17(a)(2) of the Securities Act and section 10(b) of the Exchange Act.

***10** C. Violation of the Broker-Dealer Provision of the Exchange Act

Section 15(a)(1) of the Exchange Act, 15 U.S.C. § 78***o***(a)(1) (the "broker-dealer provision") states in relevant part:

> It shall be unlawful for any broker or dealer which is . . . a natural person not associated with a broker or dealer which is a person other than a natural person . . . to make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any security . . . unless such broker or dealer is registered in accordance with subsection (b) of this section.

Section 15(b) of the Exchange Act, 15 U.S.C. § 78***o***(b), details the procedures governing broker or dealer registration with the SEC.

Because Hansen is neither registered as a broker dealer with the SEC nor associated with an entity that is so registered, the SEC argues that Hansen violated the broker dealer provision by offering interests in the VOC programs. Hansen argues that he was not acting as a broker dealer, but merely as a commissioned salesman for Vaught.

Section 3(a)(4) of the Exchange Act, 15 U.S.C. § 78c(a)(4) defines a broker as "any person engaged in the business of effecting transactions in securities for the account of others, but does not include a bank." Under section 3(a)(5) of the Exchange Act, 15 U.S.C. § 78c(a)(5), a dealer is defined as "any person engaged in the business of buying and selling securities for his own account . . . but not as part of some regular business." These definitions have not been subject to extensive judicial interpretation. The courts that have considered the provisions have required a showing that the alleged broker or dealer was characterized by "a certain regularity of participation in securities transactions at key points in the chain of distribution." *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.,* 411 F. Supp. 411, 415 (D. Mass.), *aff'd,*545 F.2d 754 (1st Cir. 1976), *cert. denied,*431 U.S. 904 (1977); *see SEC v. National Executive Planners, Ltd.,* 503 F. Supp. 1066, 1073 (M.D.N.C. 1980). Regardless of the nature of Hansen's relationship to Vaught or VOC, it is beyond question that Hansen regularly participated at key points in the chain of distribution of the VOC securities.

Moreover, Hansen's activities fall well within the more detailed definition of a broker used in the scholarly literature interpreting the Exchange Act. Among the factors listed as relevant to a determination of whether an individual acted as a broker within the meaning of that statute are whether that person 1) is an employee of the issuer; 2) received commissions as opposed to a salary; 3) is selling, or previously sold, the securities of other issuers; 4) is involved in negotiations between the issuer and the investor; 5) makes valuations as to the merits of the investment or gives advice; and 6) is an active rather than passive finder of investors. *See* N. Wolfson, R. Phillips & T. Russo, *Regulation of Brokers, Dealers and Securities Markets,* § 1.06 (1st ed. 1977) at 1-12.

***11** Hansen was not a salaried VOC employee, but rather received commissions on his sales of interests in the VOC program. Prior to his involvement with VOC, Hansen had sold securities of Siltronics, another issuer, but the SEC denied Hansen's broker-dealer registration application as a result of securities laws violations during the course of that offering. By his advertisements, correspondence, and oil and gas development seminars, Hansen was an active and aggressive finder of investors and he frequently gave those investors extensive advice with regard to the merits of the VOC programs. The court concludes that Hansen, while acting as a broker within the meaning of the Exchange Act, used the mails and other instrumentalities of interstate commerce to induce and attempt to induce the sale of interests in the VOC programs. Accordingly, Hansen has violated the broker dealer provision of the Exchange Act.

II. *Appropriateness of Injunctive Relief*

Once the SEC has established a past violation of the securities law, the "critical question" in the court's decision to issue an injunction is whether "there is a reasonable likelihood that the wrong will be repeated." *SEC v. Manor Nursing Centers, Inc.,* 458 F.2d 1082, 1100 (2d Cir. 1972); *see SEC v. Monarch Fund,* 608 F.2d 938, 943 (2d Cir. 1979). The factors relevant to the district court's resolution of that question are:

> the likelihood of future violations, the degree of scienter involved, the sincerity of defendant's assurances against future violations, the isolated or recurrent nature of the infraction, defendant's recognition of the wrongful nature of his conduct, and the likelihood, because of defendant's professional occupation, that future violations might occur.

*SEC v. Universal Major Industries Corp.,* 546 F.2d 1044, 1048 (2d Cir. 1976), *cert. denied,*434 U.S. 834 (1977).

In the instant case, the court finds substantial evidence which, under the abovementioned analysis, indicates a high probability of future securities law infractions by Hansen. Most significantly, Hansen was held to have violated those laws on at least two occasions prior to his efforts to sell interests in the VOC programs. Although the SEC did not establish Hansen's scienter with regard to all of his illegal activities in the instant case, he plainly was aware, in view of his earlier registration efforts, of the impropriety of his acting as a broker dealer without registering with the SEC. Hansen also acted deliberately in offering unfounded estimates of future performance of the VOC programs.

Hansen's violations of the securities law were not sporadic but rather continued on a regular basis throughout the relevant period. When his efforts on behalf of VOC ended, Hansen sold interests in the oil and gas programs of Bison, Inc., a company sanctioned for the violation of state securities laws. Hansen apparently has proceeded apparently to this day to sell his services as an independent counselor and advisor regarding investment in different oil and gas programs. Hansen has shown no recongnition of or remorse for any of his violations of the securities law and indeed has stated: "I would view an order issued by the Court as a consequence of such proceedings [for injunctive relief] as I would view an order from the Court to stop beating my wife."

***12** In view of all those factors, the court finds a substantial likelihood that Hansen, unless enjoined, will again violate the federal securities laws. Accordingly, the permanent injunctive relief sought by the SEC must be granted.

III. *SEC's Motion to Dismiss*

Hansen has filed what is apparently a counterclaim charging the SEC with "maladministration of the federal securities laws" allegedly resulting in large losses to him and to other investors. Section 21(g) of the Exchange Act, 15 U.S.C. § 78u(g), however, provides that no SEC action for equitable relief shall be joined with other actions involving common questions of fact, unless the SEC has consented to such consolidation. This rule has been interpreted in an SEC action for injunctive relief to bar, absent SEC consent, a counterclaim, *see SEC v. Goldfield Deep Mines Co.,* No. 83-2013, (C.D. Cal. June 7, 1983), or a crossclaim. *See SEC v. Allison,* [1981-1982 Transfer Binder] FED.SEC.L.REP. (CCH) P 98,263 (N.D. Cal. 1981). Section 21(g) thus promotes the speedy resolution of SEC injunctive actions brought to protect the investing public.

It is undisputed that the SEC has not consented to the filing of a counterclaim in this action. Accordingly, Hansen's counterclaim must be dismissed.

*Conclusion*

For the foregoing reasons, Hansen is permanently enjoined from further violations of sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c) and 77q(a); section 10(b) and 15(a)(1) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78***o***(a)(1); and Rule 10b-5, 17 C.F.R. § 240.10b-5. Hansen's purported counterclaim is dismissed.

So Ordered.

**All Citations**

Not Reported in F.Supp., 1984 WL 2413, Fed. Sec. L. Rep. P 91,426

## Footnotes

1 On May 23, 1983, final judgments of permanent injunctions by consent were entered against Hansen's co-defendants, Samuel L. Deck, individually and d/b/a Samuel L. Deck and Associates, Bill D. Vaught and Vaught Oil Company.

2 The hearing on the preliminary injunction originally was set for September 19, 1983. On September 15, 1983, in response to a request by Hansen for an adjournment on the basis of his health, the court wrote Hansen that the hearing was reset for October , 1983 at 10 a.m., but that no further adjournments would be granted unless Hansen provided an affidavit from his treating physician. Because no affidavit was submitted, the court convened the hearing at 10 a.m. on October 3, but then postponed it until 2 p.m. directing that counsel for the SEC telephone Hansen and advise him of the postponement. Hansen acknowledges having received that message at 11 a.m., but he did not communicate with the court and the hearing proceeded at 2 p.m. on October 3. Thereafter, as part of his post-hearing submission, Hansen submitted more than forty pages of affidavits and exhibits.

3 The Fifth Circuit has described those provisions as follows:

The Regulation B exemption, promulgated pursuant to § 3(b) of the [Securities Act], 15 U.S.C. § 77c(b), is available for offerings of certain fractional undivided interests in oil and gas rights up to an agregate amount of $250,000 per offering. The principal prerequisite to obtaining an exemption is the filing of an “offering sheet” of the form and content described by Schedule A, B, C, or D, 17 C.F.R. § 230.326(a) (1979), whichever is appropriate to the particular type of interest to be offered.

*SEC v. Southwest Coal and Energy Co.,* 624 F.2d 1312, 1316 n.6 (5th Cir. 1980). VOC programs entailed the offering of non-producing working interests, that is, of rights in the oil leaseholds “subject to [a] portion of the expense of development, operation or maintenance,” 17 C.F.R. § 230.300 (a)(4), “but not producing any oil at the time of offering.” Accordingly, the required filing was the Schedule D “offering sheet.” *See* 17 C.F.R. § 230.326(a)(4).

4 VOC returned purchase moneys for two of the five VOC programs for which no filing had been effected, because those programs had not been fully subscribed.

5 Sections 5(a) and 5(c) provide in relevant part:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly–

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use of medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

* * *

(c) It shall be unlawful or any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security . . . .

6 Specifically, Rule 320 provides:

A person using any estimation of the amount of oil or gas recoverable from the tract involved, or from any other tract for comparative purposes, in connection with an offer to sell any fractional undivided interest in oil or gas rights, defined in Rule 300, [17 C.F.R. § 230.300], shall not be entitled to the exemption provided by Regulation B, and, shall not be relieved from any liability which, in the absence of the exemption provided by Regulation B, would be imposed upon such person because such security was unregistered, unless such estimation is permitted to be and is included in, and furnished as part of, an offering sheet accurately describing such security.

7 The record contains copies of the Schedule D offering sheets for some but not all of the twenty one VOC programs for which such offering sheets were filed with the SEC. Testimony indicates, however, that the information provided on the Schedule D forms in the record is typical of the information given on all the Schedule D forms prepared by VOC.

8 Rule 318 provides as follows:

(a) Any written advertisement or other written communication, or any radio or television broadcast, which states from whom an offering sheet meeting the requirements of this Regulation may be obtained and, in addition, contains no more than the following information, may be published, distributed, or broadcast at or after the commencement of the public offering to any person prior to sending or giving such person a copy of the offering sheet:

(i) The name of the offeror of the interests;

(ii) The identity or type of the interests to be offered;

(iii) The number of such interests to be offered;

(iv) The location (county and state) of the tract or tracts involved;

(v) The price of the interest to be offered; or

(vi) The type of well to be drilled, such as an exploratory or developmental well.

(b) Except for the offering sheet required by this Regulation and any material permitted by paragraph (a) of this rule, no other advertisement, radio, or television broadcast, or written communication shall be used in connection with the offering of securities under this Regulation, except as required by state law.

9 Section 17(a) provides in relevant part:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly . . .

(2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . . .

10 Section 10(b) provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . .

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

Rule 10b-5 provides in relevant part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading . . ..

Section 17(a)(2) of the Securities Act, section 10(b) of the Exchange Act and Rule 10b-5 will be referred to collectively as the "anti-fraud provisions." Although the SEC cites to section 17(a) and Rule 10b-5 in their entirety, it relies solely on the provisions of the statute and regulation concerning false statements or material omissions.

11 As the Court in *Paro* noted, 468 F. Supp. at 646 n.12, the Supreme Court in *TSC Industries v. Northway, supra,* considered the requirement of materiality under Rule 14a-9, 17 C.F.R. § 240.140-9. The Second Circuit has applied the definition of materiality set forth in *TSC Industries* to violations of Rule 10b-5. *Harkavy v. Apparel Industries, Inc.,* 571 F.2d 737, 741 (2d Cir. 1978).

12 Only in view of the deluge of Hansen's misrepresentations does there appear to be any question as to the materiality of the false statements regarding investments by VOC employees and government audits. That certain misrepresentations may have been more egregious or more significant, however, should not relieve Hansen from liability for other false statements which plainly would be of significance to a reasonable investor.

13 Neither the SEC's proposed findings of fact nor the court's own review of the record indicates any evidence supporting a conclusion that Hansen knew of the falsity of his statements about the investment by VOC employees, Vaught's remuneration, government audits of VOC or the turn-key pricing system.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 9

2024 WL 4904506
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
HERMAN'S WORLD OF SPORTS, INC. et al., Defendants.

No. 05-cv-00438(KAM)(RLM)
|
Signed November 27, 2024

**Attorneys and Law Firms**

John J. Graubard, Joshua E. Levine, Mark Schonfeld, Maureen Peyton King, Securities & Exchange Commission, New York, NY, for Plaintiff.

**MEMORANDUM & ORDER**

KIYO A. MATSUMOTO, United States District Judge:

***1** This case has been pending for nearly twenty years and was reassigned to the undersigned judge on September 30, 2024. On January 26, 2005, the Securities and Exchange Commission ("SEC") filed a Complaint in this case against Herman's World of Sports, Inc. ("HWOS"), Thomas J. Dzwilewski ("Dzwilewski"), Michael Eisemann ("Eisemann"), and Louis Montaino ("Montaino") (collectively, "Defendants"). (ECF No. 1.) On February 15, 2005, Judge I. Leo Glasser entered Final Consent Judgments against HWOS and Dzwilewski, and on September 20, 2005, he entered Final Consent Judgments against Eisemann and Montaino. (ECF Nos. 9–10, 27–28). Judge Glasser ordered that HWOS and Dzwilewski were jointly and severally liable for disgorgement and civil penalties and also ordered Montaino and Eisemann to disgorge gains and to pay civil penalties. (ECF No. 33, Disbursement Memorandum ("SEC Mem.") at 1-2.)

The SEC has been made aware that $50,000 attributable to these judgments has been deposited into the Court Registry Investment System ("CRIS"). (*Id.* at 2.) On September 30, 2024, the SEC moved for an order directing (1) the turnover of funds held in the CRIS to the SEC while it analyzes whether distribution to investors is feasible; (2) that any other funds collected in this action be paid directly to the SEC; and (3) to clarify that if distribution is infeasible, the SEC may direct funds to the U.S. Treasury without further order of this Court. (*Id.*) None of the defendants has filed an opposition to the motion.

This case was reassigned to the undersigned judge on September 30, 2024. For the reasons below, the Court grants the first two requests but denies the third, without prejudice to renew after the SEC has made a feasibility determination, no later than December 20, 2024. The Court directs the parties to expeditiously move this case toward conclusion.

The SEC states that it is "analyz[ing] whether a distribution to investors is feasible," despite "the funds relat[ing] to a complaint filed nearly twenty years ago," and that the SEC would similarly analyze any other amounts that may be collected. (*Id.* at 2-3.) Should the SEC determine distribution is feasible, which will include determining and quantifying the harm, identifying any eligible harmed investors, and weighing the feasibility of distribution against administrative costs and the potential to provide meaningful recovery, the SEC states it will propose a distribution plan for the Court's approval. (*Id.* at 3.) Because the Consent Judgments in this case are nearly twenty years old, the Court finds the SEC's proposed steps - turning over funds in the CRIS and directly receiving other funds that may be collected while it analyzes the feasibility of distribution - are acceptable, but urges the SEC to expeditiously act to conclude this case. *See SEC v. Penn*, No. 14-cv-581 (VEC), 2021 WL 1226978, at *15 (S.D.N.Y. Mar. 31, 2021) (acknowledging Court's " 'authority to grant the full panoply of equitable remedies so that the [SEC] can obtain complete relief' " including "authority to order the turnover of assets to be used to satisfy judgments") (internal citations and quotations omitted), *aff'd*, No. 21-1348-cv, 2022 WL 2517218 (2d Cir. July 7, 2022).

***2** The SEC further requests that should it determine it is infeasible to distribute the amounts collected, it "may turnover the funds to the U.S. Treasury *without reverting to the Court.*" (SEC Mem. at 1, 4 (emphasis added).) The SEC relies on *Liu v. SEC*, 591 U.S. 71 (2020). *Liu* held that a disgorgement award was permissible equitable relief under § 78u(d)(5) of the Securities Exchange Act if it did not exceed a wrongdoer's net profits and was awarded for victims, *id.* at 74, but left open the question of whether "depositing disgorgement funds with the Treasury when it is infeasible to remit them to investors 'is consistent with the limitations of Section 78u(d)(5),' " *SEC v. Laura*, No. 18-

cv-5075 (NGG) (VMS), 2020 WL 8772252, at *4 (E.D.N.Y. Dec. 30, 2020) (quoting *Liu*, 591 U.S. at 89); *see Penn*, No. 14-cv-581 (VEC), 2021 WL 1226978, at *13 (noting *Liu*'s "open question" of whether SEC could "deposit disgorgement funds with the Treasury when it is infeasible to distribute such funds to investors").

The SEC argues that *Liu*'s "open question" means it is not prohibited from depositing disgorged funds with the Treasury, and this Court may appropriately order that, if needed, the SEC can "turnover the funds to the U.S. Treasury without reverting to the Court." (SEC Mem. at 4.) [1] Although in *Liu* there was no specific order "directing any proceeds to the Treasury," the Supreme Court noted that "[i]f one is entered on remand, the lower courts may evaluate in the first instance whether that order would indeed be for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." *Liu*, 591 U.S. at 90 and n.5 (further noting that "[t]o the extent that feasibility is relevant at all to equitable principles ... lower courts are well equipped to evaluate the feasibility of returning funds to victims of fraud").

Indeed, courts post-*Liu* have held that disbursement to the Treasury is appropriate, where the infeasibility of distributing funds to investors was already evident, or where no harmed investors were identified. *See, e.g.*, *SEC v. O'Brien*, 674 F. Supp. 3d 85, 103 (S.D.N.Y. 2023) (finding "[d]isbursement to the Treasury [was] appropriate" where SEC contended it would be "enormously difficult, if not impossible" to identify those harmed, and where defendant did not dispute disbursement to Treasury), *aff'd*, No. 23-1071, 2024 WL 2813722 (2d Cir. June 3, 2024); *SEC v. Bronson*, 602 F. Supp. 3d 599, 618 (S.D.N.Y. 2022) (in denying Rule 60 motion, noting that sending disgorged funds to Treasury was "consistent with *Liu*" where no harmed investors to whom disgorged profits should be returned were identified in the complaint or final judgment), *aff'd*, No. 22-1045-cv, 2022 WL 5237474 (2d Cir. Oct. 6, 2022), *cert. denied, Bronson v. SEC*, 143 S. Ct. 2643 (2023).

Here, in contrast, despite the nearly twenty years since this case was commenced, the SEC has neither determined the feasibility of distribution nor presented facts that distribution is in fact infeasible. (SEC Mem. at 3-4.) Ultimately, if the SEC does determine distribution is infeasible, it shall update the Court so the Court may consider whether directing the amounts to the Treasury is "for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles." *Liu*, 591 U.S. at 90; *see, e.g.*, *SEC v. Stone*, No. 22-cv-3553 (VM), 2023 WL 6387276, at *11 (S.D.N.Y. Sept. 29, 2023) ("Should the SEC ... seek a disgorgement order that directs the disgorged funds to the Treasury because no harmed investors have been able to be identified, the Court may assess *at that juncture* whether such an order would be 'for the benefit of investors as required by § 78u(d)(5) and consistent with equitable principles.' " (emphasis added) (quoting *Liu*, 591 U.S. at 90)); *Penn*, No. 14-cv-581 (VEC), 2021 WL 1226978, at *14 (finding SEC's proposed approach "sensible" and "consistent with *Liu*" where SEC "committed to conducting a feasibility analysis were it to collect additional money; if it determines that distribution to investors is infeasible, *it will update the Court*" so the court "can decide whether directing such proceeds to the Treasury is permissible" (emphasis added)).

***3** Accordingly, the Court grants the SEC's motion to turn over to the SEC the funds on deposit in the CRIS and any further amounts collected attributable to this case. The SEC is ordered to determine if a distribution is feasible no later than December 20, 2024, and if distribution is feasible, it shall inform the Court, and the SEC shall propose a distribution plan for approval no later than January 17, 2025. As noted, if the SEC determines, no later than December 20, 2024, that distribution is infeasible, it shall inform the Court, and it may seek an order no later than January 17, 2025, directing that the funds be remitted to the U.S. Treasury.

**SO ORDERED.**

**All Citations**

Slip Copy, 2024 WL 4904506

## Footnotes

1 The Court notes that the SEC's motion refers to the deposited funds in the CRIS as disgorged funds (*see* SEC Mem. at 3) and bases its request to direct funds to the Treasury, if needed, specifically on *Liu*, which concerned disgorgement as permissible equitable relief under § 78u(d)(5). (SEC Mem. at 3-4.) For these reasons, the Court considers the SEC's request against the backdrop of *Liu*.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 10

2020 WL 8772252
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
Joseph M. LAURA, Anthony R. Sichenzio, and Walter Gil de Rubio, Defendants.

18-CV-5075 (NGG) (VMS)
|
Signed 12/30/2020

**Attorneys and Law Firms**

Kevin P. McGrath, Margaret Dundon Spillane, Marc P. Berger, Thomas Peter Smith, Jr., Victor Edward Suthammanont, U.S. Securities and Exchange Commission, New York, NY, for Plaintiff.

Joseph M. Laura, pro se.

Anthony R. Sichenzio, pro se.

Kevin Joseph O'Connor, Doris Diana Short, Peckar & Abramson, P.C., New York, NY, Thomas Jerome Curran, Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara, Wo, Lake Success, NY, Joseph Michael Vento, Nukk-Freeman & Cerra, PC, Chatham, NJ, Shannon Danielle Azzaro, Pekar & Abramson, P.C., River Edge, NJ, for Defendants Joseph M. Laura, Anthony R. Sichenzio.

Bradley Drew Simon, Jeremy Weinstein, Windels Marx Lane & Mittendorf, LLP, New York, NY, for Defendant Walter Gil de Rubio.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, United States District Judge.

***1** Plaintiff Securities and Exchange Commission (the "SEC") instituted this action against Defendants, alleging primary and derivative violations of Sections 10, 15, and 17 of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder. (*See generally* Compl. (Dkt. 1).) The SEC alleges that Defendants made false representations to induce third parties to invest in Pristec America, Inc. ("PAI"), [1] a partial subsidiary of Austrian corporation Pristec AG ("PAG"), and misappropriated invested funds for their own benefit. (*Id.*)

Initially, Defendants Laura and Sichenzio moved to dismiss the Complaint under Federal Rule of Civil Procedure 12(b)(6)-(7), arguing that: (1) the SEC's failure to join necessary parties mandated dismissal, (2) many of the allegations in the Complaint related to conduct that occurred outside of the governing limitations period, and (3) the Complaint failed to satisfy the heightened pleading requirements for fraud. *See SEC v. Laura*, No. 18-cv-5075 (NGG) (VMS), 2020 WL 1434114, at *1 (E.D.N.Y. Mar. 24, 2020). [2] The court denied that motion in its entirety. *See id.* Mr. Laura and Mr. Sichenzio then submitted their Answer, in which they asserted 11 affirmative defenses. (*See* Answer (Dkt. 83) at 14-19.) Now before the court is the SEC's motion, under Federal Rule of Civil Procedure 12(f), to strike seven of the 11 defenses, specifically the First Defense (statute of limitations), Second Defense (laches), Third Defense (unclean hands), Fifth Defense (waiver, and accord and satisfaction), Sixth Defense (settlement), Seventh Defense (collateral effect of arbitration), and Eleventh Defense (claims relating to a joint venture ("JV") partner). (*See* SEC's Mem. in Supp. of Mot. to Strike (Dkt. 96-1) ("Mem."); Defs.' Mem. in Opp. to Mot. to Strike (Dkt. 97) ("Opp."); SEC's Reply (Dkt. 99).) For the following reasons, the SEC's motion to strike is GRANTED in its entirety, and Defendants' first, second, third, fifth, sixth, seventh, and eleventh affirmative defenses are STRUCK.

## I. BACKGROUND

The court assumes familiarity with the facts of the case, as outlined in its Memorandum & Order denying Defendants' motion to dismiss. *See Laura*, 2020 WL 1434114 at *1-3. To summarize: PAG was established to develop and commercialize certain "cold cracking" technology used in connection with the refining of crude oil. *Id.* In 2011, Defendants' company Innovative Crude Technologies ("ICT") and PAG became equal partners in PAI, an entity established to market PAG's technology in the United States, Canada, Mexico, and Colombia. *Id.* Between 2013 and 2017, Defendants raised around $7 million in investor funds for PAI. *Id.* The SEC alleges that Defendants made fraudulent misrepresentations while soliciting investors in PAI, misappropriated at least $3.7 million of investors' money to cover both their own personal expenses and debts and the expenses and debts of other, unrelated business ventures, and made efforts to conceal the fraud along the way. *Id.*

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

Defendants insist that PAG, in league with PAI's investors, "provided the SEC with false information in order to saddle Defendants with litigation and to steal their shares in [PAI]" to "convert valuable, proprietary and patented technology, for their own means." (Opp. at 1.) In their telling, the SEC is in on the steal, and either knew or should have known that PAG and the PAI investors, whom the SEC describes as victims and relies on as witnesses, were in fact "thieves who had their own secret agendas." (*Id.* at 20, 2-3.)

## II. LEGAL STANDARD

***2** An affirmative defense is an "assertion of facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all the allegations in the complaint are true." *Affirmative Defense, Black's Law Dictionary* (11th ed. 2019). "In order to prevail on a motion to strike [an affirmative defense], a plaintiff must show that: (1) there is no question of fact which might allow the defense to succeed; (2) there is no question of law which might allow the defense to succeed; and (3) the plaintiff would be prejudiced by inclusion of the defense." *SEC v. McCaskey*, 56 F. Supp. 2d 323, 326 (S.D.N.Y. 1999)[3]; *see also GEOMC Co., Ltd. v. Calmare Theraputics Inc.*, 918 F.3d 92, 95-99 (2d Cir. 2019) (discussing the origin and evolution of the *McCaskey* factors).

In light of the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Second Circuit has clarified that for the first *McCaskey* factor, the facts pleaded in an affirmative defense must be "plausible," but "applying the plausibility standard to any pleading is a context-specific task." *GEOMC*, 918 F.3d at 98. *Twombly* and *Iqbal* had no effect on the second factor, where "[t]here is no dispute that an affirmative defense is improper and should be stricken if it is a legally insufficient basis for precluding a plaintiff from prevailing on its claims." *Id.* As to the third factor, "[a] factually sufficient and legally valid defense should always be allowed if timely filed even if it will prejudice the plaintiff by expanding the scope of the litigation." *Id.* However, "prejudice may be considered and, in some cases, may be determinative, where a defense is presented beyond the normal time limits of the Rules, especially at a late stage in the litigation, and challenged by a motion to dismiss."[4] *Id.* at 99. The decision to strike an affirmative defense is within the court's discretion. *Id.*

## III. DISCUSSION

### A. First Affirmative Defense: Statute of Limitations

Defendants assert, as their first affirmative defense, that "[t]he SEC's claims against Laura are barred in whole or in part by the applicable statute of limitations."[5] (Answer at 14.) As the court explained in its Memorandum & Order denying Defendants' motion to dismiss, this case is governed by the five-year statute of limitations provided by 28 U.S.C. § 2462, and "the SEC cannot obtain relief for any conduct occurring prior to June 2, 2013." *Laura*, 2020 WL 1434114 at *5. As the court has already held, the SEC has alleged extensive misconduct during the limitations period, and it seeks disgorgement, civil monetary penalties, and injunctive relief only for post-June 2, 2013 conduct. (*See* Mem. at 6; *Laura*, 2020 WL 1434114 at *5.)

***3** Defendants argue that not every allegation on the face of the SEC's Complaint occurred on a date within the limitations period. (*See* Opp. at 9.) They also argue that no evidence from outside of the limitations period should be permitted, even if it goes to conduct that occurred within it. (*See id.* at 9-10.) The court has already addressed those arguments, and its answer has not changed. Defendants can only face liability for conduct after June 2, 2013. The extent to which background evidence should be excluded as untimely will be considered in evidentiary motions, if the SEC submits such evidence and Defendants make an appropriate objection. *See Laura*, 2020 WL 1434114 at *5. Accordingly, because there is no question of law or fact with respect to the statute of limitations that would defeat the SEC's claims, Defendants' first affirmative defense should be struck.

### B. Second Affirmative Defense: Laches

As their second defense, Defendants claim that "[t]he SEC's claims against Answering Defendants are barred in whole or in part by the doctrine of laches." (Answer at 14.) Laches is an equitable defense, applied where "the plaintiff delayed unreasonably and inexcusably in commencing the action and [ ] the defendant suffered prejudice as a result." *McCaskey*, 56 F. Supp. 2d at 327; *see also FTC v. Consumer Health Benefits Assoc.*, 10-cv-3551 (ILG) (RLM), 2011 WL 13295634 at *5-6 (E.D.N.Y. Oct. 5, 2011). This defense must be struck because "laches is not available against the federal government when it undertakes to enforce a public right or protect the public interest." *United States v. Angell*, 292 F.3d 333, 338 (2d Cir. 2002).

### C. Third Affirmative Defense: Unclean Hands

Defendants next argue that the SEC's claims are barred in whole or in part by the doctrine of unclean hands, an

equitable defense that requires plaintiffs to "have acted fairly and without fraud or deceit as to the controversy in issue." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.*, 324 U.S. 806, 814–15 (1945). Specifically, Defendants assert that the SEC is working in concert with allegedly injured investors who are, in reality, attempting to fraudulently divest Defendants of their property interests in ICT, PAI, and PAG. (Answer at 14-17.)

As with the doctrine of laches, a defense under the doctrine of unclean hands is not generally available against a government agency that brings an action pursuant to its statutory mandate, which is presumably in the public interest. *See SEC v. KPMG LLP*, 03-cv-671 (DLC), 2003 WL 21976733 at *3 (S.D.N.Y. Aug. 20, 2003); *see also SEC v. Rosenfeld*, 97-cv-1467 (RPP), 1997 WL 400131 at *2 (S.D.N.Y. July 16, 1997). However, a defendant may assert unclean hands against the Government "where the agency's misconduct was egregious and the resulting prejudice to the defendant rose to a constitutional level." *Id.* That bar is high, and Defendants have not asserted factual or legal claims to clear it.

Here, at minimum, Defendants would need to show that the allegedly injured investors are engaged in a fraudulent scheme against them, and that the SEC has participated in the fraud. Apart from Defendants' implausible and unsupported allegations, there is no reason to believe that the SEC is engaged in egregious misconduct that has deprived Defendants of any constitutional right. For instance, the mere fact that SEC attorneys "raised hypothetical questions" during a witness interview does not lead to Defendants' conclusion that, "[t]he SEC has engaged in abrasive investigatory tactics in an effort to get witnesses to agree that wrongdoing occurred, using all sorts of hypotheticals and facts which bore no relation to the truth." (Opp. at 12.) Similarly, Defendants assert that the SEC helped investors in their disputes with Defendants "by timing the filing of the Complaint in this action to do maximum potential damage to Defendants in their ongoing arbitration and in the state court litigation." (Opp. at 13.) The only evidence for this allegation appears to be that the SEC had contact with those private parties and that some proceedings happened roughly contemporaneously. (*See id.* at 17-18.) The list of Defendants' allegations is long. They claim the SEC worked with PAG's forensic accountant to mount a case against Defendants (Opp. at 14), that they helped prepare an expert report in related arbitration that "was an epic fail" (Opp. at 19), and that they "signed off" on transactions to alienate Defendants' intellectual property (Opp. at 13). The evidence for all of these theories is merely that the SEC was in contact with private parties—not parties in this case—who were engaged in private disputes with Defendants.

***4** Despite Defendants' theories, there is nothing unusual about the SEC interviewing allegedly harmed investors, nor that public and private litigation and dispute resolution concerning the same parties and conduct would happen around the same time. Even if Defendants are correct that the witnesses whom the SEC interviewed are lying and engaged in fraud—and the court does not so conclude at this time—the fact that the SEC was in contact with them does not implicate the SEC in their fraud. Of course, to the extent that Defendants wish to attack the credibility of the SEC's evidence or witnesses, they can do so at trial.

Because Defendants have not advanced any plausible factual or legal argument to show that the SEC engaged in egregious misconduct that deprived them of a constitutional right, their unclean hands defense must be struck.

### D. Fifth and Sixth Affirmative Defenses: Waiver, Accord and Satisfaction, and Settlement

In their fifth and sixth defenses, Defendants claim that the doctrines of waiver, accord and satisfaction, and settlement serve as a bar to portions of the SEC's claims. (Answer at 18.) All three doctrines concern the preclusive effect, in subsequent litigation, of agreements between parties. Here, the SEC is not a party to any waivers, accords, or settlements, so none of those doctrines could operate against it, and the defenses are therefore legally insufficient. The agreements on which Defendants base their arguments were entered into by investors who are third parties to this action, not by the SEC. Nonetheless, Defendants claim that the Supreme Court's recent decision in *Liu v. SEC*, 140 S. Ct. 1936 (2020), stands for the broad proposition that insofar as the SEC seeks a disgorgement remedy, it does so on behalf of wronged investors, and its remedy is limited to that which the investors could pursue on their own. (*See* Defs.' Letter of Aug. 26, 2020 (Dkt. 103).) The court does not share that interpretation.

In *Liu*, the Court held that disgorgement is a type of "equitable relief" that the SEC may seek under 15 U.S.C. § 78u(d)(5), even though the Court held in *Kokesh v. SEC*, 137 S. Ct. 1635 (2017), that disgorgement constitutes a penalty for statute of limitations purposes, and penalties are not enforced in equity. *See Liu*, 140 S. Ct. at 1940-1941. As an equitable remedy, disgorgement is subject to equitable limitations. Thus, the Court held, the SEC may not seek

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

disgorgement in excess of the net profits gained from the wrongdoing. *Id.* at 1946. Further, disgorgement cannot be applied jointly-and-severally where joint-and-several liability was not available at common law, and courts must deduct legitimate expenses from a disgorgement award. *See id.* at 1949-1950. However, most relevant to the case at bar, the Court stated that "[i]t is an open question whether, and to what extent" the practice of depositing disgorgement funds with the Treasury when it is infeasible to remit them to investors "is consistent with the limitations of Section 78u(d)(5)." *Id.* at 1948. With that, the Court allowed that an order remitting wrongful profits to the public rather than to an injured party might still be "for the benefit of investors as required by Section 78u(d)(5)," which decouples a disgorgement award from the particular injury felt by individual investors. *Id.* The court reads that section of the *Liu* decision as precluding Defendants' expansive reading of the case, namely, that the SEC's power to seek disgorgement is exactly coterminous with an individual injured investor's claim. If that were so, the open question that the Court identified would be settled against the SEC.

***5** *Liu* requires that a disgorgement award not exceed Defendants' ill-gotten gains, but it does not require that a disgorgement award reflect every individually wronged investor's private agreements. If it did, a court would need to conduct a mini-trial as to each investor before it could order disgorgement. There is no reason to believe that *Liu*, which confirmed the breadth of the SEC's power to seek equitable awards, also stealthily erected such a substantial barrier to SEC recovery. In any event, even if Defendants could limit a future disgorgement award based on the agreements of individual investors, they could easily assert that challenge under their fourth affirmative defense, which states that "[t]he SEC's claims for disgorgement are barred insofar as the SEC lacks the authority under existing law to seek such relief."

Accordingly, Defendants' fifth and sixth affirmative defenses should be struck.

### E. Seventh Affirmative Defense: Arbitration

For their seventh defense, Defendants argue that an arbitral award entered on June 10, 2019 by the International Center for Dispute Resolution ("ICDR") bars certain of the SEC's claims. (Answer at 18.) In that proceeding, Mr. Laura and Mr. Sichenzio were claimants, purporting to act both individually and derivatively on behalf of PAI and ICT; and PAG was respondent. (*See* Final Arbitral Award (Dkt. 80-3).) This argument suffers from the same legal defect as Defendants' fifth and sixth defense: the arbitral award cannot collaterally estop the SEC, which was not a party to the proceeding. Indeed, as the Arbitrator stated, "nothing in this Award should be construed as my giving an opinion, one way or the other, on the allegations and accusations made in the SEC Investigation...." (*Id.* at ECF p. 25.) As he recognized: "the issues within the SEC Investigation ... are outside my jurisdiction, and I am not prepared to rule, in a contract matter, as to whether any of the Parties are culpable of the complex, financial schemes covered by [that] investigation[ ]. Nor do I have access to all of the evidence possessed by the regulatory authorities that would give me the competence to rule on these issues." (*Id.* at ECF pp. 36-37.)

By the plain terms of the arbitral award, to which the SEC was not a party and therefore did not have the opportunity to fully litigate, it has no effect on the instant case. Therefore, Defendants' seventh affirmative defense must be struck.

### F. Eleventh Affirmative Defense: Claims relating to a JV partner

Finally, with their eleventh affirmative defense, Defendants argue that any claims involving Defendants' joint venture ("JV") partner in PAI, cannot be included in the SEC's claims. They assert that "[t]he SEC's claims concerning the 'JV Partner' are barred, in whole or in part, because only a passive investor in a Delaware limited liability company who expected profits to flow primarily from the efforts of the promoter or third party would have the ability to make such a securities law claim." (Answer at 19.) Again, this defense fails as legally insufficient because the private rights of a JV Partner are separate from the statutory mandate of the SEC, which has the power to bring actions on behalf of the public to enforce the federal securities laws. *See* 15 U.S.C. § 78u. Therefore, it is irrelevant to the SEC's action that an individual who is not a party to the action can (or cannot) bring the same claims.

## IV. CONCLUSION

For the foregoing reasons, the SEC's Motion to Strike (Dkt. 96) is GRANTED in its entirety, and Defendants' first, second, third, fifth, sixth, seventh, and eleventh affirmative defenses are STRUCK.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2020 WL 8772252

## Footnotes

1 As noted in the Complaint, there are two U.S.-based entities with this name, one incorporated in New Jersey ("PAI-NJ") and the other incorporated in Nevada ("PAI-NV"). (Compl. ¶ 8.) The court uses "PAI" to refer to both entities.

2 The third defendant, Mr. Gil de Rubio, has not joined Mr. Laura and Mr. Sichenzio in their motions or answering papers.

3 When quoting cases, and unless otherwise noted, all citations and quotation marks are omitted and all alterations are adopted.

4 Despite the language in *McCaskey* to suggest that a moving plaintiff must show both a fatal factual or legal defect "and" prejudice, the court understands the Second Circuit's language in *GEOMC* that prejudice "may be considered," as well as that case's focus on the timeliness of a "factually sufficient and legally valid defense," to mean that a factually implausible or legally impossible affirmative defense is necessarily prejudicial to a plaintiff and should be struck, regardless of when it was asserted. *See also* *Car-Freshner Corp. v. Just Funky LLC*, No. 19-cv-289, 2019 WL 6270991, at *2 (N.D.N.Y. Nov. 25, 2019).

5 Although the first affirmative defense names only Mr. Laura, the court understands the arguments to apply with equal force to all Defendants.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 11

KeyCite Yellow Flag - Negative Treatment
Distinguished by U.S. S.E.C. v. Benger, N.D.Ill., March 10, 2010

2005 WL 1514101
Only the Westlaw citation is currently available.
United States District Court,
N.D. California.

SECURITIES & EXCHANGE COMMISSION, Plaintiff,
v.
M & A WEST, INC et al, Defendants.

No. C-01-3376 VRW.
|
June 20, 2005.

**Attorneys and Law Firms**

Andrew B. Holmes, Elena Ro, Helane L. Morrison, James A. Howell, Marc J. Fagel, Susan F. Lamarca, San Francisco, CA, for Plaintiff.

James N. Kramer, Orrick, Herrington & Sutcliffe LLP, Susan Samuels Muck, Alice L. Jensen, Fenwick & West LLP, San Francisco, CA, Irving M. Einhorn, Patricia G. Bell, Law Offices of Irving M. Einhorn, Manhattan Beach, CA, for Defendants.

ORDER

WALKER, Chief J.

***1** Plaintiff Securities & Exchange Commission (the "Commission") moves for summary judgment against defendant Stanley Medley ("Medley") on its claims against him for:

(1) offering and selling securities when no registration statement had been filed and no exemption from registration was available, in violation of sections 5(a) and (c) of the Securities Act of 1933 (the "Securities Act"), 15 USC §§ 77e(a) and (c); and

(2) acting as a broker without being registered with the Commission in accordance with section 15(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), in violation of section 15(a) of the Exchange Act, 15 USC § 78*o*(a). Doc # 109.

For the reasons that follow, the court GRANTS IN PART the Commission's motion relative to claim (1) and sua sponte GRANTS summary judgment in favor of Medley on the Commission's claim (2).

I

A brief background on the applicable securities law will lay the foundation for the somewhat intricate facts of this case. Section 5 of the Securities Act prohibits the unregistered sale of securities. Registration is required on a transaction-by-transaction basis; securities themselves are not "registered" once and for all. Registration is an often expensive and time-consuming process of making certain reports to and obtaining authorization from the Commission to sell a security. As such, section 4 of the Securities Act provides exemptions from the registration requirement under circumstances where registration-which is intended to provide full disclosure to the investing public-would serve little purpose. The most obvious example of such a circumstance is a securities transaction between two members of the investing public who are unaffiliated with the issuer of the securities. Such investors possess no special knowledge about the issuer and are thus on equal footing in making their trade.

Such trades are exempted from the section 5 registration requirement by section 4(1), which exempts "transactions by any person other than an issuer, underwriter, or dealer"-the belief being, presumably, that issuers, underwriters and dealers (but no one else) have information superior to that possessed by the public at large. This case is about whether Medley was an "underwriter"; that term has a particular statutory definition under section 2(11) of the Securities Act. An underwriter is someone who has purchased securities from an issuer (or an affiliate of an issuer) with a view to the (public) distribution of those securities. As the court will discuss in greater detail below, Medley's status as an underwriter turns on whether he took shares from an affiliate (a person or group of persons controlling or controlled by an issuer), or escaped the statute by clever sequencing of his transactions.

As for the Commission's unregistered broker claim, the operative statutory language is the definition of "broker" in section 3(a)(4)(A) of the Exchange Act: "any person engaged in the business of effecting transactions in securities for the account of others." Although this language is

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

somewhat opaque, the court has not been supplied with further interpretive guidance.

II

***2** This case arises out of the activities of M & A West, Inc ("M & A West") and its affiliates; M & A West can fairly be described as a sham incubator for startup companies. Although other defendants (M & A West, Scott Kelly, Salvatore Censoprano, Zahra Gilak and Frank Thomas Eck, III) are charged in the complaint (Doc # 3) with stock manipulation and accounting fraud, the claims against Medley are limited to selling securities when no registration statement had been filed and acting as an unregistered broker. Moreover, the claims against Medley arise only from his facilitation of and participation in so-called reverse merger transactions, while the claims against other defendants arise not only from these reverse mergers but also from M & A West's operations and those other defendants' allegedly fraudulent transactions in the securities of M & A West and related companies.

As this is a summary judgment motion, the court must determine whether genuine issues of material fact exist, resolving any doubt in favor of the party opposing the motion-here, Medley. "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Id.

That said, the court works here from a record without genuine disputes of material fact, as suggested by the absence in Medley's papers of any detailed discussion of the merger transactions at issue. See Medley Opp (Doc # 120) at 2-7; Medley Decl (Doc # 121). Indeed, at oral argument, Medley's counsel volunteered that she did not contend there were issues of material fact with respect to the structure of the transactions at issue. To be sure, Medley discusses at great length his contentions about his role in the transactions and the disposition of his proceeds from the transactions. These contentions may be relevant to the scope of relief to which the Commission is entitled (a question for another day), but as will become apparent, Medley's factual contentions are immaterial to the instant motion, which is only directed to Medley's liability. Accordingly, what follows are the undisputed facts about the reverse mergers that Medley facilitated.

A "reverse merger," as used herein and in the parties' papers, is a transaction in which a private operating corporation (a "private" company) merges into a corporation whose stock has previously been offered to the public (a "public" company). Typically, the public company will at the time of the reverse merger be a "shell" company with minimal assets and liabilities and no actual operations. To complete the securities aspect of the reverse merger, the public shell company will exchange its treasury stock (along with, perhaps, shares from its stockholders) for all outstanding shares of the private company, and in consideration, the shareholders who control the public shell company will transfer most of their shares in the shell company to the owners of the private company. Often the public shell company will take on the name formerly used by the private company, and operations will carry on as before, except the formerly private company is now an issuer of publicly traded securities. The overall transaction thus provides a way for the private company effectively to offer its stock to the public.

***3** Medley would work with the shareholders of private companies to execute such reverse mergers by identifying suitable public shell companies and by, at a minimum, preparing the documents for the reverse mergers and coordinating among the various parties to the reverse mergers. See, e g, Medley Testimony (Ex 2 [1]) [hereinafter "Test"] at 50; Medley Deposition (Ex 1) [hereinafter "Depo"] at 24, 31-32.

Because the reverse mergers-four are at issue-are central to the claims against Medley, the court will discuss them in some detail.

(1) The first of the four reverse mergers was between VirtualLender.com, Inc ("Virtual Lender") and Golden Chain Marketing, Inc ("Golden Chain"). Virtual Lender was a subsidiary of M & A West engaged in the business of selling mortgages over the Internet; Golden Chain was a public shell company with no business operations. Medley "work[ed] on" this reverse merger by, at a minimum, "communicating" between Virtual Lender's owners and Golden Chain's owners. Test at 49-51. The reverse merger was contracted for in a "reorganization and stock purchase agreement," Ex 5, in which Medley's nominee (Robert Bryan) was to receive 100,000 shares of Golden Chain stock, id § 1. Ultimately,

it was Fordee Management Company ("Fordee"), which Medley owned, that received the shares. See Ex 7 (Fordee account statements). The Virtual Lender reverse merger agreement was made by Golden Chain by shareholders owning not less than approximately 75% of Golden Chain's outstanding stock. Ex 5 § 1.

(2) The next reverse merger was between M & A West and Buffalo Capital IV, Ltd ("Buffalo IV"). Again, Medley was involved, at a minimum, in facilitating the transaction. See Exs 11, 12 (correspondence from Medley related to drafting of stock purchase agreements). Unlike the Virtual Lender transaction, the M & A West transaction was to proceed in two steps on successive days: First, Buffalo IV would issue new shares and transfer those shares (along with some of its stockholders' shares) to M & A West in exchange for all of M & A West's outstanding shares, upon which Buffalo IV's officers (also its stockholders) would resign. The issuance of the new shares would also dilute the existing Buffalo IV shareholders' holdings considerably, and the exchange of all of M & A West's shares would cause M & A West to become a subsidiary of Buffalo IV. On the next day, Buffalo IV's shareholders would deliver most of their shares to the former shareholders of M & A West for fairly nominal cash consideration, also delivering 110,000 shares to Medley's nominee (again, Robert Bryan). See Ex 10 (various agreements executed to this end). As with the Virtual Lender transaction, it was Fordee that actually received the shares. Exs 13, 14 (directions from Medley that shares be transferred to Fordee); Ex 7 (Fordee account statements). The agreement embodying the first stage of the M & A West transaction was made by Buffalo IV shareholders owning not less than approximately 75% of Buffalo IV's outstanding stock. Ex 10 § 1. These same shareholders separately executed stock purchase agreements embodying the second stage of the transaction. Ex 10.

***4** (3) The next reverse merger also appears to have employed a two-step structure like the M & A West transaction. Medley was involved in the reverse merger of Workfire.com ("Workfire") into Buffalo Capital VII, Ltd ("Buffalo VII"). See Exs 16, 17 (correspondence from Medley related to Workfire). The agreement embodying the first stage of the Workfire transaction is similar to the shareholder agreement embodying the first stage of the M & A West transaction. Ex 19. The Commission has supplemented the record to provide the court the complementary stock purchase agreement for the second stage. LaMarca (Doc # 131) Ex 19B. Moreover, the shareholder agreement provided that Medley's nominee (again, Robert Bryan) was to receive shares in the transaction, see, e g, Ex 19 at §§ 3, 5. There were also draft agreements to embody the second stage of the transaction, Ex 18, and Medley testified that he received stock in the Workfire transaction, Test at 197-98 (discussing Workfire shares Medley held). As in the previous transactions, Fordee ultimately held Medley's Workfire shares, see Ex 7 (Fordee account statements), and the stockholder agreement embodying the first stage of the Workfire transaction was made by Buffalo VII shareholders owning not less than approximately 75% of Buffalo VII's outstanding stock. Ex 19 § 1.

(4) The final reverse merger was completed using the same two-stage structure. Again with Medley's assistance, Digital Bridge merged into Black Stallion Management, Inc ("Black Stallion"), a public shell company. See Test 48-49, 154-55. The structure of the transaction was apparently the same as the M & A West transaction, with one agreement embodying the dilution and stock swap, Ex 22, and other agreements (again, not before the court as of this order) for the subsequent purchase of the Black Stallion shareholders' stock, see id § 17 (describing the stock purchase agreements as conditions subsequent). Again, the Commission has supplemented the record to provide drafts of the stock purchase agreements embodying the second stage of the transaction. LaMarca Decl (Doc # 131) Ex 22C. Fordee and Robert Bryan were to receive shares of the merged entity in the transaction, id, and indeed, shares of the merged entity were held in a Fordee brokerage account, see Ex 25 (Fordee account statements), or the account of Byzantine Investments, Inc ("Byzantine"), another entity controlled by Medley, see Ex 26 (Byzantine account statements). Finally, as with the other transactions, the stockholder agreement embodying the first stage of the Digital Bridge transaction was made by Black Stallion shareholders owning not less than approximately 75% of Black Stallion's outstanding stock. Ex 12 preamble.

In the months following these transactions, Fordee and Byzantine sold to the public in market transactions many of the shares acquired in the four reverse mergers. See Ex 7 (detailing sales of Virtual Lender and M & A West stock); Ex 25 (detailing sales of Black Stallion / Digital Bridge); Ex 26 (detailing sales of Black Stallion / Digital Bridge). From the materials before the court, it does not appear that Medley sold any Workfire stock, and Medley himself states in his testimony that he "never sold a share of Workfire" and still "ha[s] all the shares of Workfire, mainly because I thought it

had a lot of potential and I didn't think it was worth selling any shares." Test at 197-98. Medley was unaware of any registration statement filed with respect to his transactions in the securities of any of the four companies, Depo at 61, and there is no evidence that any such registration statements were in effect.

III

***5** The Commission moves for summary judgment on both its claims: (1) violations of sections 5(a) and (c) of the of the Securities Act, 15 USC §§ 77e(a) and (c), which concern unregistered purchases and sales of securities, and (2) violations of section 15(a) of the Exchange Act, 15 USC § 78*o*(a), which prohibits the unregistered operations of brokers. The court takes them in turn.

A

Section 5 of the Securities Act provides in relevant part:

(a) Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly-

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

(c) It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security * * *.

As noted above, there are exemptions to these rules. Of relevance here is the exemption in section 4 that "[t]he provisions of section 5 shall not apply to-(1) transactions by any person other than an issuer, underwriter, or dealer."

Medley asserts that his transactions were within the section 4(1) exemption (or Rule 144 promulgated under the Securities Act); the Commission contends that Medley was an "underwriter" as the term is defined section 2(11) of the Securities Act (a "statutory underwriter"), and therefore not entitled to the section 4(1) exemption. The dispute thus turns on whether, in the transactions described above, Medley was a statutory underwriter as defined in section 2(11) and interpreted in Rule 144 ("Persons Deemed Not to Be Engaged in a Distribution and Therefore Not Underwriters").

To be clear, the court does not understand the Commission to base its section 5 claim solely on the transfer of securities to Medley from the shareholders of the public shell companies. Standing alone, those transactions would arguably fall within the section 4(2) exemption for "transactions by an issuer not involving any public offering" or the so-called "4(1-1/2)" exemption, see, e g, *United States v. Lindo,* 18 F.3d 353, 358 (6th Cir.1994). Those transactions were apparently among sophisticated parties who had substantial access to information regarding the issuer's business condition, a situation with which the securities laws are not typically concerned. See *SEC v. Ralston Purina Co.,* 346 U.S. 119, 125, 73 S.Ct. 981, 97 L.Ed. 1494 (1953) (noting that "[a]n offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering" '). Rather, what the Commission challenges here is the complete distribution of securities to the public, for which a necessary ingredient was Medley's subsequent sale of the securities he acquired to the public at large through ordinary transactions in the market.

***6** With the transactions in mind, the court turns to the definition of "underwriter" in section 2(11):

> The term " "underwriter" means any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking * * *. As used in this paragraph the term "issuer" shall include, in addition to an issuer, any person directly or indirectly controlling or controlled by the issuer, or any person under direct or indirect common control with the issuer.

This definition must be construed broadly so that the corresponding exemption in section 4(1) will be construed

narrowly. See *SEC v. Blazon Corp.,* 609 F.2d 960, 968 (9th Cir.1979).

If Medley was a statutory underwriter, it was because he purchased securities from an issuer with a view to the distribution of those securities. Given Medley's sales in the months after receiving the securities, there is no doubt that Medley purchased the securities with a view to distribution in the Virtual Lender, M & A West and Digital Bridge transactions. In the Workfire transaction, there is at least a dispute of fact whether Medley purchased with a view to distribution; he has apparently held the securities for his own account since receiving them. As such, the Commission is not entitled to summary judgment on a violation of Section 5 with respect to securities involved in the Workfire transaction.

Accordingly, the key remaining question with respect to the other three transactions-and the focus of the parties' dispute-is whether Medley "purchased from an issuer." Medley contends, at least with respect to the two-step transactions (involving M & A West and Digital Bridge), that the Buffalo IV and Black Stallion stockholders were not "issuers" within the meaning of section 2(11) because they were not control persons of the issuers. See, e g, Louis Loss & Joel Seligman, *Fundamentals of Securities Regulation* 467-69 (Aspen, 5th ed 2004) [hereinafter "Loss & Seligman"] (discussing control in the context of section 2(11)). In particular, Medley points out, the Buffalo IV and Black Stallion stockholders were neither officers or directors of their companies (having resigned following the first stage of the transaction) nor did they control a significant amount of stock (their holdings having been diluted as part of the stock swap in the first stage of the transaction).

The Commission urges the court to look behind the formal two-step structure of the transactions to the underlying substance. In this connection, the Commission relies heavily on *SEC v. Cavanaugh,* 1 F Supp 2d 337, 363-66 (S.D.N.Y.) (Cote, J), *aff'd*155 F.3d 129 (2d Cir.1998), which advanced (arguably in dictum) the concept that two-step transactions such as those here should be regarded as an integrated whole for purposes of applying a section 4 exemption.

***7** The court agrees with Judge Cote's thoughtful analysis, but also finds it unnecessary to apply the rubric of integration to the transactions here to reach the result the Commission urges. Neither the Commission nor Medley is attentive to the question of what constitutes a "purchase" under section 2(11). To the extent Medley and his compatriots believed they were complying with the law, they acted as if "purchase" occurs only upon transfer of title-on the second day, in the second stage of the merger transaction, at a moment when the shell company stockholders were not control persons of the shell companies. The Commission does not directly dispute this interpretation of "purchase," although the integration analysis the Commission offers is effectively an argument about what components of a multi-stage transaction are part of the same "purchase" transaction.

Rather than rely on the superstructure of an integration analysis, it is far more direct to interpret "purchase." "Purchase" is not defined in section 2 (or elsewhere), but its obverse, "sell" is defined in section 2(3): "The term 'sale' or 'sell' shall include every contract of sale or disposition of a security or interest in a security, for value." By extension, a "purchase" includes every contract for purchase, irrespective of when title may be transferred. Indeed, in this context, there seems to be no relevant distinction between a purchase and a sale; the lone use in section 2(11) of the undefined term "purchased" rather than the defined term "sale" seems to be the product of syntactical convenience alone.

The broad interpretation of "purchase" has ready application to this case: Irrespective of when Medley obtained title to the securities, there is no question that the *contracts for purchase* were formed at a time when the Buffalo IV and Black Stallion shareholder groups were undoubtedly control persons by virtue of their substantial holdings (at least about 75%) and their ability to direct the corporate reorganization. See also Loss & Seligman at 467 ("[C]ontrol may rest with a *group* of persons * * *." (citing *Arthur Children's Trust v. Keim,* 994 F.2d 1390, 1397 (9th Cir.1993) (emphasis in original)). Indeed, even the documents embodying the first stages of the transactions contemplate the delivery of securities to Medley's nominee. See, e g, Ex 10 § 6 (M & A West transaction); Ex 22 § 17 (Digital Bridge transaction, specifying performance of the second stage contract as a condition subsequent to the first stage contract). The same analysis applies to the Virtual Lender transaction; that transaction consists of a single contract, making the analysis simpler still.

It is of no moment that the parties may not have executed the written contracts (in particular, the stage two stock purchase contracts) until after the public shell company's shareholders were no longer control persons. A contract may be formed without reduction to writing. In these transactions, the two instruments were negotiated in tandem. See, e g, Ex 11

(transmission of both draft agreements under one cover). Moreover, business sense dictates that the two transactions could not be freestanding: The first stage, standing alone, was overwhelmingly favorable to the public shell company stockholders (who exchanged some near-worthless shares for the shell company taking over an operating company). The second stage, standing alone, was overwhelmingly favorable to the private company stockholders (who were allowed to purchase the public shell company stockholders' now-valuable shares for a pittance). The two stages were complementary and necessarily were entered into as part of a single implied or oral contract.

***8** Medley's response to the Commission's arguments (which, again, frames the issue largely as one of integration) is that he acted in reliance on Rule 144. Rule 144, 17 CFR § 230.144, is a "safe harbor" rule that specifies concrete conditions under which a person will not be engaged in a distribution and therefore deemed not to be a statutory underwriter. Rule 144 is somewhat intricate, and the court need not discuss it in detail-although a summary of its operation may be found in Loss & Seligman at 430-34. The issue here turns on whether the securities Medley received in the reverse mergers were "restricted securities" within the meaning of Rule 144(a)(3): If the securities were not restricted, Medley's subsequent sales were exempt from registration, pursuant to Rule 144(k). If the securities were restricted, Medley was required to hold the securities for one year under Rule 144(d)(1)-something he did not do (except, again, for his Workfire Shares).

Rule 144(a)(3) designates several categories of securities as "restricted securities," but only one category, Rule 144(a)(3)(i), applies here: "Securities that are acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." "Affiliate" is in turn defined by Rule 144(a)(1) in the same way that the second sentence of section 2(11) expands the definition of "issuer"; in short, affiliates are control persons, which the Buffalo IV and Black Stallion stockholders were at the time the transaction documents were executed. (And, again, for the one-stage Virtual Lender transaction, it is undisputed that Medley took his securities from an affiliate, making his securities restricted under Rule 144(a)(3)(i).)

Accordingly, the question once again turns on the meaning of a past participle-section (2)(11) uses *"purchased* from an issuer"; Rule 144(a)(3)(i) substitutes *"acquired* * * * from an affiliate of the issuer." The court has already construed "purchased" to include contracts to purchase, and there is no indication that the Commission intended "acquired" to be less expansive than "purchased"; if anything, "acquired" encompasses *more* than the simple cash-for-stock transactions suggested by "purchased." Furthermore, the court doubts that the Commission has the authority to give a safe harbor in Rule 144 to conduct that Congress itself has forbidden through sections 2(11), 4(1) and 5.

Finally, Medley makes a variety of arguments about positions the Commission has taken in the past, about whether his conduct was clearly a violation at the time of the transactions, about his reliance on counsel and so forth. These may all be relevant to the remedies the Commission seeks-injunctive relief and civil monetary penalties must be based on a concern that the defendant will continue to violate the securities laws and therefore must be restrained or deterred from doing so. See Loss & Seligman at 1057-60 (discussing civil monetary penalties); id at 1411-17 (discussing injunctions). But these arguments are irrelevant to Medley's liability for the offenses, because scienter is not an element of the violation of the registration provisions of the Securities Act. *Aaron v. SEC,* 446 U.S. 680, 714, 100 S.Ct. 1945, 64 L.Ed.2d 611 n5 (1980) (Blackmun, J, concurring in part and dissenting in part) ("The prohibition in § 5 of the 1933 Act, 15 USC § 77e, against selling securities without an effective registration statement has been interpreted to require no showing of scienter." (citing cases)).

***9** Accordingly, the court concludes that Medley has violated sections 5(a) and (c) of the Securities Act, 15 USC §§ 77e(a) and (c). The Commission's motion for summary judgment against Medley on claim 1 of the complaint is therefore GRANTED, although only with respect to Medley's transactions in the securities of Virtual Lender, M & A West and Digital Bridge.

B

The SEC's second claim against Medley is that by bringing together the public shell companies and the private operating companies, Medley acted as an unregistered broker in violation of section 15(b) of the Exchange Act. Section 15(b) provides in relevant part:

 © 2025 Thomson Reuters. No claim to original U.S. Government Works. 

> It shall be unlawful for any broker * * * to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security * * * unless such broker * * * is registered in accordance with subsection (b) of this section.

It is undisputed that Medley was not registered as a broker. Likewise, his conduct may fairly be described as inducing the purchase or sale of securities. The only question is whether he was in fact a broker. Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others."

The Commission's entire opening argument on this issue (aside from a boilerplate introduction) is a one-paragraph string of factual assertions and legal conclusions, unconnected by any interpretive or precedential authority:

> Medley actively brokered the sale of stock between the shell owners and the M & A West affiliates and their shareholders in each of the four reverse mergers. Medley thus acted as the middle-man in the transactions, inserting himself as the person through whom the parties on the two sides of the transaction would exchange their respective shares. In fact, Medley ensured that the transactions could not be completed without him, by requiring the shell company's shareholders to enter into "Non-circumvention Agreements." Medley further facilitated the purchase and sale of the securities exchanged in the reverse mergers by drafting the agreements, obtaining concurrence on the terms, and obtaining the necessary signatures and other information. And, Medley was paid handsomely for his services, receiving between $50,000 and $75,000 in cash upon completion of each transaction, and blocks of stock in the four companies. Medley was thus acting as an unregistered broker with respect to each of the four mergers, in violation of the Exchange Act.

Mot Summ Judg (Doc # 109) at 21:19-22:2.

This factual recitation capped with an ipse dixit sheds no light on why Medley's activities-commonly associated with paralegals (who draft documents), lawyers (who draft documents and orchestrate transactions), businessmen (who identify potential merger partners) and opportunists (who like to take a small cut of a big transaction), none of whom is commonly regarded as a broker-add up to Medley being a broker. In particular, no assets were entrusted to Medley, and the Commission identifies no evidence that he was authorized to transact "for the account of others" (aside from his fiduciary authority over Fordee's and Byzantine's accounts). Although Medley was in the business of *facilitating* securities transactions *among other persons,* the Commission cites no authority for the proposition that this equates to *"effecting* transactions in securities *for the account of others."* When asked at oral argument for some authority-in the form of a case or a no-action letter-that held conduct like Medley's to be that of a "broker," the Commission responded simply that it relied on the statute. A bare statutory definition without interpretive authority (or even reasoned argument from the statutory language) is too slender a reed on which to condemn Medley's conduct. Accordingly, the Commission's motion for summary judgment on this claim is DENIED. If authority in this area is as lacking as counsel maintains, the Commission may wish to consider promulgating rules beyond Rules 3a4-1 to -6 to give further guidance.

***10** Further, with the well-developed record before the court, the absence of any issues of fact and the parties' complete (if modest) briefing on this issue, the court finds it appropriate to GRANT sua sponte summary judgment in favor of Medley on the Commission's claim against him for violation of section 15(a) of the Exchange Act. See, e g, *Gospel Missions of America v. City of Los Angeles,* 328 F.3d 548, 553 (9th Cir.2003) ("Even when there has been no cross-motion for summary judgment, a district court may enter summary judgment sua sponte against a moving party if the losing party has had a 'full and fair opportunity to ventilate

the issues involved in the matter." ' (citing *Cool Fuel, Inc. v. Connett,* 685 F.2d 309, 312 (9th Cir.1982)).

IV

In sum, the Commission's motion for leave to supplement the record (Doc # 130) is GRANTED. The court GRANTS IN PART the Commission's motion for summary judgment (Doc # 109) and sua sponte GRANTS summary judgment in favor of Medley on the Commission's claim for violation of section 15(a) of the Exchange Act.

As the court has indicated above, the matter of remedies remains subject to debate. The court would benefit substantially from briefing focused on the issue of remedies. Accordingly, the Commission shall file a memorandum on appropriate remedies on or before July 7, 2005, stating with particularity the remedies it seeks. Medley shall file a response on or before July 21, 2005. The court will hear oral argument on remedies on August 4, 2005, at 2:00 pm.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2005 WL 1514101

## Footnotes

1 "Ex" citations refer to the exhibits to the Declaration of Elena Ro (Doc # 110).

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 12

KeyCite Blue Flag – Appeal Notification
Appeal Filed by Securities and Exchange Commission v. Ripple Labs Inc., 2nd Cir., October 15, 2024

2024 WL 3730403
United States District Court, S.D. New York.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,
v.
RIPPLE LABS, INC., Defendant.

20 Civ. 10832 (AT)
|
Signed August 7, 2024

**Attorneys and Law Firms**

Jorge Gerardo Tenreiro, Richard R. Best, Daphna Abrams Waxman, Ladan Fazlollahi Stewart, Mark Raymond Sylvester, U.S. Securities and Exchange Commission, New York, NY, Benjamin Hanauer, U.S. Securities and Exchange Commission, Chicago, IL, Marc Jonathan Jones, Peter Moores, United States Securities and Exchange Commission Boston Regional Office, Boston, MA, Pascale Guerrier, Securities and Exchange Commission, Miami, FL, Robert Macdonald Moye, U.S. Securities and Exchange Commission, Chicago, IL, for Plaintiff.

## ORDER

ANALISA TORRES, District Judge:

***1** Plaintiff, the Securities and Exchange Commission (the “SEC”), brings this action against Defendant, Ripple Labs, Inc. (“Ripple”), alleging that Ripple engaged in the unlawful offer and sale of securities in violation of Section 5 of the Securities Act of 1933 (the “Securities Act”), 15 U.S.C. § 77e(a), (c). Am. Compl. ¶¶ 9, 430–35, ECF No. 46. On July 13, 2023, the Court granted in part and denied in part the parties' cross-motions for summary judgment (the “Order”). Order, ECF No. 874; *see SEC v. Ripple Labs, Inc.*, 682 F. Supp. 3d 308 (S.D.N.Y. 2023), *motion to certify appeal denied*, 697 F. Supp. 3d 126 (S.D.N.Y. 2023).

Now before the Court is the SEC's motion for remedies and the entry of final judgment. [1] SEC Mot., ECF No. 948; SEC Mem., ECF No. 949; Proposed Judgment, ECF No. 950. For the reasons stated below, the SEC's motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND [2]

This case involves Defendants' offer and sale of XRP, the native digital token of the XRP Ledger, a cryptographically secured ledger or “blockchain.” Order at 2. On December 22, 2020, the SEC commenced this action. *See* Complaint, ECF No. 1. An amended complaint was filed on February 18, 2021. ECF No. 46. As relevant here, the SEC alleged that Ripple engaged in three categories of unregistered XRP offers and sales:

(1) Institutional Sales [3] under written contracts for which it received $728 million;

(2) Programmatic Sales on digital asset exchanges for which it received $757 million; and

(3) Other Distributions under written contracts for which it recorded $609 million in “consideration other than cash.”

*Id.* at 15–16; *see id.* at 4–5. The SEC also alleged that Bradley Garlinghouse and Christian A. Larsen, two of Ripple's senior leaders, engaged in unregistered individual XRP sales from which they received at least $450 million and $150 million, respectively. *Id.* at 5, 16.

Under Section 5 of the Securities Act, it is “unlawful for any person, directly or indirectly, ... to offer to sell, offer to buy or purchase[,] or sell” a “security” unless a registration statement is in effect or has been filed with the SEC as to the offer and sale of such security to the public. 15 U.S.C. §§ 77e(a), (c), (e). To prove a violation of Section 5, the SEC must show: (1) that no registration statement was filed or in effect as to the transaction, and (2) that the defendant directly or indirectly offered to sell or sold the securities (3) through interstate commerce. *See SEC v. Cavanagh*, 445 F.3d 105, 111 n.13 (2d Cir. 2006).

***2** At summary judgment, the Court—applying the Supreme Court's test set forth in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)—concluded that Ripple's Institutional Sales constituted offers or sales of investment contracts, but that Ripple's Programmatic Sales and Other Distributions did not. Order at 30. The Court also held that Larsen's and Garlinghouse's individual sales were not offers or sales of investment contracts for “substantially the same reasons”

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.

stated in the Court's analysis of Ripple's Programmatic Sales. *Id.* at 27–28.

The SEC subsequently moved to certify for interlocutory appeal the Court's holdings on Programmatic Sales and Other Distributions. ECF No. 892. On October 3, 2023, the Court denied the SEC's motion and set for trial the SEC's claim that Larsen and Garlinghouse aided and abetted Ripple's violations of Section 5 with regard to the Institutional Sales. ECF No. 917. By stipulation dated October 19, 2023, the SEC dismissed its pending claims against Larsen and Garlinghouse, obviating the need for a trial. ECF No. 921.

Now before the Court is the SEC's motion for remedies and entry of judgment on Ripple's violations of Section 5 as to the Institutional Sales. The SEC seeks a final judgment against Ripple that (1) permanently enjoins it from future violations of Section 5 and from conducting an unregistered offering of XRP in Institutional Sales; (2) orders Ripple to pay $876,308,712 in disgorgement and $198,150,940 in prejudgment interest; and (3) orders Ripple to pay an $876,308,712 civil penalty. SEC Mem. at 1. Ripple contends that an injunction and disgorgement are unwarranted, and that any civil penalty should not exceed $10 million. *See* Ripple Opp., ECF No. 955.

## DISCUSSION

"Once [a] district court has found federal securities law violations, it has broad equitable power to fashion appropriate remedies[.]" *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474 (2d Cir. 1996). Such remedies may include injunctive relief, disgorgement of ill-gotten profits, and civil penalties. *SEC v. Frohling*, 851 F.3d 132, 138 (2d Cir. 2016). The SEC asks for all three.

### I. Injunctive Relief

#### A. Legal Standard

"Injunctive relief is expressly authorized by Congress to proscribe future violations of federal securities laws." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (citing 15 U.S.C. § 78u(d)). "Such relief is warranted if there is a reasonable likelihood that [a] defendant[ ] will commit future violations of the securities laws." *SEC v. Am. Growth Funding II, LLC*, No. 16 Civ. 828, 2019 WL 4623504, at *1 (S.D.N.Y. Sept. 24, 2019) (*citing SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99–100 (2d Cir. 1978)). To award injunctive relief, "a court must look beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence." *In re Rsrv. Fund Sec. & Derivative Litig.*, No. 09 Civ. 4346, 2013 WL 5432334, at *22 (S.D.N.Y. Sept. 30, 2013) (quotation marks and citations omitted). To determine whether injunctive relief is appropriate, courts are directed to consider:

> [1] the fact that the defendant has been found liable for illegal conduct; [2] the degree of scienter involved; [3] whether the infraction is an "isolated occurrence;" [4] whether defendant continues to maintain that his past conduct was blameless; and [5] whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated.

*Cavanagh*, 155 F.3d at 135 (quoting *Commonwealth Chem. Sec., Inc.*, 574 F.2d at 100).

#### B. Application

***3** The SEC asks the Court to enjoin Ripple from "violating Section 5 and from conducting an unregistered offering of Institutional Sales of XRP." SEC Mem. at 4. Ripple argues that the SEC has failed to show that an injunction is warranted. *See* Ripple Opp. at 2–16. The Court agrees with the SEC.

As to the first and third *Cavanagh* factors, Ripple has been found liable for violating Section 5 in its sales of XRP to the Institutional Buyers. Order at 22. These violations were not isolated: they spanned eight years and involved forty-one counterparties. *Id.* at 4; Long Decl. ¶ 4, ECF No. 957-1; *see SEC v. Fowler*, 440 F. Supp. 3d 284, 301 (S.D.N.Y. 2020) (offenses not isolated when they involved "13 clients over the course of three years").

On the second *Cavanagh* factor, the degree of scienter, the SEC contends that Ripple's violations "involved, at least, a reckless disregard for the law." SEC Mem. at 4. The SEC notes that in February 2012, before the XRP Ledger was publicly launched, Ripple received a memorandum from

the Perkins Coie LLP law firm advising it that "if sold to investors, XRP tokens are likely to be securities." Order at 7 (cleaned up). A subsequent Perkins Coie memorandum counseled that "although we believe that a compelling argument can be made that XRP tokens do not constitute 'securities' under federal securities laws, given the lack of applicable case law, we believe that there is some risk, albeit small, that the SEC disagrees with our analysis." *Id.* at 8 (cleaned up). The law firm also advised Ripple that the more it promoted XRP as an investment opportunity, "the more likely it is that the SEC will take action." *Id.* Larsen testified that after receiving the second Perkins Coie memorandum, Ripple took steps to ensure compliance with its advice. *Id.* at 32.

At summary judgment, the Court found that a genuine issue of material fact remained as to whether Larsen and Garlinghouse had recklessly disregarded the securities laws. *Id.* at 31–33. Because the SEC has adduced no new facts to support a finding of recklessness at this stage, the Court finds that Ripple's scienter, too, is inconclusive. *See* *SEC v. Haligiannis*, 470 F. Supp. 2d 373, 381–82 (S.D.N.Y. 2007) (collecting cases imputing the scienter of a corporate agent to the corporation). Although the SEC points to Ripple's profit motive to avoid registration and disclosure, SEC Mem. at 5, this fact alone does not support an inference that Ripple recklessly disregarded regulatory requirements in making its business decisions. *Cf.* *Prickett v. N.Y. Life Ins. Co.*, 896 F. Supp. 2d 236, 247 (S.D.N.Y. 2012) (noting that, in the common-law fraud context, "the profit motive common to all businesses is insufficient to establish scienter").

On the fourth *Cavanagh* factor, the defendant's willingness (or unwillingness) to accept blame, the SEC points to a number of post-Order statements made by Ripple and its corporate agents to argue that "Ripple has not accepted responsibility for its violations." SEC Mem. at 6. Ripple, in turn, notes that it has acknowledged the Court's ruling on the Institutional Sales in each of its quarterly market reports and contends that the other cited statements are taken out of context. Ripple Opp. at 14–16. Having considered the post-Order statements, the Court does not find that Ripple has "continued a campaign of def[l]ecting blame." SEC Mem. at 6. Although Ripple and its employees have largely emphasized the favorable aspects of the Order in their public statements, Ripple has also repeatedly acknowledged the Court's holding as to its Institutional Sales. *See* Long Decl. ¶ 5. Ripple's post-Order statements do not rise to the level of blame-shifting required to justify injunctive relief based on this factor alone. *E.g.*, *SEC v. Mattessich*, No. 18 Civ. 5884, 2022 WL 16948236, at *6–7 (S.D.N.Y. Nov. 15, 2022) (citing defendant's "continued protestations that his conduct was blameless").

***4** Ripple's actions, however, are another story. Relevant to the fourth and fifth *Cavanagh* factors, the SEC asserts that Ripple "continues to sell [XRP], unregistered," to Institutional Buyers—specifically, in "continu[ing] to execute contracts for unregistered sales of XRP in direct [on-demand liquidity ('ODL')] transactions."[4] SEC Mem. at 8. Ripple admits that after the Order was issued, it has continued to sell XRP in ODL transactions. Ripple Opp. at 6–7. It also concedes that the Order defined Institutional Sales as including sales to "ODL customers." *Id.* at 9 (citing Order at 4). However, Ripple argues that its "ongoing ODL Sales do not have the key characteristics that this Court relied on in finding that Ripple's Institutional Sales were sales of investment contracts." *Id.* Not so. Although the Court noted that "*some* Institutional Buyers agreed to lockup provisions or resale restrictions"—features "inconsistent with the notion that XRP was used as a currency or for some other consumptive use"—the Court did not hold that a contract lacking these features is *ipso facto* lawful under Section 5. Order at 21–22 (emphasis added). Ripple attempts to relitigate the Court's inclusion of ODL transactions in Institutional Sales, *see* ECF No. 825 at 6–7, while at the same time suggesting that "[r]emedies briefing is not the time or place" to analyze the ODL transactions in detail, Ripple Opp. at 9. The company cannot have it both ways.

To be clear, the Court does not today hold that Ripple's post-Complaint sales have violated Section 5.[5] Rather, the Court finds that Ripple's willingness to push the boundaries of the Order evinces a likelihood that it will eventually (if it has not already) cross the line. On balance, the Court finds that there is a reasonable probability of future violations, meriting the issuance of an injunction.

Turning to the scope of the injunction, Ripple first contends that Part I of the SEC's Proposed Judgment—which "permanently restrain[s] and enjoin[s] [Ripple] from violating Section 5 of the Securities Act," Proposed Judgment at 2—is an unhelpfully vague "directive not to violate" the law. Ripple Opp. at 16. But, the Second Circuit has found that an injunction that "merely parrot[s]" statutory language is proper. *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1103 (2d Cir. 1972). Courts in this Circuit routinely impose such injunctions in securities cases. *See* SEC Reply at 7 (collecting cases); *e.g.*, *SEC v. Fowler*, 17 Civ. 139, ECF No.

205 (S.D.N.Y. 2020); *SEC v. Bronson*, 12 Civ. 6421, ECF No. 186 (S.D.N.Y. 2017).

Ripple also argues that Part II of the Proposed Judgment, which enjoins it from "conducting an unregistered offering of Institutional Sales," Proposed Judgment at 3, should be altered to clarify that "it does not bar ODL sales, does not bar extraterritorial conduct, and does not bar sales that qualify for exemptions from registration," Ripple Opp. at 17. The Court agrees that the SEC's proposed language is too categorical and, in any case, duplicative of behavior proscribed by Part I of the Proposed Judgment. The Court will, therefore, omit the SEC's proposed Part II.

Finally, Ripple asks the Court to "waive the 'bad actor disqualification' provisions of § 230.506(d)(1), which prevent an enjoined issuer from using the SEC's Regulation D exemption for certain private securities offerings." Ripple Opp. at 17. Although the Court has the discretion to do so, *see* 17 C.F.R. § 230.506(d)(2)(iii), Ripple cites no authority that persuades the Court that judicial waiver is necessary or appropriate here.

Accordingly, the SEC's request for injunctive relief is GRANTED, and the Court will impose a permanent injunction consistent with Part I of the Proposed Judgment.

II. Disgorgement

A. Legal Standard

***5** In addition to injunctive relief, a district court may also order disgorgement, which "serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). Disgorgement is an equitable remedy, permissible only where it "does not exceed a wrongdoer's net profits and is awarded for victims." *Liu v. SEC*, 591 U.S. 71, 75 (2020). [6]

Following *Liu*, the Second Circuit clarified the meaning of "victims" in *SEC v. Govil*, 86 F.4th 89 (2d Cir. 2023). There, the defendant caused his company "to engage in three fraudulent securities offerings," representing to investors that the company "would use the proceeds from the transactions to satisfy outstanding debts and for general corporate purposes." *Id.* at 93. "Instead, he diverted over $7.3 million of the offering proceeds to his own private accounts." *Id.* The district court determined that disgorgement was warranted, reasoning that the defrauded investors were victims of the defendant's conduct because they were lied to, even if they "may not have been financially harmed" as a result of the lie. *Id.* at 97.

The Second Circuit reversed, holding that "a 'victim' for purposes of § 78u(d)(5) is one who suffers pecuniary harm from the securities fraud." *Id.* at 102. The Circuit explained that an equitable remedy is meant to "restore[ ] the status quo"—in the context of disgorgement, by "returning the funds to victims." *Id.* at 103 (quoting *Liu*, 591 U.S. at 80, 88) (cleaned up). Allowing "defrauded investors who suffered no pecuniary harm ... to receive the proceeds of disgorgement," the Circuit reasoned, would "confer[ ] a windfall on those who received the benefit of the bargain." *Id.* at 103. Therefore, for purposes of ordering disgorgement, it is not enough that investors are lied to and "thus denied the right to make an informed decision when considering whether to make [an] investment." *Id.* at 105. "[O]ffending that right" does not result in pecuniary harm." *Id.* (citing *Ciminelli v. United States*, 598 U.S. 306, 315 (2023)).

B. Application

The parties dispute whether the Circuit's decision in *Govil* bars disgorgement of Ripple's profits from Institutional Sales. The Court finds that it does.

The SEC contends that ordering disgorgement would not run afoul of *Govil* because Ripple's violation of Section 5, via "entirely tainted transactions, caused pecuniary harm to investors." SEC Mem. at 17. Specifically, the SEC argues that Ripple sold XRP to certain Institutional Buyers at "deep undisclosed discounts" as high as [Redacted]. *Id.* at 18. Because Ripple failed to publicly register these discounted Institutional Sales, the SEC argues, "non-favored investors" were deprived of "the information they needed to determine whether Ripple was treating them worse and whether they could purchase [ ] XRP at a better price." *Id.* The SEC estimates that if Ripple had disclosed its "significant discounts to other investors," non-favored investors could have saved "potentially more than [Redacted]." *Id.* at 19–20. The SEC further contends that the discounted sales caused pecuniary harm by "put[ting] downward pressure on the market price of XRP," as investors who bought discounted XRP could sell for below-market prices and still profit. *Id.* at 20.

***6** *Govil* forecloses this argument. The SEC contends that Ripple "appears to have not uniformly disclosed the disparate prices and discounts offered" to Institutional Buyers. *Id.* at 18. The Circuit held, however, that "the right to make an informed decision when considering whether to make [an] investment" is not a property interest that can be vindicated through disgorgement. *Govil*, 86 F.4th at 105. As Ripple argues, many of the *Govil* investors would have likely been dissuaded from investing—or, at least, valued the shares at a lower price—had they known that the company's founder intended to pocket the funds for his own use. *See* Ripple Opp. at 20. Yet the Circuit found that the pecuniary-harm requirement was not satisfied, as the district court acknowledged that "the investors received the return on the investment contemplated at the outset." *Govil*, 86 F.4th at 105.

Here, the SEC offers only speculative evidence that the Institutional Buyers did not "receive[ ] the return on the investment contemplated." *Id*; *see also id.* at 104 n.16 (noting that "whether the investors actually suffered pecuniary harm would depend on the type of securities held, the terms of those securities, and when those securities were sold," a level of detail missing from the record in *Govil*.) The SEC's [Redacted] estimate of lost potential savings comes from an analysis conducted by SEC accountant Andrea Fox, who calculated "how much less Institutional Buyers in the aggregate would have paid for XRP if the best price offered to Institutional Buyers had been obtained by every Institutional Buyer." [7] Fox Decl. ¶ 34, ECF No. 946. But, the SEC does not (and cannot) establish that Ripple would have, in fact, offered any additional discounts to investors had it complied with Section 5's registration requirements. It is possible that some investors "could have demanded and potentially paid lower prices." SEC Mem. at 18. Yet, it is at least equally possible that Ripple would have opted to offer fewer and smaller discounts overall. *Cf. id.* at 17 (explaining that "unregistered shares ... are [generally] worth less" than their registered counterparts). The fact that some investors "may have been able to negotiate better deals if discounts [offered to others] were disclosed as required," SEC Mem. at 19, does not establish that they suffered pecuniary harm by paying the sticker price. *Cf. Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (noting that in fraud-on-the-market cases, "an inflated purchase price will not itself constitute or proximately cause the relevant economic loss"). [8]

Relying on *SEC v. Ahmed*, 72 F.4th 379 (2d Cir. 2023), the SEC also argues that disgorgement is appropriate because Ripple's failure to disclose the discounts "tainted" each of the Institutional Sales. SEC Reply at 9, ECF No. 961. In *Ahmed*, the investment-manager defendant "stole over $65 million" from his employer and ten portfolio companies, including by negotiating transactions in which he had an undisclosed conflict of interest. 72 F.4th at 390. The Second Circuit found that the conflicted transactions were "entirely tainted," holding that the defendant was obligated to disgorge the full amount he received. *Id.* at 397. But the Circuit's inquiry into the permissible *amount* of disgorgement sheds little light on the threshold question here: whether the SEC has shown pecuniary harm at all such that disgorgement is warranted. In *Ahmed*, which involved the defendant's knowing misappropriation of millions of dollars from his employer, there was no question that the employer had suffered an economic loss. *See id.* at 390–91. Here, pecuniary harm is far less apparent.

***7** Because binding Circuit precedent precludes disgorgement based on the facts of this case, the SEC's request for disgorgement and prejudgment interest [9] is DENIED.

III. <u>Civil Penalties</u>

A. Legal Standard

The SEC is also authorized to seek the imposition of civil monetary penalties, which serve "the dual goals of punishment of the individual violator and deterrence of future violations." *Off. Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006) (quotation marks and citation omitted). "Courts can impose penalties in civil injunctive actions not to exceed the greater of: (i) the gross pecuniary gain to a defendant as a result of the violation, or (ii) a specified amount per violation, depending on whether the violation falls in the first, second[,] or third penalty tier." *SEC v. Bajic*, No. 20 Civ. 07, 2023 WL 6289953, at *4 (S.D.N.Y. Sept. 27, 2023) (citing 15 U.S.C. § 77t(d)(2); 15 U.S.C. § 78u(d)(3)(B)). A court may impose a first-tier penalty for any violation of the Exchange or Securities Acts; a second-tier penalty if the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"; and a third-tier penalty if, in addition to meeting the second-tier requirements, the "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id.* (citations omitted). Because "[t]he term 'violation' is not defined by the statutory scheme," courts have discretion to determine the unit of violation for

the purposes of imposing civil penalties under the tier method. *SEC v. Fowler*, 6 F.4th 255, 264 (2d Cir. 2021); *see id.* at 265.

Although gross pecuniary gain or "the tier determines the maximum penalty, ... the actual amount of the penalty [is] left up to the discretion of the district court." *SEC v. Kern*, 425 F.3d 143, 153 (2d Cir. 2005). In determining the appropriate penalty, courts may consider factors including:

> (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition.

*SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019) (citation omitted); *see also id.* at 45 (noting that the list is not exhaustive); *cf. Fowler*, 6 F.4th at 266 (noting that the Circuit has not held that "the civil penalty for a securities fraud offense needs to be proportional to the disgorgement amount"). The Court may also consider "the extent to which other aspects of the relief and/or judgment issued in this matter will have the desired punitive effect." *SEC v. Universal Exp., Inc.*, 646 F. Supp. 2d 552, 568 (S.D.N.Y. 2009), *aff'd*, 438 F. App'x 23 (2d Cir. 2011).

B. Application

The SEC asks the Court to impose a penalty of $876,308,712, equal to the net profits it calculates for the Institutional Sales. SEC Mem. at 23. Ripple argues that a penalty of no more than $10 million, or "about [Redacted] of Ripple's actual gross revenues ... from pre-Complaint Institutional Sales," is appropriate. Ripple Opp. at 30 (citation omitted).

***8** The Court finds that a first-tier penalty is appropriate in this case, which involves no allegations of "fraud, deceit, [or] manipulation," and no conclusively established "deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77t(d)(2)(B); *see supra* Part I.B. Although Ripple's gross pecuniary gain from the Institutional Sales sets a higher statutory ceiling, the Court finds that the tier-analysis method more closely tailors the penalty to the scope of Ripple's actual wrongdoing than the parties' (virtually) all-or-nothing requests.

As to the amount of the penalty, the Court has discussed the second and fourth *Rajaratnam* factors, which overlap with the factors relevant to injunctive relief, above. *See supra* Part I.B. On the first factor, the egregiousness of Ripple's conduct, there is no question that the recurrent, highly lucrative violation of Section 5 is a serious offense. However, this case does not involve allegations of fraud, misappropriation, or other more culpable conduct. Relatedly, as to the third factor, the SEC has not established that Ripple's failure to register the Institutional Sales caused substantial losses (or the risk thereof) to investors. *See supra* Part II.B. And, on the fifth factor, Ripple does not contest that its current financial condition does not merit a reduced penalty. *See* Ripple Opp. at 28–29.

Beyond the *Rajaratnam* factors, the Court considers that Ripple will not be ordered to pay disgorgement, which dictates in favor of a larger penalty to accomplish "the desired punitive effect." *Universal Exp., Inc.*, 646 F. Supp. 2d at 568. The Court finds, therefore, that a per-violation penalty at the first-tier maximum is appropriate.

The final step is to define and count the "violations" involved in the Institutional Sales. Because Section 5's registration requirement is "transaction-specific," it follows that each unregistered transaction constitutes a separate violation of the statute. *Cavanagh*, 155 F.3d at 133; *see also SEC v. Colonial Inv. Mgmt. LLC*, 381 F. App'x 27, 29 (2d Cir. 2010) (summary order) (affirming per-transaction penalties calculation). The SEC suggests that each of Ripple's "1,700 relevant contracts" constitutes a separate violation. SEC Mem. at 23–24 n.8. Ripple responds that the "1,700 relevant contracts" figure includes "hundreds of contracts related to Programmatic Sales and Other Distributions," which should be excluded. Ripple Opp. at 19 n.20. But, Ripple does not offer its own tabulation of the relevant contracts, and the SEC does not respond to Ripple's contention in its reply brief. Based on the Court's independent analysis of Ripple's expert report summarizing the relevant contracts, *see* Schwarz Rep., ECF No. 582-7, the Court finds that 1,278 transactions violated Section 5, resulting in a civil penalty of $125,035,150. [10] Accordingly, the SEC's request for a civil monetary penalty

is GRANTED in part, and the Court will impose a penalty of $125,035,150.

### CONCLUSION

***9** The SEC's motion for remedies and the entry of final judgment is GRANTED IN PART and DENIED IN PART. The Court shall enter a final judgment enjoining Ripple from further violations of the securities laws and imposing a civil penalty of **$125,035,150**.

SO ORDERED.

**All Citations**

Slip Copy, 2024 WL 3730403, Fed. Sec. L. Rep. P 101,907

## Footnotes

1 Ripple has also moved to seal certain documents filed in connection with the SEC's motion. ECF No. 963; *see* ECF Nos. 964–68. The Court will address the sealing requests by separate order.

2 The Court presumes familiarity with the facts and procedural history of this matter as detailed in prior orders, *see* Order at 2–9, and, therefore, only summarizes those facts necessary for its decision here.

3 Capitalized terms not otherwise defined herein have the meanings set forth in the Order.

4 “ODL facilitates cross-border transactions by allowing customers to exchange fiat currency (for example, U.S. dollars) for XRP and then the XRP for another fiat currency (for example, Mexican pesos).” Order at 3.

5 Ripple notes that “most of [its] ODL business is outside the United States,” where its contracts are governed by foreign law, and that Ripple now ensures that “all new ODL customers have at least $5 million in total assets, so that they are ‘accredited investor[s]’ under 17 C.F.R. § 230.501(a)(3).” Ripple Opp. at 7–8 (citation omitted). Whatever merit these defenses may have, they are not determinative of the question before the Court: whether the SEC has shown a risk of future violations.

6 Six months after *Liu*, “Congress enacted § 78u(d)(7), which “gives the SEC the power to ‘seek’ and federal courts the power to ‘order’ the remedy of ‘disgorgement.’ ” ” *SEC v. Govil*, 86 F.4th 89, 99–100 (2d Cir. 2023) (discussing 15 U.S.C. § 78u(d)(7)). The Second Circuit has interpreted § 78u(d)(7) to limit disgorgement to the bounds established by the Supreme Court's decision in *Liu*. *Id.* at 102 (citing *SEC v. Ahmed*, 72 F.4th 379, 396 (2d Cir. 2023)). *But see* *SEC v. Hallam*, 42 F.4th 316, 338 (5th Cir. 2022) (holding that “Section 78u(d) authorizes disgorgement in a legal—not equitable—sense.”).

7 Ripple separately moves to strike Fox's declaration and supporting exhibits, arguing that they were filed late. ECF No. 951; *see* ECF Nos. 959, 960. In light of the Court's finding that no disgorgement is permitted, the motion is DENIED as moot.

8 The SEC's sole authority to the contrary, *SEC v. iFresh, Inc.*, No. 22 Civ. 3200, 2024 WL 416709 (E.D.N.Y. Feb. 5, 2024), is an unpublished district court opinion that found (without analysis) the fact that stock prices were artificially inflated sufficient to establish pecuniary harm. *Id.* at *3; *see* SEC Reply at 9, ECF No. 961. That case—involving a consent order—required the district court to accept the SEC's allegations of stock price inflation as true. *iFresh, Inc.*, 2024 WL 416709 at *3.

9 “[T]he amount on which a violator must pay prejudgment interest usually tracks the amount that the party is ordered to disgorge.” *Contorinis*, 743 F.3d at 308.

10 The Court arrived at this figure by first tabulating the 1,278 “Sales Contracts” listed in Exhibit C of the expert's report, which excluded “Programmatic Contracts,” “Service Contracts,” and “Other Contracts.” Schwarz Rep. at 80–124; *see id.* ¶¶ 18–55. The Court then determined the applicable penalty for each contract based on its date. *See* 17 C.F.R. § 201.1001, Tbl. I; Adjustments to Civ. Monetary Penalty Amounts, Release No. 6521, 2024 WL 111023 (Jan. 5, 2024) (“Release No. 6521”). For contracts entered into on or after November 2, 2015, the penalty is currently $115,231 per contract. Release No. 6521. For contracts entered into between March 6, 2013 and November 2, 2015, the penalty is $80,000 per contract. 17 C.F.R. § 201.1001, Tbl. I. And, for contracts entered into between March 4, 2009 and March 5, 2013, the penalty is $75,000 per contract. *Id.* For the four undated contracts, the Court applied the current inflation-adjusted penalty amount. Finally, the Court totaled the per-contract penalties to arrive at a civil penalty of $125,035,150. This sum is concededly an estimate of the maximum first-tier penalty; it is possible that the contracts listed in Exhibit C are either an incomplete or overinclusive list of Ripple's Institutional Sales during the relevant period. Because neither party provided a more specific calculation, however, the Court believes that its estimate is an adequate approximation.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 13

2013 WL 6334375
United States District Court,
S.D. New York.

SECURITIES & EXCHANGE COMMISSION, Petitioner,
v.
Michael H. TABER, CPA, Responent.

No. 13 Misc. 282(KBF).
|
Dec. 4, 2013.

*MEMORANDUM DECISION & ORDER*

KATHERINE B. FORREST, District Judge.

***1** On August 8, 2013, petitioner the Securities and Exchange Commission ("SEC" or "Commission") filed an application for an Order under Section 21(e)(1) of the Securities Exchange Act of 1934 to enforce compliance with an SEC order issued against petitioner Michael H. Taber, CPA ("Taber" or "respondent") in 2004. (ECF No. 1.)[1] On November 26, 2013, a Show Cause Hearing was held; Taber, proceeding *pro se,* appeared telephonically due to geographical distance and health issues. (ECF No. 11.) For the reasons set forth on the record, the Court granted the SEC's application for an Order enforcing compliance by Taber with the SEC order entered against him on July 21, 2004, pursuant to Section 21(e)(1) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(e) (l). (Tr. 11–12.) The Court reserved its determination on the proper amount to be disgorged; it provided the parties with an opportunity to submit additional documentation and to brief the issue of whether Taber's financial condition should factor into the Court's determination. (Tr. 12–14.) That issue is the subject of the instant decision.

*FACTUAL BACKGROUND*

On July 21, 2004, the SEC entered an order (the "2004 Order") suspending Taber from appearing or practicing before the SEC as an accountant, pursuant to Rule 102(e)(3)(i) of the SEC's Rules of Practice. 17 C.F.R. § 201.102(e)(3)(i). (See Application of the SEC for an Order Under Section 21(e)(1) of the Securities Exchange Act of 1934 Enforcing Compliance with Commission Order ("SEC App.") ¶ 8, Aug. 8, 2013, ECF No. 1.) At the time the 2004 Order was issued, Taber was employed as the controller of Sono–Tek Corporation. (*See id.* ¶ 9.) Taber's responsibilities included preparing and drafting Sono–Tek's financial statements as well as filing the company's periodic reports with the SEC. (*See id.*) Despite the 2004 Order, Taber continued to work at Sono–Tek until 2005. (See *id.*)

After leaving Sono–Tek, Taber worked for Jefferson Wells International, Inc., a professional services firm that outsources specialists to perform accounting and other work, from 2005 to 2010. (See Pet'r's Reply Mem. at 2, Oct. 28, 2013, ECF No. 18.)

While at both Sono–Tek and Jefferson Wells, Taber "draft[ed] and edit[ed] footnotes to financial statements, compil[ed] and comput[ed] schedules of support for financial statement footnotes, and edit[ed] data and other information that was then incorporated into reports filed with the SEC." (*Id.*)[2] During this entire period, Taber was suspended from appearing or practicing before the SEC as an accountant. (*See* SEC App. ¶ 9.)

The SEC calculates that Taber should be disgorged in the amount of $584,500.41, comprising the illicit monies he gained by engaging in work that was proscribed by the 2004 Order;[3] the SEC further contends that he owes prejudgment interest in the amount of $146,827.01 as of October 30, 2013. (See Pet'r's Reply Mem. at 2.) In total, as of October 30, 2013, the SEC contends that $731,327.42 should be disgorged from Taber. (*See id.*)

***2** Taber argues that the proper disgorgement amount should be $340,465.92. (*See* Resp.'s Affs., Ex. A, Oct. 18, 2013, ECF No. 14.)[4] Taber argues, *inter alia,* that he does not have the funds to cover the amount sought by the SEC, and that as a result, the Court should to take into account his financial situation in determining the amount to be disgorged. (*Id.,* Ex. B; Tr. 8.)

*LEGAL FRAMEWORK*

I. *Disgorgement*
Once a district court finds a federal securities law violation, "it has broad equitable power to fashion appropriate remedies, including ordering that culpable defendants disgorge their

profits." *SEC v. First Jersey Secs., Inc.,* 101 F.3d 1450, 1474 (2d Cir.1996) (citations omitted). The primary purpose of disgorgement in securities law cases "is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence objectives of those laws." *SEC v. Credit Bancorp, Ltd.,* No. 99 Civ. 11395, 2011 WL 666158, at *2 (S.D.N.Y. Feb. 14, 2011) (citation omitted).

The district court "has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey Secs.,* 101 F.3d at 1474–75 (citation omitted). In calculating such amount, the court "should include all gains flowing from illegal activities, plus prejudgment interest, and 'need only be a reasonable approximation of profits causally connected to the violation.' " *Credit Bancorp, Ltd.,* 2011 WL 666158, at *2 (quoting *First Jersey Secs.,* 101 F.3d at 1475); *see also SEC v. Absolutefuture.com,* 393 F.3d 94, 96 (2d Cir.2004) ("[T]he amount of disgorgement, as an equitable remedy, is determined by the amount of profit realized by the defendant.") (citation omitted). This calculation does not require exactitude; rather, "[s]o long as the measure of disgorgement is reasonable, 'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.' " *SEC v. Warde,* 151 F.3d 42, 50 (2d Cir.1998) (quoting *SEC v. Patel,* 61 F.3d 137, 140 (2d Cir.1995)).

For purposes of calculating disgorgement, "[f]inancial hardship does not preclude the imposition of an order of disgorgement." *SEC v. Inorganic Recycling Corp.,* No. 99 Civ. 10159, 2002 WL 1968341, at *2, 4 (S.D.N.Y. Aug. 23, 2002) (reasoning that "to withhold the remedy of disgorgement or penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws"); *see also SEC v. Universal Exp., Inc.,* 646 F.Supp.2d 552, 565 (S.D.N.Y.2009) ("In deciding a motion for disgorgement, a court is not bound to consider a defendant's claims of financial hardship.") (citation omitted); *Credit Bancorp.* 2011 WL 666158, at *2 (stating that a defendant's "current financial net-worth is irrelevant to the Court's consideration of the disgorgement award"). As a policy matter, declining to take a wrongdoer's financial situation into account is logical—" 'whether or not the defendant may have squandered and/or hidden [ ] ill-gotten profits' " should not determine the amount disgorged; similarly, the likelihood that the SEC will in fact be repaid is unrelated to the amount by which a wrongdoer was improperly enriched. *SEC v. McCaskey,* No. 98 Civ. 6153, 2002 WL 85001, at *5 (S.D.N.Y. Mar. 26, 2002) (quoting *SEC v.. Rosenfeld.* 97 Civ. 1467, 2001 WL 118612, at *2 (S.D.N.Y. Jan. 9, 2001)); *see also Inorganic Recycling Corp.,* 2002 WL 1968341, at *4.

II. *Prejudgment Interest*

***3** The SEC seeks prejudgment interest on the amount it seeks in disgorgement (*see* Pet'r's Reply Mem. at 2); Taber does not include such interest in his calculations. (*See* Resp.'s Affs., Ex. A.)

The determination of whether to impose prejudgment interest is at the discretion of the court. *First Jersey Secs.,* 101 F.3d at 1476; *see also Credit Bancorp,* 2011 WL 666158, at *3 (reasoning that requiring interest "prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity") (internal quotation marks and citation omitted). "In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey Secs.,* 101 F.3d at 1476 (internal quotation marks and citations omitted).

*ANALYSIS*

In exercising its equitable powers to determine the appropriate amount Taber must disgorge, the Court is cognizant of the competing interests in play. On the one hand, in reaching a settlement with Taber in 2004, the SEC actually waived disgorgement and prejudgment interest for which Taber was liable, and further declined to impose a civil monetary penalty against him due to his stated financial position at the time. (Pet'r's Reply Mem. at 5.) Taber nonetheless continued to practice accounting in a manner directly contravening the 2004 Order.

On the other hand, Taber credibly argued at the Show Cause Hearing that he did not know his conduct was in violation of the 2004 Order, and that had he been aware of such fact, he would have "changed [his] occupation totally." (Tr. 5.) In his papers, Taber states that he does not intend to again practice accounting (and is allowing his license to lapse); he is partially handicapped as a result of a large brain tumor that was surgically removed in March of 2013, is unemployed, and is fully retired. (Resp.'s Affs., Ex. B .)

Given these factual circumstances, the Court hereby finds that prejudgment interest shall not be awarded, and the final disgorgement amount proposed by the SEC shall be decreased to the sum of $400,000. This amount reflects the large amount of money illicitly gained by Taber following the 2004 Order, furthers the important goal of deterrence, and also takes into account the fairness and equity considerations in play.

*CONCLUSION*

Judgment shall enter against Taber for disgorgement in the amount of $400,000. No prejudgment interest shall be imposed.

The Clerk of Court is directed to terminate this action.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 6334375, Fed. Sec. L. Rep. P 97,763

## Footnotes

1 On that date, the SEC also filed an Order to Show Cause why the order should not be entered. (ECF No. 2.)

2 While he was with Jefferson Wells, Taber also did work unrelated to the SEC for certain clients, including the Harvard Club of New York City, American Express Company, Dun & Bradstreet, Inc. and Dow Jones & Company, Inc. (Pet'r's Reply Mem. at 3.) Accordingly, the Commission obtained compensation records from Jefferson Wells that indicated Taber's salary on a client-by-client basis. (*Id.*) The SEC states that it did *not* include Taber's compensation associated with these clients in its disgorgement calculation. (*Id.*)

3 In determining this sum, the SEC relied on "evidence included [in Taber's] sworn investigative testimony and documents obtained during the Commission's investigation" in determining this sum. (Pet'r's Reply Mem. at 3 (citing Exhibits B and C–1 through C–9, ECF No. 8–1).) Again, the SEC represents that it did not include compensation associated with non-SEC-reporting work. (*Id.* at 3, n. 5.)

4 Part of the discrepancy between Taber's calculations and those of the SEC is that Taber does not include prejudgment interest in his calculations.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

# TAB 14

# SEC Enforcement Activity: Public Companies and Subsidiaries

FISCAL YEAR 2024 UPDATE

**ANALYSIS & TRENDS**

ACTIONS | ALLEGATIONS | SETTLEMENTS | COOPERATION

CORNERSTONE RESEARCH

ECONOMIC AND FINANCIAL CONSULTING
AND EXPERT TESTIMONY

NYU | Pollack Center for Law and Business

# Table of Contents

EXECUTIVE SUMMARY ... 3

NUMBER OF ACTIONS ... 4

SPOTLIGHT: SEC SWEEPS ... 5

ALLEGATIONS ... 6

SETTLEMENTS AND COOPERATION ... 7

RESEARCH SAMPLE ... 11

ENDNOTES ... 12

ABOUT THE AUTHORS ... 13

# Table of Figures

FIGURE 1: PUBLIC COMPANY AND SUBSIDIARY ACTIONS ... 4

FIGURE 2: SUMMARY OF SWEEPS ... 5

FIGURE 3: HEAT MAP OF ALLEGATIONS AGAINST PUBLIC COMPANIES AND SUBSIDIARIES ... 6

FIGURE 4: PUBLIC COMPANY AND SUBSIDIARY DEFENDANTS: MONETARY SETTLEMENTS AND COOPERATION NOTED ... 7

FIGURE 5: MONETARY SETTLEMENTS IMPOSED IN PUBLIC COMPANY AND SUBSIDIARY ACTIONS ... 8

FIGURE 6: BREAKDOWN OF TOTAL MONETARY SETTLEMENTS IMPOSED IN PUBLIC COMPANY AND SUBSIDIARY ACTIONS ... 9

FIGURE 7: PUBLIC COMPANY AND SUBSIDIARY DEFENDANTS: ADMISSION OF GUILT ... 10

## EXECUTIVE SUMMARY

An analysis of the Securities and Exchange Commission's (SEC's) enforcement activity in FY 2024 reveals that the SEC initiated 80 enforcement actions against public companies[1] and subsidiaries, marking a 12% decline from FY 2023. However, this number is still nearly 5% above the prior nine-year average.

The findings in this report are based on data from the Securities Enforcement Empirical Database (SEED), a collaboration between the NYU Pollack Center for Law & Business and Cornerstone Research. SEED data cover FY 2010 through FY 2024.[2]

FY 2024 saw several recent trends in SEC enforcement activity. The SEC brought 38 actions against public companies and subsidiaries as part of five sweeps. Recordkeeping violations due to off-channel communications continued to be a high priority for the SEC, accounting for 22 enforcement actions against public companies and subsidiaries in FY 2024. The SEC brought seven actions against public companies and subsidiaries for violations of the whistleblower protection rule in FY 2024, up from three in FY 2023.

### NUMBERS AT A GLANCE

| | |
|---|---|
| **80** actions initiated against public companies and subsidiaries | **75%** of defendants in settled actions had cooperation noted by the SEC, the highest level since FY 2019 |
| **$784 million** in civil penalties imposed in administrative proceedings | **38** actions brought under five sweeps |
| **$19.8 million** average monetary settlement | **34** defendants had admissions of guilt in FY 2024, the most in any year in SEED |

Actions against public companies and subsidiaries with Broker Dealer allegations increased in FY 2024. The actions in the SEC's sweep for recordkeeping failures due to off-channel communications were a driver of this increase.

The SEC noted cooperation by 75% of public company and subsidiary defendants, representing the highest level of cooperation since FY 2019. This trend is consistent with the SEC's emphasis on the benefits of cooperation, which the SEC has stated can lead to reduced or even no penalties.[3]

Settlement types shifted in FY 2024, with the proportion of public company and subsidiary defendants with no monetary settlement rising to 15% from 9% in FY 2023. This is higher than the FY 2015–FY 2023 average of 6%.

> "The SEC's FY 2024 enforcement actions reveal a focus on trends like off-channel communications and whistleblower protection. We also saw a focus on cooperation and non-monetary settlements, as the agency prioritized efficiency and cooperation in its enforcement approach."

**Stephen Choi**
**Bernard Petrie Professor of Law and Business, New York University School of Law**
**Co-Director of the Pollack Center for Law & Business, New York University**

## NUMBER OF ACTIONS

After a near-record level of actions in FY 2023, the number of SEC enforcement actions against public companies and subsidiaries dipped to 80 in FY 2024. While there were 11 fewer actions in FY 2024 as compared to FY 2023, 80 actions is still higher than the average number of actions initiated over the last nine fiscal years (76).

Of the 80 actions, 44% (35) were initiated in September, the last month of the SEC's fiscal year. This is the highest number of any month in SEED. The second-highest number of actions (31) occurred in FY 2023 (September) and FY 2019 (March).

In FY 2024, the SEC initiated just one action against public companies and subsidiaries that had ties to crypto markets, alleging that investors were misled regarding the monitoring of crypto customers. Two public company and subsidiary actions had ties to crypto in FY 2023. The SEC initiated three actions related to cybersecurity against public companies and subsidiaries in FY 2024, up from two the previous fiscal year.

### HIGHLIGHTS FOR FY 2024

**5**
The lowest number of civil actions in SEED.

**96%**
The percentage of actions with concurrent resolutions.

**3**
The number of actions not resolved concurrently, all of which were civil actions.

## Figure 1: Public Company and Subsidiary Actions
### FY 2015–FY 2024




Source: Securities Enforcement Empirical Database (SEED)

Note: Relief defendants are not considered.

## SPOTLIGHT: SEC SWEEPS

Sweeps were a notable trend in FY 2024. The SEC brought 38 enforcement actions against public companies and subsidiaries as part of five sweeps, accounting for 48% of the enforcement actions against public companies and subsidiaries.

### Off-Channel Communications

Off-channel communications continued to be a high priority for the SEC in FY 2024. The SEC prioritized the enforcement of rules related to recordkeeping: 22 of the 38 sweep-related enforcement actions were part of the off-channel communications sweep.

### Whistleblower Protections

According to the SEC, its "whistleblower program plays a critical role in [its] ability to effectively detect wrongdoing, protect investors and the marketplace, and hold violators accountable."[4] Consistent with the SEC placing high value on the whistleblower program, seven actions against public companies and subsidiaries were brought for violations of the whistleblower protection rule in FY 2024, up from three in FY 2023.

The SEC brought nine additional actions against public companies and subsidiaries under sweeps:

- Six actions for failing to timely file beneficial ownership and insider transaction reports
- One action for failing to file a Form 13F
- Two actions for violating the Marketing Rule

## Figure 2: Summary of Sweeps
Public Companies and Subsidiary Actions
**FY 2024**

| | Off-Channel Communications Sweep | Other Four Sweeps | All Five Sweeps | Other Actions |
|---|---|---|---|---|
| **New Actions** | 22 | 16 | 38 | 42 |
| **Broker Dealer Allegations** | 86% | 0% | 50% | 10% |
| **Settled Actions** | 22 | 16 | 38 | 41 |
| **Total Monetary Settlements Imposed by the SEC** | $465 million | $6 million | $471 million | $995 million |
| **Total Civil Penalties Imposed by the SEC** | $465 million | $6 million | $471 million | $469 million |
| **Average Monetary Settlement Imposed by the SEC** | $21 million | $360 thousand | $12 million | $28 million |
| **Defendants with Monetary Settlements Imposed by the SEC** | 100% | 100% | 100% | 72% |
| **Defendants with Settlements Noting Cooperation** | 100% | 100% | 100% | 51% |
| **Defendants with Settlements Noting Self-Reporting** | 24% | 6% | 18% | 8% |
| **Defendants with Admissions of Guilt** | 100% | 0% | 68% | 0% |

# ALLEGATIONS

## In FY 2024, the SEC initiated an increased number of actions against public companies and subsidiaries with Broker Dealer allegations, primarily related to its sweep for alleged recordkeeping failures due to off-channel communications.

In addition, the number of Issuer Reporting and Disclosure actions (33) was the second highest in the FY 2015–FY 2024 period, with only FY 2023 being higher (41).

### Figure 3: Heat Map of Allegations Against Public Companies and Subsidiaries

**FY 2015–FY 2024**

| Allegation Type | SEC Fiscal Year of Initiation | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Average 2015–2023 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 |
| Issuer Reporting and Disclosure | 37% | 23% | 27% | 40% | 33% | 29% | 50% | 49% | 38% | 45% | 41% |
| Broker Dealer | 15% | 13% | 12% | 12% | 26% | 16% | 10% | 6% | 24% | 19% | 29% |
| Investment Adviser/ Investment Company | 19% | 8% | 20% | 18% | 18% | 38% | 23% | 25% | 15% | 7% | 13% |
| Foreign Corrupt Practices Act | 13% | 12% | 19% | 15% | 14% | 16% | 11% | 8% | 9% | 12% | 3% |
| Public Finance Abuse | 8% | 38% | 12% | 0% | 1% | 1% | 2% | 4% | 7% | 3% | 1% |
| Securities Offering | 2% | 0% | 6% | 0% | 3% | 1% | 2% | 2% | 6% | 2% | 0% |
| Insider Trading | 0% | 0% | 0% | 0% | 0% | 0% | 0% | 2% | 0% | 0% | 0% |
| Market Manipulation | 1% | 1% | 0% | 6% | 1% | 0% | 2% | 0% | 0% | 0% | 0% |
| Other | 5% | 5% | 4% | 8% | 4% | 0% | 2% | 6% | 1% | 12% | 14% |
| Number of Actions | 76 | 84 | 94 | 65 | 73 | 96 | 62 | 53 | 68 | 91 | 80 |

| 0% | 1–10% | 11–20% | 21–50% | 51–100% |
|---|---|---|---|---|

Source: Securities Enforcement Empirical Database (SEED)

Note: Relief defendants are not considered. Percentages may not add to 100% due to rounding. "Public Finance Abuse" includes actions that were categorized by the SEC as "Municipal Securities and Public Pensions" prior to FY 2016. "Other" includes actions categorized by the SEC as "Other" or "Transfer Agent."

# SETTLEMENTS AND COOPERATION

The SEC continues to emphasize the importance of self-reporting and cooperation in cases of securities law violations. Companies that self-report and cooperate with the SEC may receive better outcomes, including reduced or even no penalties.[5] In FY 2024, the percentage of public company and subsidiary defendants for which the SEC noted cooperation was at its highest level (75%) since FY 2019 (77%). The average from FY 2015 through FY 2023 was 64%.

The SEC considers five key factors when negotiating a settlement with a cooperating defendant: self-policing, self-reporting, remediation, cooperation, and collaboration. By cooperating, the SEC asserts that companies can demonstrate their commitment to compliance and potentially avoid harsher penalties.[6] SEED measures three of the factors—self-reporting, remediation, and the SEC noting cooperation in the settlement announcement—as an indication of whether the public company or subsidiary defendant cooperated with the SEC.

The SEC's emphasis on this approach is reflected in its FY 2024 enforcement activity. In FY 2024, 77 public company and subsidiary defendants (75% of all defendants) had cooperation noted, the highest since FY 2019 when there were 84 (77%). A shift in settlement outcomes is also evident in the percentage of defendants that settled with no monetary penalty, which reached 15% in FY 2024—a substantial increase from the FY 2015–FY 2023 average of 6%. This was the highest percentage of defendants that settled without a monetary penalty since FY 2013.

## Figure 4: Public Company and Subsidiary Defendants: Monetary Settlements and Cooperation Noted

**FY 2015–FY 2024**




Source: Securities Enforcement Empirical Database (SEED)

Note: Settlements are counted at the defendant level. Relief defendants, individual defendants, and non-public/non-subsidiary defendants are not considered. Defendants that did not settle, either because the action is ongoing or because the action was resolved through trial, are excluded. A defendant with cooperation indicates the defendant cooperated with the SEC prior to the non-trial resolution of that action. The words "cooperation" or "remediation" must be mentioned in the document detailing the non-trial resolution, or the SEC must acknowledge voluntary reporting by the defendant. Percentages may not add to 100% due to rounding.

## Monetary Settlements

The SEC's monetary settlements in FY 2024 show a mixed picture.[7] On one hand, the average monetary settlement amount for public company and subsidiary defendants was $19.8 million, higher than the average of $15.0 million in FY 2023, but lower than the FY 2015–FY 2023 average of $24.7 million. However, the median monetary settlement amount decreased to $3.2 million in FY 2024, down from $4.0 million in FY 2023. This was a result of a more cases with monetary settlements under $100,000 and the top 10 actions making up a higher percentage of total monetary settlements than in FY 2023. When looking at the total amount of monetary settlements, the SEC imposed $1.5 billion in FY 2024, up from $1.3 billion in FY 2023 but lower than the FY 2015–FY 2023 average of $1.8 billion.

### Figure 5: Monetary Settlements Imposed in Public Company and Subsidiary Actions

**FY 2015–FY 2024**




Source: Securities Enforcement Empirical Database (SEED)

Note: Relief defendants are not considered. For actions where monetary settlements are not imposed on all defendants in the same fiscal year, actions are classified by the first fiscal year in which a monetary settlement was imposed. There are 15 actions for which not all defendants have settled. Total monetary settlements for those actions only include monetary settlements through September 30, 2024. Monetary settlements include Sarbanes-Oxley 304 clawbacks, which were noted for fewer than 30 defendants in FY 2015–FY 2024.

## Disgorgement and Prejudgment Interest

Implications of the National Defense Authorization Act (NDAA), which expanded the SEC's authority beginning January 1, 2021, continue to evolve. The NDAA increased the statute of limitations for the SEC to pursue disgorgement in civil actions from five to 10 years, allowing the SEC to pursue disgorgement claims for a longer period.[8] In FY 2024, the percentage of total monetary settlements from disgorgement and prejudgment interest in civil actions brought against public companies and subsidiaries was 15%, the highest percentage since FY 2020. The amount of disgorgement and prejudgment interest from civil actions in FY 2024 was $219 million, higher than the previous three fiscal years, but lower than the FY 2015–FY 2023 average of $236 million.

On June 27, 2024, the U.S. Supreme Court ruled in *SEC v. Jarkesy* that the SEC's use of the administrative forum to seek civil penalties violated the defendant's right to a jury trial under the Seventh Amendment.[9] It is too soon to tell how *Jarkesy* and other constitutional challenges will impact the SEC's patterns. While civil penalties imposed in administrative proceedings increased in FY 2024, most were imposed before the *Jarkesy* decision.

### Civil Penalties Imposed on Public Companies and Subsidiaries in Administrative Proceedings in FY 2024:

The amount of civil penalties imposed totaled $784 million (54% of total monetary settlements).

This increased from the FY 2023 total of $694 million (53% of total monetary settlements).

While lower than the FY 2015–FY 2023 average of $895 million, it is higher than the median of $737 million over the same period.

## Figure 6: Breakdown of Total Monetary Settlements Imposed in Public Company and Subsidiary Actions

Disgorgement and Prejudgment Interest as a Percentage of Total by Venue

**FY 2015–FY 2024**

**(Dollars in billions)**




Source: Securities Enforcement Empirical Database (SEED)

Note: Relief defendants are not considered. For actions where monetary settlements are not imposed on all defendants in the same fiscal year, actions are classified by the first fiscal year in which a monetary settlement was imposed. There are 15 actions for which not all defendants have settled. Total monetary settlements for those actions only include monetary settlements through September 30, 2024. Percentages may not add up to 100% due to rounding. Monetary settlements include Sarbanes-Oxley 304 clawbacks, which were noted for fewer than 30 defendants in FY 2015–FY 2024.

## Admission of Guilt

The SEC's current administration has taken a strong stance on admissions of guilt as a key accountability measure, with former Division of Enforcement Director Gurbir Grewal emphasizing it as "incredibly powerful."[10] Under Director Grewal's leadership, admissions of guilt by public company and subsidiary defendants significantly increased.

In FY 2024, the last year under Director Grewal's leadership, the SEC saw a record number of admissions of guilt (34) from public company and subsidiary defendants. This is more than double the previous record of 16 admissions in each of the previous two fiscal years. No other enforcement director under the past three SEC chairs has had more admissions of guilt by public company and subsidiary defendants.

Under SEC Chair Gary Gensler, a total of 66 defendants in public company and subsidiary actions had admissions of guilt, more than double those under Chair Mary Jo White (29) and more than seven times those under Chair Jay Clayton (9). This significant increase in admissions of guilt highlights the SEC's commitment to using this tool for accountability under Chair Gensler's tenure.

### Figure 7: Public Company and Subsidiary Defendants: Admission of Guilt

**FY 2015–FY 2024**




Source: Securities Enforcement Empirical Database (SEED)

Note: SEED captures whether defendants had admissions of guilt or did not admit or deny the allegations. Defendant settlements that do not fall into either of those categories typically have default judgments against them or consent to the entry of the resolution without specific language regarding the allegations (identified in SEED as "other"). Relief defendants, individual defendants, and non-public/non-subsidiary defendants are not considered.

## RESEARCH SAMPLE

The Securities Enforcement Empirical Database (SEED) is a collaboration between the NYU Pollack Center for Law & Business and Cornerstone Research. The analysis in this report is based on data identified by NYU and Cornerstone Research as of November 12, 2024 (http://seed.law.nyu.edu).

SEED identifies 356 individuals that are named defendants in the 993 actions initiated against public companies and subsidiaries between October 1, 2009, and September 30, 2024.

The sample used for the majority of this report is referred to as "public company and subsidiary actions" and includes only those enforcement actions with public companies or their subsidiaries listed explicitly as defendants. The sample does not include cases where the allegations relate exclusively to delinquent filings.

Public companies are defined as those that traded on a major U.S. exchange as identified by the Center for Research in Security Prices (CRSP) at the time the enforcement action was initiated, or otherwise within the five-year period preceding the initiation. Thus, public companies that traded over-the-counter or only on major non-U.S. exchanges are excluded, as are companies that did not become publicly traded until after the enforcement action was initiated.

**993**

SEED identifies 993 SEC enforcement actions initiated against 850 public companies and subsidiaries between October 1, 2009, and September 30, 2024.

Subsidiaries are defined as those entities that had a publicly traded parent company at the time the enforcement action was initiated, or otherwise within the five-year period preceding the initiation. The public parent companies of subsidiaries were identified as those cited in the enforcement action document initiating proceedings when available, or those identified through SEC filings if no parent company was mentioned in the initial enforcement action document.

Individuals are defined as named defendants in actions against public companies or their subsidiaries.

# ENDNOTES

[1] Public companies are defined as those that traded on a major U.S. exchange as identified by the Center for Research in Security Prices (CRSP) at the time the enforcement action was initiated or within the five-year period preceding the initiation.

[2] SEC fiscal years begin on October 1 of the prior year and end on September 30. SEC FY 2010 through FY 2024 spans October 1, 2009, to September 30, 2024.

[3] See, e.g., Gurbir S. Grewal, Former Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Remarks at New York City Bar Association Compliance Institute," October 24, 2023, https://www.sec.gov/newsroom/speeches-statements/grewal-remarks-nyc-bar-association-compliance-institute-102423.

[4] Sanjay Wadhwa, Acting Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Remarks at Securities Enforcement Forum D.C. 2024," November 6, 2024, https://www.sec.gov/newsroom/speeches-statements/wadhwa-remarks-securities-enforcement-forum-110624.

[5] See, e.g., Gurbir S. Grewal, Former Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Remarks at New York City Bar Association Compliance Institute," October 24, 2023, https://www.sec.gov/newsroom/speeches-statements/grewal-remarks-nyc-bar-association-compliance-institute-102423.

[6] Gurbir S. Grewal, Former Director, Division of Enforcement, U.S. Securities and Exchange Commission, "'The Five Principles of Effective Cooperation in SEC Investigations,' Remarks at Securities Enforcement Forum West 2024," May 23, 2024, https://www.sec.gov/newsroom/speeches-statements/grewal-remarks-securities-enforcement-forum-west-052324. In the past, the SEC has only mentioned four factors: self-policing, self-reporting, remediation, and cooperation.

[7] Total monetary settlements include disgorgement, prejudgment interest, civil penalties, and other monetary penalties imposed by the SEC in public company and subsidiary actions that were initiated in FY 2010 and later.

[8] See, e.g., "A New Year's Booster Shot: Congress Grants the SEC a Statutory Disgorgement Remedy and Extended Statute of Limitations," *National Law Review*, January 4, 2021, https://www.natlawreview.com/article/new-year-s-booster-shot-congress-grants-sec-statutory-disgorgement-remedy-and.

[9] *SEC v. Jarkesy*, 144 S. Ct. 2117 (2024).

[10] Gurbir S. Grewal, Former Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Remarks at Securities Enforcement Forum," November 15, 2022, https://www.sec.gov/news/speech/grewal-speech-securities-enforcement-forum-111522. See also Gurbir Grewal, Former Director, Division of Enforcement, U.S. Securities and Exchange Commission, "Remarks at Ohio State Law Journal Symposium 2024: ESG and Enforcement of the Federal Securities Laws," February 23, 2024, https://www.sec.gov/newsroom/speeches-statements/grewal-ohs-022324.

# ABOUT THE AUTHORS


## Stephen Choi

**Bernard Petrie Professor of Law and Business, New York University School of Law, and Co-Director of the Pollack Center for Law & Business, New York University**


Stephen Choi is a noted authority on SEC enforcement matters. He provides expert testimony before judges and juries and analyzes price impact, materiality, loss causation, securities disclosures and liability, and corporate governance. His research interests include empirical and theoretical analysis of securities litigation and SEC enforcement, corporate finance and governance, valuation, and financial institutions.


## Sara E. Gilley

**Vice President, Cornerstone Research**


Sara Gilley provides research and consulting services for federal and state class actions, corporate investigations, and government enforcement activity. She also has experience in matters brought under international securities laws. Ms. Gilley has analyzed class certification, loss causation, and damages in a range of contract disputes and litigation. Ms. Gilley coheads Cornerstone Research's securities litigation practice. She also co-manages the firm's research related to SEC enforcement actions.


## Heather B. Lazur

**Principal, Cornerstone Research**


Heather Lazur provides consulting services in litigation involving economic and financial issues. She specializes in securities class actions and cases involving investment performance and strategy, valuation, mutual funds, and mortgage securities. She also co-manages the firm's research related to SEC enforcement actions.


## Giovanni Patti

**Associate Director of SEED Research, Pollack Center for Law & Business, New York University**


Giovanni Patti is an academic researcher. His research interests include corporate law and securities regulation. He has published in American and European law reviews and presented papers at various universities.

The authors acknowledge the research efforts and significant contributions of their colleagues at New York University and Cornerstone Research.

The views expressed herein are solely those of the authors and do not necessarily represent the views of the NYU Pollack Center for Law & Business or Cornerstone Research.

The authors request that you reference Cornerstone Research and the NYU Pollack Center for Law & Business in any reprint of the information or figures included in this report.

Please direct any questions to:

Sara E. Gilley
312.345.7377
sgilley@cornerstone.com

## Cornerstone Research

Cornerstone Research provides economic and financial consulting and expert testimony in all phases of complex disputes and regulatory investigations. The firm works with an extensive network of prominent academics and industry practitioners to identify the best-qualified expert for each assignment. With a reputation for high quality and effectiveness, Cornerstone Research has consistently delivered rigorous, state-of-the-art analysis since 1989. The firm has more than 1,000 professionals in nine offices across the United States, UK, and EU.

www.cornerstone.com

© 2024 by Cornerstone Research.
All rights reserved. Cornerstone Research is a registered service mark of Cornerstone Research, Inc.
C and design is a registered trademark of Cornerstone Research, Inc.

# TAB 15

THE WALL STREET JOURNAL.

English Edition ▾ | Print Edition | Video | Audio | Latest Headlines | More ▾

MARKETS & FINANCE | REGULATION

# SEC Writes Off $10 Billion in Fines It Can't Collect

Internal data shows securities enforcers bring in far less money than their cases indicate

*By Dave Michaels*
*Dec. 31, 2024 9:00 pm ET*




THE SEC HAS FACED POLITICAL PRESSURE SINCE THE 2008-09 FINANCIAL CRISIS TO EXTRACT HIGHER PENALTIES.

Paul Bilzerian has been on the run from the Securities and Exchange Commission for so long that he now owes the agency $180 million with interest—almost three times what a court initially ordered him to pay.

For 31 years, the agency has tried and failed to collect a $62 million judgment against the former corporate raider for securities fraud. To avoid paying the penalty, Bilzerian pleaded poverty and twice declared bankruptcy. He later moved to the island nation of St. Kitts and Nevis, beyond the reach of the U.S. government.

The financier told The Wall Street Journal in 2014 that he "would rather starve to death than earn a dollar to feed myself and pay the government a penny of it." So far, he has mostly succeeded.

This fall, federal prosecutors charged Bilzerian, 74 years old, with new crimes they say he committed with millions of dollars he had hidden from the SEC. He hasn't answered the charges, and declined to comment.

The case is emblematic of the commission's long struggle to enforce its judgments against individuals who go to great lengths to avoid paying them. And in other circumstances, the SEC publicizes penalties that it will never collect because defendants can receive waivers if they make payments in related criminal or overseas cases. Those two dynamics mean the SEC typically brings in less money than it appears.

In 2023, the commission touted court orders or settlements representing $4.9 billion in financial sanctions. But it also wrote off $1.4 billion in penalties levied in prior years, according to data obtained by the Journal.

Over the past 10 years, the SEC has written off almost $10 billion in penalties, according to the data, which the Journal obtained under the Freedom of Information Act.

“If we are going to advertise the numbers that we are imposing, we ought to be transparent about the fact that does not mean that money is flowing to the government and to investors,” said Commissioner Hester Peirce, a Republican member of the SEC.

The agency says it works aggressively to recover funds for harmed investors. “As a result of our continuous efforts, the commission has returned billions of dollars to investors in the past four years alone,” a spokesman for the agency said.

Overall, the commission tends to collect about two-thirds of its money judgments, officials said.

While the SEC previously shared how much of its enforcement bounty actually got collected, it stopped doing so in 2019, and declined to say why.

The SEC has faced political pressure since the 2008-09 financial crisis to extract higher penalties, according to James Park, a law professor at the University of California, Los Angeles, who researches the agency’s work.

In its 2024 fiscal year, which ended in September, the agency said it obtained orders for $8.2 billion in financial remedies, the highest amount in its history. But more than half of that amount will likely never hit a government bank account.

The SEC took credit for a $4.4 billion judgment against Terraform Labs, a cryptocurrency issuer that won’t pay anything to the government as long as it gives enough money back to harmed investors through its bankruptcy case.

Including the Terraform judgment, in 2024 the SEC collected just 23% of the sanctions it took credit for obtaining, according to data provided to the Journal. Excluding the Terraform case, it collected 51%.

The SEC writes off penalties and other amounts owed to the agency that have gone unpaid for two years. In some cases, it keeps trying to collect the money, often through the courts, according to legal records and lawyers involved in the cases. The agency doesn’t disclose its success rate at chasing down this written-off debt.

The commission has a small collections office that uses tactics such as garnishing defendants’ wages and slapping liens on properties to collect fines—with mixed success. Regulators occasionally put defendants who profess an inability to pay on payment plans.

Former stockbroker Randall Letcavage, who owes about $10 million to the SEC, is supposed to pay the agency $5,000 a month. As of May 2022, he had only paid about $12,470 of what he owes, SEC lawyers wrote in a court filing that month.

A judge imposed the penalty in 2021 after finding that Letcavage and the company he ran, Premier Holding Corp., misled shareholders about the value of its assets, including its largest investment in a startup whose books were such a mess the firm couldn’t be reliably valued, according to court filings.

Phillip Trad, a lawyer for Letcavage, said that his client doesn’t have any more money to pay the SEC and that the agency was late to go after $600,000 that Letcavage used for living expenses. “The SEC did nothing,” he said.

During Letcavage’s winding case, he once blamed his inability to comply with a court order on injuries suffered in a shower fall. The SEC pushed back, saying the doctor who assessed his injury rented his office from Letcavage.

In the same year Letcavage was ordered to pay almost $10 million, the SEC took credit for $3.8 billion in financial sanctions. It collected $2.4 billion, or 62% of that amount, according to figures the agency provided to the Journal.

Big banks and other Wall Street firms that have to deal with the SEC regularly pay their penalties on time, according to defense lawyers and other people familiar with the process.

The scofflaws tend to be people who ran Ponzi schemes or other scams that steal money from individual investors, said Jan Folena, a former SEC litigator. “This is the bad fraud,” Folena said. “Those are typically the cases where they cannot collect.”

The SEC is still attempting to collect from Bilzerian. After Bilzerian failed to wipe out his debt with a bankruptcy filing, a court-appointed receiver spent millions of dollars trying to find his assets inside a complex web of offshore trusts and family-owned companies.

The new criminal charges against him allege Bilzerian used his hidden wealth to secretly control and fund Ignite International, a Canadian vaping company affiliated with his son, the social-media celebrity Dan Bilzerian.

Prosecutors say Paul Bilzerian's involvement with the company, and his claim that he couldn't afford to pay the SEC, constituted a conspiracy to avoid paying the agency "by deceitful and dishonest means." The SEC has also filed a new lawsuit against him.

He has still only paid about $547,000 of the original 1993 judgment, according to prosecutors who brought the new criminal case against him.

Write to Dave Michaels at dave.michaels@wsj.com